## Page 1

```
1                IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
2                         SOUTHERN DIVISION

3

4

5  SUE POLK, INDIVIDUALLY, AND AS
   ADMINISTRATRIX OF THE ESTATE OF JERRY R. POLK,
6  THE HEIRS OF THE ESTATE OF JERRY R. POLK, AND
   ON BEHALF OF ALL WRONGFUL DEATH BENEFICIARIES
7  OF JERRY R. POLK                        PLAINTIFF

8  V.           CIVIL ACTION NO.: 1:18-cv-59 HSO-JCG

9  MAURICIO PERAZA, MNE FREIGHT, LLC;
   and JOHN DOES 1-5                       DEFENDANTS
10

11

12                       DEPOSITION

13                           OF

14                    BENJAMIN N. SMITH

15                   SEPTEMBER 11, 2018
                   10:00 A.M. TO 2:48 P.M.
16

17               Taken at the Law Offices of
                       McHard, McHard,
18                 Anderson & Associates, PLLC
                   140 Mayfair Road, Suite 1500
19                 Hattiesburg, Mississippi 39402

20

21
   ELENA C. JAMES, CERTIFIED COURT REPORTER #1682
22            560 LAVELLE LADNER ROAD
                 LUMBERTON, MS. 39455
23                  225-663-0482
              HBURGFREEBIRD@YAHOO.COM
24

25
```

## Page 2

```
1                   A P P E A R A N C E S

2

3  Representing Plaintiff:

4            SAMUEL S. McHARD, ESQ.
             McHARD, McHARD,
5            ANDERSON & ASSOCIATES, PLLC
             140 Mayfair Road, Suite 1500
6            Hattiesburg, Mississippi 39402
             601.450.1715
7            smchard@mchardlaw.com

8
   Representing Defendants:
9

10           L. CLARK HICKS, JR., ESQ.
             HICKS LAW FIRM, PLLC
11           211 South 29th Avenue, Suite 201
             Hattiesburg, Mississippi 39401
12           601.544.6770
             clark@hicksattorneys.com

13

14

15  ALSO PRESENT:  Becky Jo Williams

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT
tabbies
14

## Page 3

```
1                       I N D E X

2                   BENJAMIN N. SMITH

3

4                                            Page

5  Caption                                    1

6  Appearances                                2

7  Stipulations                               5

8  Examination

9     Mr. Samuel McHard                       6

10 Errata Sheet                             195

11 Certificate of Reporter                  196

12                     * * * *

13 EXHIBITS:
```

```
14 13 - Crash Report                         52

15 14 - Driver's Daily Log 1/2/18            36

16 16 - Driver's Daily Log 1/3/18            37

17 30 - Ben Smith Notice of Deposition        6

18 30A - 9/10/18 Letter from Mr. Hicks        8

19 31 - Ben Smith CV                         21

20 32 - MNE Designation of Experts           78

21 33 - Hester Photos                        80

22 34 - Police Photos                        82

23 35 - Normand Photos                       47

24 36 - 4/30/18 CDR Retrieval               100

25 37 - 5/1/18 CDR Retrieval                106
```

## Page 4

```
1  EXHIBITS CONTINUED:
```

```
2  38 - 5/3/18 CDR Retrieval                107

3  39 - 6/14/11 Toyota CDR                  110

4  41 - Normand Inspection Notes & Photos    94

5  42 - GPS Download of Peraza Truck        113

6  43 - Cazz Holden Statement               32

7  44 - Report of Ben Smith                 14

8  45 - Messerschmidt Billing & Time        68

9  46 - ASI Plat of Crash                   40

10 47 - ACM Photos                          47

11 48 - Brett Alexander's Report           147

12 56 - Best Practices Computer Forensics  131

13 57 - NIST Digital Evidence Subcommittee 133

14 58 - NIST Computer Forensics Testing

15       Handbook                          134

16 59 - Chip Research                       135

17 60 - Best Practices for Chip-Swap       139

18 61 - JTAG Standard                       140

19 62 - Exponent Failure Analysis Associates 142
```

```
20

21

22

23

24

25
```

```
 1                S T I P U L A T I O N S          5
 2           It is hereby stipulated and agreed by and
 3   between the parties hereto, through their respective
 4   attorneys of record, that this deposition may be taken
 5   at the time and place herein before set forth, by
 6   Elena C. James, Court Reporter and Notary Public,
 7   pursuant to the Federal Rules of Civil Procedure;
 8           That the formality of READING AND SIGNING is
 9   specifically RESERVED;
10           That all objections, except as to the form of
11   the questions and the responsiveness of the answers,
12   are reserved until such time as this deposition, or
13   any part thereof, may be used or is sought to be used
14   in evidence.
15
16
17
18
19
20
21
22
23
24
25
```

```
 1      Q.   And did you bring any of the documents that  7
 2   you were requested to bring?
 3      A.   I did not.
 4      Q.   And why is that?
 5      A.   Under advice of counsel.
 6      Q.   Is all of the information that was requested
 7   to be brought still retained by your office here in
 8   Hattiesburg?
 9      A.   It is.
10      Q.   And is it all electronically stored?
11      A.   It is.
12      Q.   So all it would have taken was a few minutes
13   to electronically download it or print it off?
14      A.   Sure. Yes.
15      Q.   When you say on advice of counsel, you mean
16   Clark Hicks?
17      A.   That's correct.
18      Q.   And he's the attorney that retained you to
19   serve as an expert witness in this case?
20      A.   That's correct.
21           MR. HICKS:  No, that's not correct.
22      A.   That's right.  It's Ms. House.  Jackie House.
23   I was originally retained by Ms. House.
24      Q.   And Ms. House works for the insurance company
25   that was insuring MNE and Mauricio Peraza, the driver
```

```
 1             BENJAMIN N. SMITH,              6
 2   the witness, having been duly sworn to tell the truth,
 3   the whole truth, and nothing but the truth, was
 4   examined and testified as follows:
 5           MR. MCHARD:  Let the record show that
 6           this is the deposition of Ben Smith taken
 7           pursuant to Notice, agreement of the parties
 8           and pursuant to the Federal Rules of Civil
 9           Procedure.
10                 EXAMINATION
11   BY MR. MCHARD:
12      Q.   Would you please state your name and address.
13      A.   Benjamin Nicholas Smith. 1207 Oakleigh Drive,
14   Hattiesburg, Mississippi 39402.
15      Q.   And your occupation?
16      A.   I'm a crash reconstructionist.
17      Q.   And by whom are you employed?
18      A.   Messerschmidt Safety Consultants.
19      Q.   And I'm showing you Exhibit number 30.
20           (EXHIBIT 30 ENTERED)
21      Q.   Is this the Notice of Deposition that you
22   have provided?
23      A.   It is.
24      Q.   And did you review this document?
25      A.   Yes.
```

```
 1   that was involved in the fatal crash with Mr. Polk; is  9
 2   that correct?
 3      A.   To the best of my knowledge, yes.
 4      Q.   And do you agree with the representation of
 5   Clark Hicks, the attorney that advised you not to
 6   bring anything to this deposition, that you and he
 7   have provided all the documents and relied on by you
 8   in support of your written report?
 9      A.   I don't quite understand that question. But I
10   think that you have everything that is in our file for
11   the most part.
12           MR. MCHARD: Well, can you mark this as
13           30A, please?
14           (EXHIBIT 30A ENTERED)
15      Q.   I'm showing you Exhibit 30A.  This is a
16   letter I was shown this morning from Mr. Hicks.  Do
17   you see that?
18      A.   Yes.
19      Q.   Have you seen this letter before?
20      A.   No.
21      Q.   You see that Mr. Hicks represents "We have
22   provided you all the documents relied on by Mr.
23   Smith in support of his written report and
24   supplemented chip-swap report, and he has most
25   recently reviewed the deposition of Sue Polk and
```

1  Whitney Polk."  Do you see that?
2       A.   Yes.
3       Q.   And is that a true statement?
4       A.   I have actually not seen the depositions of
5  Sue Polk or Whitney Polk.
6       Q.   But other than that, you have provided all
7  the documents relied upon in support of your report?
8       A.   Yes.
9       Q.   With regard to any peer-reviewed articles,
10  have you ever written any peer-reviewed articles or
11  co-authored any such articles on crash reconstruction?
12       A.   Yes.
13       Q.   And are those the ones that are listed in
14  your CV?
15       A.   They are.
16       Q.   Any others?
17       A.   No.
18       Q.   None of those deal with CDR module recovery,
19  do they?
20       A.   No.
21       Q.   And if we could, because of the nature of the
22  terms, get some terms and acronyms established, all
23  right?
24       A.   Sure.
25       Q.   CDR is crash data reporter?

1       A.   Retrieval.
2       Q.   Retrieval?
3       A.   Yes.
4       Q.   And is that a methodology or is that an
5  actual what some people refer to as black box?
6       A.   Well, so CDR is a system name.  So it is
7  crash data retrieval.  That's the software package.
8  Or it's the name of the software package on the
9  hardware that falls under that's available
10  commercially.  Black box I guess is kind of a
11  misnomer.  But it's commonly used to refer to the ACM
12  or the airbag control module.
13       Q.   So ACM is the airbag control module?
14       A.   Correct.
15       Q.   Is that a sensing and diagnostic module?
16       A.   Yes.  It's a different acronym for basically
17  the same thing.
18       Q.   And is it also the same as an ECU?
19       A.   I mean, technically they are all -- ECU would
20  be electronic control units.  So theoretically they
21  are all ECUs.
22       Q.   What do you mean they are all?
23       A.   So an ACM, an SDM, an ORC, all of these, RCM,
24  that's another acronym.  They are all generally
25  manufacturer specific, but they are all electronic

1  control units.
2       Q.   And those are devices that consist of
3  integrated circuits; is that correct?
4       A.   Yes.
5       Q.   And there are four layers in those?
6       A.   Four layers?
7       Q.   Yes.
8       A.   You have to explain what you mean there.
9       Q.   Well, in an SDM or ECU or ACM, which we agree
10  those are all the same, right?
11       A.   Yes.
12       Q.   The ACM is an integrated circuit that
13  consists of four layers.
14       A.   Four layers of what?
15       Q.   Well, a plastic base, a layer of copper coil,
16  green solder mask and a silk screen of white to ID the
17  components.
18       A.   Yeah, I mean, I guess you are right.  The
19  four layers, they are all different because they are
20  all made by different manufacturers, so they are all a
21  little different.  But sure, I'm sure they are all
22  very similar in their construction, but I don't know
23  if they all have that exact layout.
24       Q.   And this ACM that we're talking about is also
25  referred to as a PCB - a printed circuit board; is

1  that correct?
2       A.   That's a component of the ACM, yes.
3       Q.   Was the one in this case analog or digital?
4       A.   Well, they are all digital. They write in
5  hexadecimal code, so they are all digital.
6       Q.   And who was the manufacturer of the chip in
7  question?
8       A.   I think it was $I^2C$.
9       Q.   Do you know?
10       A.   I'm not sure.  I would have to refer back.
11       Q.   Do you know for sure?
12       A.   Yes. It's in the report, but I'm not exactly
13  sure as I sit here now.
14       Q.   Do you know what a stereoscopic microscope
15  is?
16       A.   Yes.
17       Q.   You never used one in this case, did you?
18       A.   No.
19       Q.   And nobody used one in this case, did they?
20       A.   No. I believe Shanon did examine this module
21  with a microscope.
22       Q.   Well, that's not in his report, is it?
23       A.   I'm not sure if he detailed every step, but
24  he did examine it very carefully.
25       Q.   How do you know that?

1    A.    Because it was done under my guidance.  So [13]
2 that's part of the protocol.
3    Q.    When you say under your guidance, you weren't
4 physically present for that, were you?
5    A.    No.
6    Q.    Is there written protocol?
7    A.    Yes. He operates under a specific protocol.
8 But it's basically there is a lot of -- he goes step-
9 by-step through this process where he examines it.  So
10 it's --
11    Q.    But again, you weren't there to monitor that,
12 were you?
13    A.    No.  That's why I had him video it so I could
14 review that.
15    Q.    Where is the written protocol?
16    A.    He would have that.  He goes by industry
17 standards for board examination.
18    Q.    Well, is there a written industry standard
19 for that?
20    A.    I'm sure there is.
21    Q.    Well, what is it?
22    A.    I don't have that.
23    Q.    Well, do you know what the name of it is?
24    A.    No. He refers to it in his report, but I
25 would have to check that.

---

1    Q.    Well, when you say that he refers to it in [14]
2 his report, I'm showing you exhibit number 44.
3         (EXHIBIT 44 ENTERED)
4    Q.    If we look at that, there is a report that is
5 signed by you at the beginning of that; is that
6 correct?
7    A.    That's correct.
8    Q.    And that consists of pages 1 through 6; is
9 that correct?
10    A.    Yes.
11    Q.    And then under Benjamin N. Smith, that's your
12 signature; is that correct?
13    A.    That's correct.
14    Q.    And then you didn't sign the next document
15 that's attached after that, which consists of pages 1
16 and then in Roman numerals through VI; is that
17 correct?
18    A.    That's correct.
19    Q.    That in fact is signed by Shanon Burgess,
20 correct?
21    A.    That's correct.
22    Q.    And he's not an expert witness disclosed and
23 designated in this case, is he?
24         MR. HICKS: Object to the form of the
25         question.  He's not an expert witness

---

1         offering opinions. [15]
2    A.    I don't think so.
3    Q.    Can you point out when you say that Shanon
4 Burgess is relying on industry standards that he sets
5 forth in this document that he prepared, where?
6    A.    In his JTAG Technique section on page 4, he
7 starts his JTAG paragraph with "Joint Test Action
8 Group (JTAG) is an industry standard used for testing
9 printed circuit boards as they come off the
10 manufacturing assembly line."  So he went through that
11 process to see if that could be done.
12    Q.    So that's the industry standard you are
13 talking about; is that correct?
14    A.    Yes.
15    Q.    But that wasn't used in this case, was it?
16    A.    Well, no, it was.  He went through that
17 process to establish that he would have to do a chip-
18 swap.
19    Q.    Are there any other industry standards that
20 applied to your work or his work in this case?
21    A.    That I assume he would have mentioned those,
22 but not -- I didn't perform this procedure, so not to
23 my knowledge.
24    Q.    And you don't see them mentioned in his
25 report either, do you?

---

1    A.    Well, he mentions the JTAG protocol which i[16]
2 I'm sure -- well, he's talking about examining the
3 module, so yes, he does.
4    Q.    But only the JTAG procedure, correct?
5    A.    Right. But I'm sure that encompasses the
6 inspection of that module.
7    Q.    No. But what we have -- we'll get to the JTAG
8 in a moment.  But you would agree other than JTAG,
9 there are no industry standards that are mentioned or
10 that were followed in connection with this?
11    A.    There are none that are mentioned.  There is
12 research that was done years ago which lays out a
13 protocol for this process.
14    Q.    And what is that?
15    A.    It was an article that was written by Wade
16 Barklett in one of our industry magazines.  And I
17 don't know the exact issue or edition, we do have it,
18 which lays out the process for chip-swapping.
19    Q.    Well, can you identify that?
20    A.    If you give me a minute we could, yes.
21    Q.    So at a break you can get that for me?
22    A.    We can identify the issue, yes, or the volume
23 and the issue, yes.
24    Q.    Again, that is not mentioned in any of these
25 reports, is it?

17

```
 1    A.   Well, this is a --
 2    Q.   That's a yes or no.
 3    A.   No.
 4    Q.   You've never written any peer-reviewed
 5  articles on CDR module data recovery, correct?
 6    A.   No.
 7    Q.   And you've never authored or co-authored any
 8  articles on chip level digital forensics, have you?
 9    A.   No.
10    Q.   And do you know of any?
11    A.   Any articles on chip-swap?
12    Q.   Yes.
13    A.   The one that I just mentioned, which is the
14  chip-swap that was kind of the original article on
15  that.  I know of one article on chip -- I guess fire
16  damaged chips.  One study that was done by Exponent.
17  But other than that, no.
18    Q.   No, it's what?
19    A.   Well, I mean, chip-swapping, this level of
20  moving chips around, that's not my area.
21    Q.   That's not your area of expertise?
22    A.   The physical process of moving the chips, no,
23  is not my area.
24    Q.   And what was the name of the second article?
25    A.   I don't know the name of it.  It was
```

18

```
 1  performed by Exponent, which is a large research
 2  corporation I think in Arizona.  The heat testing on
 3  these chips.
 4    Q.   When you say they did them on these chips,
 5  they did heat testing exclusively on Toyota chips,
 6  didn't they?
 7    A.   Yes. Right.
 8    Q.   And it was specifically for and limited to
 9  certain Toyota chips from certain years of Toyota
10  vehicles?
11    A.   Probably, yes.
12    Q.   Do you have any scientific or technical
13  articles or treatises that you rely upon to support
14  any of your opinions or conclusions in this case?
15    A.   Yes.
16    Q.   What?
17    A.   So we have -- let me just go through it
18  step-by-step?  Do you want to do that?
19    Q.   No.  If you could just tell me what those
20  are.
21    A.   I'm sorry.  Repeat the question.
22    Q.   Do you have any scientific or technical
23  articles or treatises or any other peer-reviewed
24  documents that you rely on to support the principles
25  and methodology used in your case and the reliability
```

19

```
 1  and accuracy of it?
 2    A.   Well, in this particular case I've used
 3  specifically my training in crash reconstruction to
 4  perform all my calculations.  Those are all based in
 5  physics and mathematics.  And then in the case of the
 6  gap acceptance, this is based on a program called
 7  I.DDR which is Integrated Driver Research.  That
 8  program is based on the culmination of hundreds of
 9  research papers.  But I used specifically this program
10  to boil this all down.
11    Q.   This program meaning the I.DRR program?
12    A.   Right.
13    Q.   And that's a computerized program; is that
14  right?
15    A.   That's correct.
16    Q.   Anything else?
17    A.   No.  Just my training and experience.
18    Q.   Any other documents which explain and
19  demonstrate the methods used by you in this crash
20  reconstruction?
21    A.   No.  Not specifically.
22    Q.   Any other documents which explain or
23  demonstrate the methods used by you in CDR module data
24  recovery or chip level digital forensics?
25    A.   No.  In the CDR data analysis again, I used
```

20

```
 1  my training and experience there.
 2    Q.   But you are not an expert in performing those
 3  downloads and those chip-swaps, are you?
 4    A.   Not in chip-swaps, but yes, in downloads.
 5    Q.   Well, once somebody else does the chip-swap,
 6  then you simply look at whatever data gets produced;
 7  is that correct?
 8    A.   That's correct.
 9    Q.   And all of the work up to the time a printed
10  report comes out, that's outside your area of
11  expertise, isn't it?
12    A.   Correct.
13    Q.   Have you ever seen the Polk ECM or airbag
14  control module?
15    A.   Yes.
16    Q.   And when was that?
17    A.   My assistant Olivia Normand picked it up from
18  Brett Alexander's office and it was in storage at our
19  office for a few days before it was shipped to
20  Birmingham to Shanon Burgess.
21    Q.   But you just saw it inside the bag?
22    A.   Yes.
23    Q.   And didn't take it outside the bag?
24    A.   No.
25    Q.   Is that correct?  You didn't take it out of
```

**21**

1  the bag?
2      A.   That's correct.
3      Q.   And you didn't attempt to perform any tests
4  or actual inspection on it?
5      A.   Just a visual inspection.
6      Q.   Meaning you just looked at it through the
7  sealed plastic bag that it was in; is that right?
8      A.   Correct.
9      Q.   And then it was shipped out to the Birmingham
10  office of Messerschmidt for efforts to be made to see
11  if data could be recovered from that airbag control
12  module; is that right?
13     A.   That's correct.
14     Q.   I'm showing you exhibit number 31.
15              (EXHIBIT 31 ENTERED)
16     Q.   Is this your CV?
17     A.   Yes.
18     Q.   And according to this, you have a Masters of
19  Science in Analytics that's in process.
20     A.   Yes.
21     Q.   Did you graduate?
22     A.   Actually I took the year off.  I've had a lot
23  of life changes this year, so I took the year off.  So
24  I will start back in January and I have one class
25  remaining in my thesis.

**22**

1      Q.   So the degree that you hold is not a Master
2  of Science in Analytics, but really is just a Bachelor
3  of Science in Biological Sciences that you obtained at
4  USM; is that correct?
5      A.   Correct.
6      Q.   And according to this document, you are the
7  principal technical analyst and managing partner at
8  Messerschmidt Safety Consultants in Hattiesburg,
9  correct?
10     A.   That's correct.
11     Q.   And you've held that position since August of
12  2010 to the present?
13     A.   That's correct.
14     Q.   And your job for them is to manage the
15  day-to-day operations at the Hattiesburg, Mississippi
16  office, correct?
17     A.   That's correct.
18     Q.   And that office is separate and distinct from
19  the office in Pelham, Alabama, correct?
20     A.   Physically, yes.
21     Q.   You don't work there, do you?
22     A.   Sometimes, yes.
23     Q.   But not in this case?
24     A.   No.  But it's one LLC.  It's one company.
25  We're all in the same system.

**23**

1      Q.   No.  You are all in the same system.  But
2  according to your time records, you never went to
3  Pelham, Alabama in connection with any work in this
4  case, did you?
5      A.   That's correct.
6      Q.   And the functions that you performed here in
7  Hattiesburg are investigating and reconstructing motor
8  vehicle accidents, performing forensic analysis of
9  roadway and vehicle evidence, conducting event data
10  recorder retrieval, preservation and analysis,
11  photograph and document accident scenes and related
12  evidence, correct?
13     A.   Yes.
14     Q.   But in this case you didn't photograph and
15  document any of the accident scene or related
16  evidence, did you?
17     A.   Yes, we did.
18     Q.   No.  You personally.
19     A.   No. My assistant did.
20     Q.   Olivia?
21     A.   Yes.
22     Q.   You never went to the scene according to the
23  records, did you?
24     A.   No, I actually did.
25     Q.   When?

**24**

1      A.   I was there shortly after the crash after
2  Olivia went.  I stopped by when I was coming through.
3  I actually have two crashes at that site.  So I've
4  been there actually three or four times.
5      Q.   Well, in connection with this crash, you
6  never logged any time for going to that site, did you?
7      A.   No.  We had already billed for going and
8  doing that investigation, so I didn't want to double
9  bill.
10     Q.   And because this was a dangerous
11  intersection, there was another fatal crash that
12  happened in essentially the same manner shortly
13  thereafter, isn't it?
14          MR. HICKS: Object to the form of the
15  question.
16     A.   I don't know if it was fatal or not.  I'm not
17  sure.  I don't recall that crash specifically or the
18  details of that crash.
19     Q.   Well, it was just in January or February of
20  this year, wasn't it?
21     A.   I think so.  It was around the same time,
22  yes.
23     Q.   And that was an 18-wheeler also pulling out
24  from that -- pulling across that intersection and
25  hitting another vehicle that was on Route 26 headed

25

```
1  westbound?
2      A.   I think it was turning left from the
3  eastbound lanes.  I'm not sure though.
4      Q.   And in this case you didn't conduct any event
5  data recorder data retrieval preservation, did you?
6      A.   Not retrieval, no.
7      Q.   Or preservation?
8      A.   Well, it's preserved on my system, so yes.
9      Q.   When you say preserved on your system, you
10 mean the Messerschmidt computer system?
11     A.   Yes.
12     Q.   You mean the work that was done by somebody
13 else was simply downloaded to that, it's there?
14     A.   Right.
15     Q.   That's what you mean by preservation?
16     A.   Right.  But it's preserved by me, yes.
17     Q.   And according to your CV, you worked as an
18 associate crash reconstructionist from August of '07
19 through August of 2010 for ACI Investigations here in
20 Hattiesburg, right?
21     A.   ASI.
22     Q.   Yes.  And that's Brett Alexander's firm; is
23 that right?
24     A.   That's right.
25     Q.   And you worked under Brett?
```

26

```
1      A.   Yes.
2      Q.   And you had also worked as a technical
3  consultant for him for over a year before that,
4  correct?
5      A.   Yes.
6      Q.   So you worked for him for approximately four
7  years under his direction and control, correct?
8      A.   Yes.
9      Q.   According to your CV, you attended a training
10 in Pelham, Alabama involving advanced accident
11 reconstruction with human factors in November of 2017;
12 is that right?
13     A.   Yes.
14     Q.   And who put that on?
15     A.   That was actually put on by my company, but
16 we brought in Jeff Muttart, who is the resident expert
17 in North America on human factors issues.
18     Q.   And has he published anything?
19     A.   He's published more papers than I could
20 probably count.
21     Q.   And were there any documents that were
22 produced in connection with the Jeff Muttart seminar
23 at Pelham, Alabama in November of '17?
24     A.   Any documents that were produced?
25     Q.   Yes.  I mean, did he provide any documents or
```

27

```
1  papers in connection with that seminar?
2      A.   We talked about papers, but because those
3  papers are copyrighted, he can't give us copies of
4  them.  But we've talked about all of the research or
5  kind of highlighted different research papers that
6  he's used in the past.
7      Q.   And was there a syllabus of those that was
8  produced for that?
9      A.   Yes.  We have a big book.
10     Q.   That was produced from that?
11     A.   Yes.  A part of the class, yes.
12     Q.   And where is that?
13     A.   I have a copy at my office.
14     Q.   And you could provide that to me?
15     A.   I could let you see it, but I can't give it
16 to you.
17     Q.   Why is that?
18     A.   It's copyrighted.  For one thing, it's mine.
19 We use it.  And two, I can't make a copy of it.  It's
20 a copyrighted document.  That would be --
21     Q.   Copyrighted by whom?
22     A.   By Jeff Muttart.
23     Q.   But it was copied for purposes of this
24 seminar, correct?
25     A.   He gave us a copy of his book.  That's his
```

28

```
1  prerogative.
2      Q.   Some of the items that were covered during
3  that were evaluating a response during nighttime
4  driving, correct?
5      A.   Correct.
6      Q.   And do you consider his publications to be
7  authoritative on the issues of responses during
8  nighttime driving and nighttime crashes?
9      A.   Yes.
10     Q.   And also in terms of headlight beam analysis?
11     A.   Yes.
12     Q.   Any others that you consider to be
13 authoritative on those issues?
14     A.   I would consider all of his peer-reviewed
15 research to be authoritative.
16     Q.   Is that all in the book that you have at your
17 office?
18     A.   I think so, yes.
19     Q.   And also covered at that time was gap
20 acceptance and driver search patterns?
21     A.   Yes.
22     Q.   What are those things?  First, gap
23 acceptance.  What's that?
24     A.   Gap acceptance is you look at what percentage
25 of the tested population.  He combines all these
```

1  research papers on basically pull out.  So what Mr.
2  Peraza did in this situation, pulling out into a lane.
3  And you look at what percentage of the population
4  would have pulled out with a certain amount of
5  headway?
6       Q.  What do you mean headway?
7       A.  With a certain gap.  So it's gap acceptance.
8  So it's very simple.  It's what percentage of the
9  population based on research would have pulled out
10  with a certain gap to traffic.  So if a car is 8
11  seconds away, what percentage of the population would
12  have pulled out then.
13      Q.  What assumptions did you make with regard to
14  the gap in this case?
15      A.  Well, I used the CDR data that was recovered
16  to establish what the gap would have been based on the
17  time necessary to pull out to see what that gap would
18  have been when he decided to pull out or when most
19  people would have pulled out.
20      Q.  Well, when you say that, that assumes that
21  Mr. Peraza stopped somewhere in the intersection south
22  of the intersection with Route 26, correct?
23      A.  Right.  And so in this case I used the
24  absolute minimum.  So I gave Mr. Polk the benefit of
25  the doubt and moved Peraza's vehicle to the very edge

1  of the roadway, not to the stop bar, because that was
2  some distance back.
3       Q.  Well, but do you have any facts, witnesses or
4  documents to support that assumption?
5       A.  That he stopped?
6       Q.  Yes.
7       A.  No.
8       Q.  And you know that according to the statement
9  of Cazz Holden, Mr. Holden says that Peraza didn't
10  stop.  You are aware of that, correct?
11      A.  I am, yes.
12      Q.  What if any reliance or credibility do you
13  place on the statement of Cazz Holden?
14      A.  In this case I've got digital evidence and
15  I've got physical evidence.  Very little, to be honest
16  with you.
17      Q.  You say in this case you have digital
18  evidence and physical evidence.
19      A.  Correct.
20      Q.  And digital evidence meaning you relied upon
21  the download information that came from the chip-swap
22  that was performed in Pelham, Alabama; is that
23  correct?
24      A.  That's correct.
25      Q.  And you relied significantly on that, didn't

1  you?
2       A.  Yes.
3       Q.  And then you are saying physical evidence.
4  There is digital.  We've described that.  And then
5  physical.
6       A.  Yes.
7       Q.  What physical?
8       A.  Well, we have a skid mark that was documented
9  by the Poplarville Police Department I think they
10  measured.  And so when you look at the speed loss from
11  braking for Mr. Polk, if Mr. -- I'm sorry.  What was
12  the witness' name?  Cazz?
13      Q.  Cazz Holden.
14      A.  If Mr. Holden is correct, that means that Mr.
15  Polk would have hit the tractor at about 8 miles an
16  hour, which is not possible in this situation.  So Mr.
17  Holden is obviously incorrect there.
18      Q.  Why do you say it would have been 8 miles per
19  hour?
20      A.  Well --
21      Q.  Did you run any numbers?
22      A.  Yes.
23      Q.  Where are those calculations?
24      A.  I didn't bring them.  But I have or we have a
25  34-foot skid.  So if you take the speed loss from that

1  skid, that's 26, 27 miles an hour.  Mr. Holden says he
2  was doing 35 after the truck turned in front of him.
3  So that's what's left.  35 minus 27.  So you are
4  talking about 8 miles an hour.
5       Q.  So you state that because of that digital and
6  that physical evidence that you've just described, you
7  made the credibility and determination that Mr. Cazz
8  Holden's statement is not credible; is that correct?
9       A.  With respect to speed, I don't think he's
10  credible, no.
11      Q.  And anything else that you observed of import
12  or took into consideration with regard to Cazz
13  Holden's statement when you were forming your opinions
14  and conclusions?
15          MR. HICKS: Object to the form of the
16          question.
17      A.  No.
18      Q.  And I'm showing you exhibit number 43.
19          (EXHIBIT 43 ENTERED)
20      Q.  That is the Cazz Holden statement that you
21  examined; is that correct?
22      A.  That's correct.
23      Q.  And found not to be credible; is that
24  correct?
25      A.  Not with respect to speed.

**33**

```
1    Q.  Well, with respect to anything?
2    A.  You know, I don't know if he was behind him
3  or not.  I don't know all these things.  This is what
4  he says.  He does say that Mr. Peraza did not stop at
5  the stop sign.  Mr. Peraza says he did.  So it's his
6  word against his I guess on some level.  But with
7  respect to speed, which is the main thing that we have
8  here because he's talking about 45 miles an hour, 35
9  miles an hour.  No, I don't find it credible at all.
10    Q.  Thank you.  In terms of driver search
11  patterns, what's that?
12    A.  It's the way that drivers search the roadway
13  when they look left and look right and look to the
14  center.  And that's very roadway dependent, very
15  situational -- or situationally very dependent.  That
16  didn't come into play in this particular case.
17    Q.  Well, it didn't come into play in this
18  situation because there is no evidence that Mr. Peraza
19  looked to the right to see what was coming from the
20  east; is that correct?
21    A.  Well, there would never be any evidence of
22  that.  So I disagree with the way the question is
23  formed.
24          MR. HICKS: Object to the form of the
25          question.  Mr. Peraza has testified.
```

**34**

```
1    Q.  No, I'm sorry.  You haven't seen Mr. Peraza's
2  testimony, have you?
3    A.  Yes.  That was the deposition I was provided
4  with yesterday.
5    Q.  Did you read that?
6    A.  Yes.
7    Q.  And with regard to Mr. Peraza's testimony,
8  you would agree that Mr. Peraza and the company that
9  he worked for, his daughter's company MNE, they used
10  the sleeper driver manner of over-the-road driving,
11  correct?
12    A.  The sleeper driver?
13    Q.  Yes.
14    A.  Yes.  That's what's in the deposition.
15    Q.  And by that, the tractor of the Peraza MNE
16  truck had a sleeper portion of the cab where Mr.
17  Peraza would get a few hours of sleep; is that right?
18    A.  Yes.
19    Q.  And you are well aware that the problem of
20  fatigue being the most prevalent cause of serious
21  truck accidents, accounting for approximately 40
22  percent of those, is a serious problem with that
23  sleeper driver method.
24          MR. HICKS: Object to the form of the
25          question.
```

**35**

```
1    Q.  Is that correct?
2    A.  I've never read any specific research.
3  Obviously fatigue is an issue or can be an issue.  But
4  no, I'm not an expert in the area of fatigue or -- no.
5    Q.  No, you are just not an expert in that area?
6    A.  Well, I don't really understand what you are
7  asking, Sam.  Yes, fatigue is obviously a problem.  So
8  I mean, unless you have some specific reference, then
9  -- do you have a specific reference?
10    Q.  Well, in this case you are aware of what the
11  route was that Mr. Peraza was on, correct?
12    A.  Yes.
13    Q.  And he had slept in his truck for a few hours
14  the night before this crash, correct?
15    A.  Correct.
16    Q.  And you looked at the driver logs for this
17  particular trip, did you?
18    A.  I haven't seen the logs.
19    Q.  So you don't know what they provide?
20    A.  No. We haven't seen the logs.
21    Q.  They weren't provided to you by MNE or the
22  investigators for MNE or the attorneys for MNE or
23  Peraza; is that correct?
24    A.  Not to my knowledge.  I haven't seen the
25  logs.
```

**36**

```
1    Q.  Is that information that would be helpful to
2  you in forming your opinions and conclusions in this
3  case?
4    A.  If fatigue was an issue or there was an hours
5  of service violation, sure.
6    Q.  Do you know why these documents weren't
7  provided to you?
8    A.  I don't.
9    Q.  I'm showing you exhibit number 14.
10          (EXHIBIT 14 ENTERED)
11    Q.  Have you ever seen this Driver's Daily Log
12  from January 2, 2018 signed by Mauricio Peraza?
13    A.  I've never seen this, no.
14    Q.  And according to this document, he came on
15  duty at 4 o'clock on the 2nd; is that correct?
16    A.  It's very difficult to read, but it appears
17  that, yes.
18    Q.  And then on the 2nd it appears that he drove
19  from Arkansas to Dallas, Texas to unload, correct?
20    A.  Yes.  Somewhere in Fort Smith maybe to
21  Dallas, yes.
22    Q.  And then was in his sleeper berth for half an
23  hour from 10 p.m. until 10:30, correct?
24    A.  Well, it just says off duty if I'm reading
25  this correctly.
```

37

1     Q.   Well, you don't know if he was in his sleeper

2  berth or what he was doing during that off duty half

3  hour, correct?

4     A.   Of course no.

5     Q.   And then proceeded to drive from 10 o'clock

6  to midnight the rest of the day on the 2nd, correct?

7     A.   Yes.  It appears so.

8     Q.   And then looking at exhibit number 16.

9                (EXHIBIT 16 ENTERED)

10     Q.   When you say that you weren't provided these,

11  these were made a copy of the deposition of Mr.

12  Peraza.  Why didn't you examine that if you were

13  provided that deposition transcript?

14     A.   I don't think I have the -- well, I just got

15  that yesterday and I don't think I have the exhibits

16  from that.

17     Q.   So you didn't read the deposition of it?

18     A.   Yes, I did read the deposition.  But I've

19  never seen these documents.

20     Q.   Even though they are part of the deposition

21  transcript that's the exhibits from it; is that

22  correct?

23     A.   That's correct.

24     Q.   And then it indicates that Mr. Peraza on the

25  3rd continued driving from midnight until 2:00, 2:30

38

1  in the morning and got in his sleeper berth at 2:30 in

2  the morning and was in his sleeper berth until noon,

3  correct?

4     A.   12:30 I think is where the line draws to.  So

5  yes.

6     Q.   And then drove in Houston from 1:00 to 1:30,

7  correct?

8     A.   1:00 to 1:30.  Yes.

9     Q.   And then proceeded after his truck was loaded

10  to drive from 2:30 until 4:30 in Houston, correct?

11     A.   It says he goes from Houston to Orange.

12     Q.   Yes. So during rush hour traffic in Houston,

13  he's driving from Houston to Orange, Texas, correct?

14     A.   Well, I don't know how the traffic

15  description, I don't know if that's accurate, but yes,

16  from Houston to Orange.

17     Q.   Where he fueled up, correct?

18     A.   Yes. It says fuel.

19     Q.   And do you know then how many miles it was

20  from where he fueled up in Orange, Texas to the point

21  of the crash?

22     A.   No.

23     Q.   Well, did you ever look at the receipt for

24  where he fueled up at that time to calculate that?

25     A.   No.

39

1     Q.   Well, this indicates that without stopping

2  after having only slept in his berth in the cab, he

3  drove from 5:30 on the 3rd from Orange, Texas all the

4  way to the scene of the crash at approximately 10:15,

5  correct?

6     A.   That's correct.

7     Q.   So almost five hours of driving without any

8  stops or breaks, correct?

9     A.   Correct.

10     Q.   You did attend a course according to your CV

11  on human fatigue and driver performance, correct?

12     A.   Correct.

13     Q.   And how does human fatigue affect driver

14  performance?

15     A.   Negatively.

16     Q.   What do you mean by that?

17     A.   Well, I mean, this is a very -- it's an

18  analog issue.  So there is a lot of points between

19  zero and 1.  But depending on the level of fatigue, it

20  can reduce your ability to react and respond.

21     Q.   You are aware from the deposition of Mr.

22  Peraza that he claims never to have seen the Polk

23  vehicle prior to the crash, right?

24     A.   Yes.

25     Q.   And you would agree that the scene of the

40

1  crash, it's a straight view that is available

2  eastbound from where the Peraza vehicle was entering

3  onto Route 26, correct?

4          MR. HICKS:  Object to the form of the

5          question.

6     A.   Relatively so, yes. Sam, do you mind if I

7  grab some water real quick?

8     Q.   Oh, please. Well, I'm showing you exhibit

9  number 46.

10                (EXHIBIT 46 ENTERED)

11     Q.   Have you ever seen this document before?

12     A.   I don't think so.

13     Q.   Did you ever review the disclosure and report

14  of Brett Alexander from ASI in this matter?

15     A.   Yes.

16     Q.   Well, if we look at the second page of that

17  document, the scaled photo of Route 26 east of this

18  intersection, it shows that it's going perfectly

19  straight from this intersection, doesn't it?

20          MR. HICKS:  Object to the form of the

21          question.

22     A.   Yes.  It is relatively so.

23     Q.   And it's also relatively flat, although the

24  point where the Peraza truck would be, would be the

25  highest point looking slightly downhill, correct?

41

1    A.   Yes.

2    Q.   So Mr. Peraza would be able to see, if he

3  looked, for over 1500 feet eastbound for approaching

4  traffic from the east, correct?

5    A.   Yes.

6         MR. HICKS: Object to the form of the

7         question.

8    Q.   And if he looked, there would be no reason

9  why he couldn't see the headlights of the approaching

10 Polk vehicle; is that correct?

11        MR. HICKS: Object to the form of the

12        question.

13   A.   Assuming that a vehicle was approaching in

14 that way with headlights on, yes, he should have seen

15 him.

16   Q.   Well, all of the facts, witnesses and

17 documents, in fact, prove that Mr. Polk's vehicle was

18 approaching the scene of the crash from the east with

19 his headlights on, correct?

20        MR. HICKS: Object to the form of the

21        question.

22   A.   All of the -- are you talking about Mr. Polk

23 again?

24   Q.   No.  Mr. Polk's vehicle.

25   A.   Right.  When you said the witness statements,

42

1  you are referring to Mr. Holden?

2    Q.   All of the facts, witnesses and documents

3  show that Mr. Polk's vehicle was approaching the scene

4  of the crash from the east with his headlights on,

5  correct?

6    A.   Yes.

7         MR. HICKS: Object to the form of the

8         question.

9    Q.   And it was a dark night at an otherwise

10 totally unlit area of roadway.

11   A.   That's correct.

12   Q.   And the only lights that would be shining at

13 that intersection at and immediately before the crash

14 would be the headlights of the Peraza semi truck that

15 were pointed to the north/northwest, correct?

16        MR. HICKS: Object to the form of the

17        question.

18   A.   So there is the little building that's right

19 there off, that little business, I think it's called

20 the Chrome Shack.  I think there is actually a parking

21 lot light there.  And I don't know what lights would

22 have been on at the time in that building.

23   Q.   You don't know what, if any, lights were on

24 there?

25   A.   No. I'm just pointing out that those could

43

1  have been on.  But yes, you are correct.

2    Q.   There is no facts, witnesses or documents to

3  support that?

4    A.   No one mentioned that.  But yes.

5    Q.   But yes, the only other lights would be the

6  lights on the front of Mr. Peraza's semi that were

7  pointed to the north/northwest --

8    A.   That's correct.

9    Q.   -- that would not be visible to Mr. Polk,

10 would they?

11        MR. HICKS: Object to the form of the

12        question.

13   A.   Why would they not be visible to Mr. Polk?

14   Q.   Because they weren't pointed in his

15 direction, were they?  They were pointed in the

16 opposite direction.

17   A.   You can see headlights from the side and the

18 other lights on the tractor.

19   Q.   What other lights on the tractor?

20   A.   The tractor has marker lamps on the side.

21 But you would be able to see his headlights shining

22 forward, you would be able to see the side of them.

23   Q.   You would be able to see the side of

24 headlights at night?

25   A.   Yes.

44

1    Q.   What would that illuminate?

2    A.   Well, it wouldn't illuminate anything for Mr.

3  Polk except for the roadway in front of Mr. Peraza.

4    Q.   So given those facts, what if any explanation

5  do you have for the fact that Mr. Peraza didn't

6  observe the headlights of Mr. Polk and react to that?

7    A.   Well, you have to remember Mr. Polk is over

8  two football fields away when he's coming up when he's

9  looking.  So I don't know that --

10   Q.   Two football --

11        MR. HICKS: Let him answer.

12   A.   I'm not suggesting that they weren't visible

13 to Mr. Peraza.  What I would say is that that may not

14 have registered.  He was so far away when he pulled

15 up, it may not have entered into his mind as a threat,

16 so he may not remember seeing them.

17   Q.   Well, that's just speculation on your part,

18 isn't it?

19   A.   Well, it's speculation as to Mr. Peraza's

20 memory.  It's not speculation as to the distance.

21   Q.   Well, what he testified is that he never saw

22 the Polk vehicle or its headlights approaching; isn't

23 that correct?

24   A.   That's correct.

25   Q.   That's the only fact that we have in terms of

45

1 Mr. Peraza's point of view, correct?

2     A.   Well, I mean, that's his remembrance.  I

3 wouldn't call it a fact necessarily.

4     Q.   And we also know from Cazz Holden's statement

5 that Mr. Peraza told Mr. Holden immediately after the

6 crash "I never saw the Polk vehicle," correct?

7     A.   Right.  It may not have registered in his

8 mind.

9     Q.   Well, that's just speculation though again,

10 isn't it?

11     A.   Again.  Yes, sure.

12     Q.   Back again to Exhibit 31, your CV.  It also

13 talks about a seminar that you took in '06 with regard

14 to the physical locations of modules and DLC ports.

15 What's a DLC port?

16     A.   So that's the onboard port that's underneath

17 your dash.  When you take your car in to get serviced

18 and they plug into your dash, it's just that little

19 port.

20     Q.   Well, where was what we've been talking about

21 as the airbag control module in Mr. Polk's car prior

22 to the crash?

23     A.   Well, that was removed by the Poplarville

24 Police Department and that was subsequently

25 transferred to Mr. Alexander, so I never saw it there.

46

1     Q.   Well, do you know where it would have been?

2     A.   In that vehicle I think it would be under the

3 right front seat.

4     Q.   Do you know?

5     A.   I don't.  I would have to look that up.

6     Q.   What would you look at?

7     A.   The CDR program has a location guide for

8 where these modules are.  They aren't always in a

9 different location, but every vehicle model has the

10 module in a slightly different location.  So what we

11 would do if we were removing one, is we would look at

12 this program and reference basically the map or the

13 layout of the interior of the vehicle and that's how

14 we would locate where that module would be.

15     Q.   But neither you nor anybody from

16 Messerschmidt nor anybody under your direction and

17 control used any of the proper techniques to remove

18 the airbag control module from Mr. Polk's car; is that

19 correct?

20          MR. HICKS: Object to the form of the

21          question.

22     A.   Well, we didn't use any techniques because we

23 didn't remove it.

24     Q.   And you don't know the name of the person who

25 did it or how they did it, do you?

47

1     A.   No.  We do have the name of the person

2 because we have the chain of custody form for that for

3 the person that recovered it.  But I don't know how

4 they did it.  I mean, there is only one way to do it

5 really is you unbolt it and you pull it out.  It is

6 not a complex operation.

7     Q.   Well, when you say that you unbolt it and

8 take it out, ordinarily you have to unplug it, right?

9     A.   Yes.

10     Q.   But in this case nobody would have had to

11 unplug it because all of the wires and the connections

12 were totally burned off, correct?

13     A.   Not totally burned off, but yes, they were

14 badly burned.

15     Q.   Well, let's take a look at Exhibits 35 and

16 47.

17          (EXHIBITS 35 & 47 ENTERED)

18     Q.   I'm showing you exhibit number 35.  This is a

19 series of documents that are photos that were taken by

20 Olivia.  What's Olivia's last name?

21     A.   Normand.

22     Q.   Olivia Normand; is that correct?

23     A.   That's correct.

24     Q.   And the photos show that the interior of the

25 Polk Yukon was totally consumed by fire.

48

1     A.   Correct.

2     Q.   Are there tests that can be run to determine

3 whether headlights of a vehicle are on at the time of

4 a crash?

5     A.   Yes.

6     Q.   Was that done in this case?

7     A.   No.

8     Q.   Why not?

9     A.   I don't think there were any filaments that

10 remained.  That's something we would do normally if

11 there were filaments that could be looked at.

12     Q.   Filaments in the headlamps of Mr. Polk's car

13 didn't remain because the car had been consumed by

14 intense heat and fire, correct?

15     A.   Probably.  That and a very, very large impact

16 with the tractor, yes.  Besides that, the main thing

17 with headlight filaments is heat.  So looking at

18 filaments from a car that was on fire wouldn't

19 necessarily be conclusive because that's what warps

20 them to begin with.

21     Q.   Heat damages such components, doesn't it?

22     A.   Right.  It might contaminate the test, yes.

23     Q.   In fact, heat is a very serious contaminant

24 for testing of electronic components from cars, isn't

25 it?

49

1    A.   It can be.
2    Q.   And if we look at the series of photos taken
3  of the interior of the car from group exhibit number
4  35, and we look at photo number 39, that shows that
5  both of the front passenger seats were totally
6  consumed by fire with nothing left but some of the
7  metal structure that held it up, right?
8    A.   Correct.
9    Q.   And you are saying that the ECM or the airbag
10  control module was immediately under one of those
11  seats?
12    A.   I think so.  I would have to refer back to
13  the CDR program to tell you exactly where it was.  But
14  more than likely in that type of vehicle.
15    Q.   And I'm showing you exhibit number 47 in
16  connection with that.  These are a series of photos
17  dealing with the ACM that was taken out by somebody.
18  It doesn't reflect who.  And then eventually turned
19  over to Olivia to see if from the box there could be a
20  download of information, correct?
21    A.   Correct.  Well, it does --
22    Q.   Is that correct?
23    A.   Can I answer?
24    Q.   First say yes and then you can explain.
25    A.   Yes.  It does say received by Butch

51

1    Q.   And you've outlined in green where typically
2  the serial number would be had it not been totally
3  consumed by fire in this case, correct?
4    A.   Typically that's where they are.
5    Q.   And in this case we know that there was a
6  fire that consumed the interior of Mr. Polk's car,
7  correct?
8    A.   Correct.
9    Q.   And it was observed by Cazz Holden, correct?
10    A.   The fire?
11    Q.   Yes.
12    A.   Yes.
13    Q.   And he made efforts to put out the fire,
14  didn't he?
15      MR. HICKS: Object to the form of the
16      question.
17    A.   I don't remember that from his statement.
18  But if that's in his statement, that's fine.
19    Q.   In this case do you have any facts, witnesses
20  or documents as to how many minutes the fire continued
21  to burn in the Polk car out of control?
22    A.   I don't.
23    Q.   Was it still burning when first responders
24  got there?
25    A.   I don't know.

50

1  something, so I would imagine that's who first took
2  the module out.
3    Q.   Well, do you know that?
4    A.   No, I don't.  That would be likely.  I'm not
5  trying to make a point of it.  I'm just saying you
6  said you didn't know who.  But I would imagine
7  received by Butch.
8    Q.   But that's just an assumption, correct?
9    A.   Yes.
10    Q.   And it indicates that there is no serial
11  number that was available for the ACM because that was
12  burnt off, correct?
13    A.   I believe so, yes.
14    Q.   Do you agree with that statement?
15    A.   Yes.  The top.  I don't think the sticker
16  remained.  No, it didn't.  So no.
17    Q.   When you say the sticker, you mean that would
18  identify the serial number for the ACM?
19    A.   Yes.  Typically it would be right here.  So
20  fire took that off.
21    Q.   Well, can you mark with a green highlighter
22  where the serial number would typically be on the --
23  and mark it in green on the second page of exhibit
24  number 47.
25    A.   Usually they are in this area.

52

1    Q.   Well, do you know how many minutes afterwards
2  that would be?
3    A.   Well, the crash report says that they were --
4  does somebody have the crash report I can look at?
5    Q.   Yes.  You've asked to see exhibit number 13,
6  the crash report.
7      (EXHIBIT 13 ENTERED)
8    Q.   So I'm providing you a copy of that.  You can
9  write 13 on that.
10    A.   So it was reported at 10:15 p.m. and the
11  arrival is 10:21.  So six minutes after the report
12  time the first responder would have been there.  And
13  then there is also an ambulance report, but I can't
14  remember what the arrival time was.  But I don't have
15  any direct knowledge as to how long the fire had
16  burned, no.
17    Q.   So it may have been in excess of six minutes,
18  correct?
19    A.   It may have been.
20    Q.   You have no facts, witnesses or documents to
21  determine that, do you?
22    A.   No.
23    Q.   Anything with regard to the length and
24  intensity of the fire would just be speculation on
25  your part, wouldn't it?

53

1    A.   Yes. Unless there is some document that says
2  the fire started here and we put it out here. I don't
3  know.
4    Q.   But we do know that it was intense heat
5  because the photos that were taken, even photos taken
6  by your company, show that intense heat consumed
7  virtually all of the burnable materials in that car,
8  correct?
9         MR. HICKS: Object to the form of the
10             question.
11   A.   It appears that way, yes.
12   Q.   You've asked to see Exhibit 13, so I would
13 like to go through a few of those things with you.
14 This is one of the documents that you reviewed,
15 correct?
16   A.   The crash report?
17   Q.   Yes.
18   A.   Yes.
19   Q.   And it shows that the crash on January 3rd of
20 '18 having been reported at what would be 10:15 and
21 the police arriving at around 10:21, correct?
22   A.   Correct.
23   Q.   And that it was an intersection crash at the
24 intersection of Highway 26 east of Poplarville and
25 Interstate 59, correct?

54

1    A.   Correct.
2    Q.   And you agree that it was a crash with a
3  vehicle in the roadway at an angle, correct?
4    A.   Correct.
5    Q.   Meaning that the Peraza vehicle was at an
6  angle angling west/northwest at the time of the crash,
7  correct?
8         MR. HICKS: Object to the form of the
9             question.
10   A.   Correct.
11   Q.   And the Polk vehicle was headed straight
12 westbound on Highway 26.
13        MR. HICKS: Object to the form of the
14             question.
15   A.   Correct.
16   Q.   And that it was dark and unlit on a clear
17 night, correct?
18        MR. HICKS: Object to the form of the
19             question.
20   A.   That is what the crash report indicates, yes.
21   Q.   And you have no facts, witnesses or documents
22 to contradict that, do you?
23   A.   No, I don't.
24   Q.   And then we see that on page 4 of the report
25 that the Peraza truck was making a left-hand turn onto

55

1  a 2-lane roadway Route 26, correct?
2    A.   Correct.
3    Q.   And he was loaded with a weight in excess of
4  25,000 pounds pulling an enclosed trailer hauling
5  beer, correct?
6    A.   Correct.
7    Q.   And do you know what the weight was?
8    A.   I don't.
9    Q.   Did you ever look at what any of the weight
10 information was for the load?
11   A.   I haven't been provided with a load ticket
12 for that.
13   Q.   Why not?
14   A.   I don't know.
15   Q.   Would that be important to you?
16   A.   Generally speaking in this case no.
17   Q.   In this case according to the crash report it
18 says that the front airbag deployed; is that correct?
19   A.   In the --
20   Q.   Polk vehicle.
21   A.   Yes, it does.
22   Q.   Was that correct?
23   A.   That's what it says.  It says the front
24 airbag was deployed, yes.
25   Q.   How do you know that?

56

1    A.   Well, we do have a deployment event in the
2  CDR module.  I don't know why he marked deployed
3  front, but it says that it was deployed.
4    Q.   But yet in terms of safety equipment, the
5  safety equipment would include the airbag, correct?
6    A.   Yes.
7    Q.   And that would be the automated restraint,
8  right?
9    A.   Yes.
10   Q.   But it's marked here that there was no
11 automated restraint and no shoulder belt, correct?
12   A.   Where does it say that?
13   Q.   At the top in box number 22.
14   A.   None.  Okay.  Safety equipment.
15   Q.   It indicates no shoulder belt and no airbag,
16 right?
17   A.   Well, there is not a -- I'm assuming they
18 used this, the airbag section specifically for that.
19 But the CDR report also indicates that he was not
20 buckled.
21   Q.   Are you aware that -- but you don't have any
22 facts, witnesses or documents to support that from the
23 scene, do you?
24   A.   From the scene?
25   Q.   Yes.

57

1   A.   No.  I mean, everything was burned up inside,
2   so the airbag nor the seatbelt would remain in any way
3   you could tell.  We do have that from the CDR report
4   from the data.
5       Q.   But you are relying exclusively on that?
6       A.   In this particular case, yes.  The interior
7   was burned.
8       Q.   So you are relying exclusively on whatever
9   information you could get from the download from the
10  chip-swap that was performed by Mr. Burgess, correct?
11      A.   With respect to the CDR report, yes, it does
12  say that it was deployed front and that he was not
13  wearing his belt, which confirms what we see in the
14  CDR report.
15      Q.   Well, are you aware that Cazz Holden said
16  that he had to break the window to get Mr. Polk out
17  and used his knife to cut the seatbelt off to get him
18  out?
19          MR. HICKS: Object to the form of the
20          question.
21      Q.   Are you aware of that?
22      A.   I am aware of that, yes.
23      Q.   Well, so is it your testimony that Mr. Holden
24  is simply lying and not credible about that?
25      A.   I don't know why Mr. Holden would say that.

58

1   But the data that we have does not support that.  I
2   also -- I mean, he's in error on several things.  I'm
3   not saying he's lying.  I'm saying he's in error.
4       Q.   Well, but at least from the only eyewitness
5   that we have with regard to that, he specifically says
6   that Mr. Polk was still wearing his seatbelt and
7   shoulder harness at the time that the crash occurred
8   and Mr. Holden was trying to pull him out, right?
9          MR. HICKS:  Object to the form of the
10         question.
11      Q.   Is that right?
12      A.   That's fine, but --
13      Q.   Is that correct?
14      A.   I think so, yes.
15         MR. HICKS: You can go ahead and answer.
16         He's trying to cut you off.  So you go ahead
17         and answer.
18      A.   And you would have to ask the police officer.
19  Maybe you already have.  I haven't seen the
20  deposition.  But for whatever reason, they put none
21  for seatbelt and deployed for airbag.  So I don't know
22  what they saw.  So he may not be the only eyewitness.
23  And again, our CDR data backs up both of these
24  conclusions.
25      Q.   But your CDR data is inconsistent with

59

1   eyewitness Holden and what he says he saw and had to
2   do to extricate Mr. Polk from the vehicle; is that
3   right?
4       A.   Mr. Holden is very inconsistent to the facts
5   of the case that we have, the digital and physical
6   evidence, so I don't put a lot of weight in Mr.
7   Holden.
8       Q.   But you would agree that according to the --
9   can you read the last question back because I didn't
10  get an answer.
11         (WHEREUPON THE LAST QUESTION WAS READ BACK BY
12          THE COURT REPORTER AS FOLLOWS:  "But your
13          CDR data is inconsistent with eyewitness
14          Holden and what he says he saw and had to do
15          to extricate Mr. Polk from the vehicle; is
16          that right?")
17      A.   Yes, that's correct.
18      Q.   And if the eyewitness testimony of Mr. Holden
19  is correct, that he had to cut the seatbelt and the
20  shoulder harness to get Mr. Polk extricated, that
21  would mean that the download information is incorrect,
22  isn't it?
23         MR. HICKS:  Object to the form of the
24         question.
25      A.   They are inconsistent.

60

1       Q.   And you can't explain that inconsistency, can
2   you?
3       A.   Well again, I would trust a computer system
4   that's only designed to log these values.  And for
5   whatever reason, Sam, the officer marked these things.
6   So I've got an officer that's marked this in an
7   official report and I have a CDR system that is
8   specifically designed to log these events and they
9   both line up. So I mean, if you want to go with Cazz's
10  opinion, then that's fine.  But I think first I think
11  you have to depose this officer and find out why these
12  things were marked.
13      Q.   You never spoke with the officer, did you?
14      A.   No.
15      Q.   And you know that by the time the officers
16  got there, Cazz Holden had already extricated Mr. Polk
17  from the vehicle and pulled him away from the vehicle
18  that was on fire, correct?
19         MR. HICKS: Object to the form of the
20         question.
21      A.   I think that's correct, yes.  But again,
22  based on Mr. Holden's statement.
23      Q.   Well, do you have any facts, witnesses or
24  documents that's contrary to that?
25      A.   Well, Mr. Holden also says that the first

61

1  responders didn't show up for 35 minutes, which we
2  know is not true.  Again, that's just one more problem
3  with Mr. Holden's statement that just doesn't stand
4  up.
5      Q.  The first responders meaning the medical
6  providers.
7      A.  Right. He says the medic or the -- what does
8  he say?
9          MR. HICKS: After about 35 minutes EMTs
10         arrived.
11     A.  Right.  Which we know is not true.
12     Q.  Based on what?
13     A.  Based on the EMT report, the dispatch report.
14     Q.  That says what?
15     A.  Do you have that?
16     Q.  Did you review that?
17     A.  Yes.
18     Q.  Is that listed in one of the things that you
19 reviewed?
20     A.  I got it yesterday or today.
21     Q.  Well, that wasn't in your disclosed opinions
22 or reports, was it?
23     A.  No. But I have seen it.
24     Q.  Well, what was provided to you then within
25 the past 48 hours?

62

1      A.  The depositions of Ms. Peraza, Mr. Peraza and
2  that ambulance report.
3      Q.  Anything else?
4      A.  No.
5      Q.  Well, can you show me in the ambulance report
6  what you are referring to?
7      A.  Do you have that, Clark?
8          MR. HICKS: I do not, no.
9      A.  Well, I don't have it with me.
10     Q.  Well, what does it say?
11     A.  The dispatch time, they were dispatched I
12 think at -- I'm trying to remember here, so forgive me
13 if I'm a little off, but it was only minutes after.  I
14 think it was 2216 that they were dispatched.  They
15 arrived three minutes later.  So they would have been
16 there very quickly after this began. So Mr. Holden's
17 statement they arrived 35 minutes after is not
18 credible either.
19     Q.  Would you agree that according to all of the
20 photos and measurements, the Peraza vehicle traveled
21 almost 60 feet west from the point of impact shown by
22 the gouge marks on the pavement after the crash?
23         MR. HICKS: Object to the form of the
24         question.
25     A.  No.  I think that's too far.

63

1      Q.  Well, how many feet did it travel?
2      A.  I don't know.  I don't think it's 60 feet,
3  Sam.  It might be 40.  But I mean, I honestly don't
4  know.  This scale is too small for me to make any
5  judgment of that.
6      Q.  Well, according to the police report that we
7  were just looking at, measurements, it shows that the
8  end of skid mark from V2 was at 194 feet, correct?
9      A.  Right.
10     Q.  And that the right front of Mr. Peraza's
11 vehicle eventually was able to stop 249.6 feet,
12 correct?
13     A.  Right.
14     Q.  And that's 55 to 56 feet, correct?
15     A.  Right.  But you have to subtract the distance
16 from the front of the truck to where he hit.  I don't
17 know the exact measurement, but he would have hit him
18 15 feet back.
19     Q.  Did you ever measure that?
20     A.  Yes.
21     Q.  Well, do you have that?
22     A.  I don't.
23     Q.  Why not?
24     A.  Well, it doesn't really come into play with
25 my analysis.

64

1      Q.  Why not?
2      A.  Well, because he didn't skid to final stop,
3  so I can't calculate a speed for Mr. Peraza based on
4  his movement from impact to final rest.
5      Q.  That's just speculation, isn't it?
6      A.  No, it's not speculation.  There is no
7  skidding.  I don't know if he accelerated a little
8  longer after impact.
9      Q.  You don't know what he did?
10     A.  No, I don't.
11     Q.  But he wasn't able to stop until as the
12 report indicates, 249.6 feet west, correct?
13     A.  Right.  If that's a controlled stop, then it
14 means nothing.
15     Q.  Well, in this case the evidence is that
16 because he never saw the Polk vehicle prior to the
17 crash, he never knew about the Polk vehicle until the
18 moment of the crash, then applied his brakes and
19 stopped as soon as he could, correct?
20     A.  Correct.
21     Q.  Well, if he was just pulling out from a dead
22 stop into the intersection, at the time of the crash
23 he could have stopped immediately, right?  Is that
24 correct?
25     A.  No.

65

1    Q.  Why not?

2    A.  You can't stop a truck immediately.

3  Immediately is a relative term.  Do you mean within 15

4  feet?

5    Q.  Within 5 to 10 to 15 feet.

6    A.  Maybe.  But you don't know what his mental

7  process was after that.

8    Q.  And you don't either, do you?

9    A.  No.

10    Q.  That's all just speculation, isn't it?

11    A.  I'm not speculating about anything.  You are,

12  but I'm not.

13    Q.  Well, it's speculation as to how fast he was

14  going at the time of the crash - Mr. Peraza, correct?

15    A.  It's not speculation.  I mean, it's based on

16  calculations.

17    Q.  Calculations based on what?

18    A.  Normal acceleration or H for tractors pulling

19  out.

20    Q.  From a stop, correct?

21    A.  And a distance, yes.

22    Q.  And we've been over the fact that that's a

23  disputed fact, correct?

24    A.  It is.

25    Q.  And you would agree that a fully loaded semi

66

1  trailer such as Mr. Peraza's that's going 30 miles per

2  hour, it's a stopping distance of approximately 60

3  feet to stop it, correct?

4          MR. HICKS: Object to the form of the

5          question.

6    A.  I haven't done those calculations.

7    Q.  Why not?

8    A.  Why would I do that?  I don't know what

9  friction value we can apply for this because I don't

10  know if he came to a controlled stop or not.  We don't

11  have any physical evidence to suggest that he skidded.

12  Right?  There is nothing that you have, right?

13    Q.  And you would agree that the notion that he

14  stopped at all south of the intersection with 26 is

15  totally contrary to what Cazz Holden says; is that

16  correct?

17    A.  Yes.

18    Q.  Now, you have in front of you still exhibit

19  number 47.

20    A.  Yes.

21    Q.  The second page of that set of photos shows

22  the burnt up remains of the Polk ACM; is that correct?

23          MR. HICKS: Object to the form of the

24          question.

25    A.  Yes.

67

1    Q.  And that shows it in the condition that it

2  was received by the individuals in Pelham, Alabama at

3  the Messerschmidt office out there, correct?

4    A.  That's correct.

5    Q.  And you weren't out there when it was

6  received, examined or tested; is that correct?

7    A.  That's correct.

8    Q.  With regard to Messerschmidt, it's important

9  that each one of the individuals that does individual

10  items of work in connection with a particular project

11  itemize the amount of time that they spent, the date

12  that they did an activity, and describe accurately

13  what activity they performed; is that correct?

14          MR. HICKS: Object to the form of the

15          question.

16    A.  Correct.

17    Q.  And to the best of your knowledge was that

18  done on the billing reports that were done for this

19  case?

20    A.  I think in this case we had a project cost.

21  So depending on what we're doing, which operation it

22  is, we have project costs.  So we'll say, you know, we

23  can do this job for X amount of dollars, as it was

24  part of an estimate.  I sure you get those as well.

25  So I don't know exactly how detailed the billing is

68

1  for this, but looking at Mr. Burgess' work --

2    Q.  Let's stop there.  But I mean, the date and

3  what's done by each separate individual has to be

4  accurately recorded on this; is that correct?

5    A.  Yes. Generally speaking.

6    Q.  And do you have any facts, witnesses or

7  documents to say that that wasn't done in this case?

8    A.  I don't know exactly what you're getting at,

9  Sam, so just go ahead and tell me.  This appears to be

10  a very detailed run-down of what Mr. Burgess did with

11  dates and times.

12    Q.  And what you did and what Olivia did in

13  connection with the project, correct?

14    A.  Correct.  This is extremely detailed.  I don't

15  know what you are looking for.

16    Q.  I'm going to show you exhibit number 45,

17  which is the extremely detailed billing report for the

18  work done in this case; is that correct?

19          (EXHIBIT 45 ENTERED)

20    A.  Yes.

21    Q.  And the first page is simply the retainer,

22  correct?

23    A.  Correct.

24    Q.  And you would agree then that there is

25  highlighting then that shows in yellow the work that

69

```
1  was done by Olivia Normand, correct?
2      A.  Correct.
3      Q.  And then there is highlighting in orange for
4  the work done out in Pelham, Alabama by Shanon
5  Burgess, correct?
6      A.  Correct.
7      Q.  And then there is highlighted in green the
8  items of work and the amount of time that you expended
9  in this case, correct?
10     A.  Correct.
11     Q.  So let's focus on the green, the work that
12 you did, all right?
13     A.  Okay.
14     Q.  This indicates that the first work that you
15 did was an initial analysis Download Review on
16 February 9th of 2018, correct?
17     A.  Yes.
18     Q.  And that was a review of the EDR data read
19 from the --
20     A.  The Freightliner.
21     Q.  -- from the Freightliner truck driven by Mr.
22 Peraza, correct?
23     A.  Yes.
24     Q.  And that proved to be meaningless, didn't it?
25     A.  It did.
```

70

```
1      Q.  And why is that?
2      A.  Well, a hard brake was not recorded and we
3  also have the last stop.  I did the timing analysis on
4  that and the last stop would have occurred after the
5  crash.  So there is no event recorded and there is no
6  last stops.  There is no event data.
7      Q.  Had there been a hard brake by Mr. Peraza in
8  connection with this crash, it would have shown such
9  data, correct?
10     A.  It should have recorded it, correct.
11     Q.  But it didn't?
12     A.  It didn't.
13     Q.  So in that case half of the electronic or
14 digital information was totally meaningless.
15         MR. HICKS:  Object to the form of the
16         question.
17     Q.  That is, that which came from one of the two
18 vehicles, right?
19     A.  Well, it's not completely meaningless to your
20 point just now when you were talking about 35 miles an
21 hour.  We know that he wasn't because an event wasn't
22 recorded.  The recording threshold for the DDEC system
23 is 17 miles per hour.  So if he was doing what you
24 said he was doing, there would be an event, but we
25 don't have one.  So it is not completely meaningless.
```

71

```
1      Q.  Well, there would be an event if he braked
2  hard going 30 miles an hour or a mile per hour in
3  excess of 17?
4      A.  Right.
5      Q.  Only then, right?
6      A.  But that was your point earlier is that a
7  tractor skidding over that distance would mean that he
8  was going 30 miles an hour, whatever he said.  So we
9  know that's not the case.
10     Q.  He never said that he skidded because he
11 didn't realize what had happened; isn't that right?
12     A.  Well, you indicated --
13         MR. HICKS:  He needs to answer the
14         question.  You are talking over each other.
15         He gets to answer the question.  So go ahead
16         and explain your answer.
17     A.  What you've indicated before or what you were
18 insinuating is that that distance traveled from impact
19 to final rest indicated that he was doing 30 miles an
20 hour.  And what I'm suggesting here is that it's not
21 totally irrelevant, this data, because it does tell us
22 that he wasn't -- either he didn't have a hard stop
23 and he definitely didn't have one over 16, 17 miles an
24 hour.  Do you see what I'm saying?  So it is not
25 totally irrelevant.  But from recovering an event that
```

72

```
1  tells us what happened, it was meaningless.  We did
2  not get an event that details his pre-impact or
3  post-impact movement.
4      Q.  The second entry that you have is three days
5  later on February 12th when you had a client phone
6  call.  Who was that with?
7      A.  That would have been at that time I think
8  with Ms. House.
9      Q.  And that was the claims investigator in
10 connection with Criterion Claims Solutions of Omaha?
11     A.  That's correct.
12     Q.  And then the third item of work that you
13 performed would have been at the end of the month
14 another phone call to her; is that correct?
15     A.  That's correct.
16     Q.  And both of the phone calls lasted
17 approximately six minutes, correct?
18     A.  That's correct.
19     Q.  And then the fourth item that you did is
20 reflected on 3/19 and it just says phone call.  With
21 whom did that occur?
22     A.  That would have been a client phone call as
23 well.
24     Q.  And again, that only lasted approximately six
25 minutes or less, correct?
```

73

1    A.   Correct.

2    Q.   And then the fifth entry that you have on the

3  bill is for May 3rd of 2018 where you did a CDR Report

4  Analysis, correct?

5    A.   Correct.

6    Q.   And what that was, was you taking a look at

7  whatever data was transmitted to you from Shanon

8  Burgess who had performed the destructive testing of

9  the ACM, the chip-swap, correct?

10   A.   That's correct.

11   Q.   Because you weren't involved in any of that,

12  were you?

13   A.   Not with the chip-swap, no.

14   Q.   Well, not with regard to any of that work

15  that had been done with regard to the ACM from the

16  Polk vehicle from the time that it was delivered to

17  Messerschmidt until the time of May 3rd when you

18  received the email from Shanon Burgess after

19  completion of his work; is that correct?

20   A.   No.   Now that you mention it, the 3/19 phone

21  call was probably to Shanon Burgess.

22   Q.   Well, you don't know that, do you?

23   A.   No, I don't.

24   Q.   And then after you had performed the

25  technical analysis, it simply indicates phone call.

74

1  And was that again a phone call lasting under six

2  minutes to Jackie House?

3    A.   I don't know.

4    Q.   And then the next to the last item of work

5  that you show is Report Writing, Formal Analysis for

6  Report, correct?

7    A.   Right.

8    Q.   But did you only prepare one report in this

9  case?

10   A.   Yes.

11   Q.   And was a draft of that prepared by Olivia

12  Normand?

13   A.   No.

14   Q.   Well, what report did she write?

15   A.   She frames up my report for me.  So she will

16  give me the bullet points from the crash report.  So

17  she will go in and put the -- she will basically build

18  the framework for the report and then I write it.

19   Q.   So she gives you first draft with the bullet

20  points that you need to fill in?

21   A.   No.   The bullet points from the crash report.

22  So she pulls the information out of the crash report,

23  puts it in the report, puts the date, the addressee.

24  She kind of builds the framework for the beginning of

25  the report and I write the report.  So I write the

75

1  analysis.

2    Q.   Other than the bullet points from the crash

3  report, which does she does?

4    A.   Right.

5    Q.   And so you wrote one report on 6/13 and

6  finished it on 6/18, correct?

7    A.   Yes.

8    Q.   And yet Shanon Burgess wrote a separate

9  report on 6/18, correct?

10   A.   Yes.

11   Q.   And he wrote his out in Pelham, Alabama,

12  correct?

13   A.   That's correct.

14   Q.   And you didn't participate in the writing of

15  his, correct?

16   A.   Correct.

17   Q.   And he didn't participate in the writing of

18  yours, did he?

19   A.   No.

20   Q.   Are there any other of these time entry

21  detailed or extremely detailed itemized billings that

22  have been prepared in connection with this case?

23   A.   I'm sure there will be one after today.  But

24  no.  I think this should be the total for to date.

25  This should be all that's logged, yes.

76

1    Q.   And there is nothing on the billing reports

2  to indicate that you ever went to inspect any of the

3  vehicles or the scene; is that correct?

4    A.   That's correct.  It's not on the billing

5  report, but I did go to the scene with respect to this

6  case and I have seen the MNE tractor.

7    Q.   When?

8    A.   I actually had another inspection at that

9  yard that was shortly after.  So I saw it while I was

10  there.

11   Q.   But it's not reflected in your bill?

12   A.   No.  Again, I don't double-bill clients, so

13  that's why it's not in here.  But I did see it.

14   Q.   Did you make any report or any notes or take

15  any photographs?

16   A.   No.  That had already been done by Ms.

17  Normand.  I had all I needed.  So I just wanted to see

18  it for myself.

19   Q.   And you never did see the Polk vehicle?

20   A.   I not see it.

21   Q.   And physically where is the ACM for the Polk

22  vehicle?

23   A.   It's in Birmingham still.

24   Q.   Birmingham/Pelham one in the same?

25   A.   Right.  Pelham.  It is in the Birmingham

77

1  office.
2    Q.  Why is it there?
3    A.  That's where it's been held since the chip-
4  swap was completed.
5    Q.  But I mean, that's owned by Mrs. Polk, isn't
6  it?
7    A.  I don't know.
8          MR. HICKS: Object to the form of the
9          question.
10    Q.  Well, it was part of the Polk vehicle at the
11  time of the crash, wasn't it?
12    A.  Does Ms. Polk still own the vehicle?  Does it
13  not belong to the insurance company?  I'm assuming
14  since it was at Copart, that means that the insurance
15  company technically owns the ACM.
16    Q.  What was at Copart?
17    A.  The vehicle.  I think the vehicle was
18  inspected at Copart, correct?  Yes.  Copart.  New
19  Orleans.  So that's where the vehicle is, which means
20  the insurance company owns the vehicle.
21    Q.  No.  But the ACM had been removed from the
22  vehicle.
23    A.  Right.  But it's a part of that vehicle.
24    Q.  Within the time shortly after the crash,
25  correct?

78

1    A.  Sam, if you want to get into who owns the
2  ACM, we can.  We can return it.  That's fine. I don't
3  know where we're going here.
4    Q.  Well, with regard to the testing that was
5  done, let's do this first.  Have you ever seen the
6  designation of your opinions in this case?
7    A.  Yes.
8    Q.  And when did you see them?
9    A.  I don't know.
10    Q.  Well, was it within the last week or month or
11  two months?
12    A.  It's been recently.  I'm not sure exactly
13  when I saw it.
14    Q.  Well, recently within the last week?
15    A.  I don't know.  I honestly don't know when I
16  saw my designation.  I have seen it.
17    Q.  Well, did you participate in the preparation
18  of your designation in this case?
19    A.  No.  Well, I wrote my report, so I guess so.
20    Q.  But you didn't participate in or review the
21  designation prior to the time it was filed; is that
22  correct?
23    A.  That's correct.
24    Q.  I'm showing you exhibit number 32.
25          (EXHIBIT 32 ENTERED)

79

1    Q.  This document says that for you, the
2  designated expert, that your CV has been produced and
3  we've gone through that CV, correct?
4    A.  Yes.
5    Q.  And then you have your written and signed
6  report, correct?
7    A.  Correct.
8    Q.  And your written and signed report is the one
9  that we discussed before that is five pages and bears
10  your signature, correct?
11    A.  Correct.
12    Q.  And then there is a listing of your prior
13  testimony and the confirmation information which is
14  the billing that we just went through; is that
15  correct?
16    A.  Correct.
17    Q.  And then we've been through the Uniform Crash
18  Report, correct?
19    A.  Correct.
20    Q.  And is there anything else of import that we
21  didn't go through from that report?
22    A.  Not to my knowledge.
23    Q.  And then we have you say that the photographs
24  from insurance adjuster C.J. Hester.  That's what's
25  listed.  Did you ever review those?

80

1    A.  Yes, I'm sure I did.  They are in my file.
2    Q.  Well, do you know if C.J. Hester actually
3  went out and took photos or if it was somebody else?
4    A.  I don't.
5    Q.  Did you rely on those photographs to form any
6  opinions and conclusions in this case?
7    A.  Yes.  It is part of my report.  I don't know
8  what photos you are specifically talking about.
9    Q.  Well, exhibit number 33. Have you seen these
10  before?
11    A.  Yes.
12          (EXHIBIT 33 ENTERED)
13    Q.  And it says at the top C.J. Hester, Inc.,
14  right?
15    A.  It does.
16    Q.  But it says taken by DON.  Do you know who
17  DON is?
18    A.  I have no idea who DON is.
19    Q.  Did you ever discuss this matter with some
20  adjuster by the name of DON?
21    A.  I have not.
22    Q.  What was it that you relied on from this
23  group of photos to form your opinions and conclusions?
24    A.  I didn't.  They were reviewed as part of me
25  writing my report.

81

```
 1     Q.   So there is nothing of significance or import
 2  in reviewing this; is that right?
 3     A.   Well, there is nothing in this that I can't
 4  see from my own photos or I can't reconstruct from the
 5  crash report.  But they were reviewed in the course of
 6  writing my report.
 7     Q.   Well, there is a photo on page 7 that's photo
 8  number 14 taken on 1/16 by DON.  It says it's the
 9  intersection of off ramp and 26 facing east, correct?
10     A.   Page 7?
11     A.   Yes.
12     A.   Number 14.  Facing east, yes.
13     Q.   And that essentially would have been the line
14  of sight that would have been available to Mr. Peraza
15  on the night of the vehicle except that it was night,
16  right?
17     A.   Correct.
18          MR. HICKS: Object to the form of the
19          question.
20     Q.   Is that right?
21     A.   Approximately, yes.
22     Q.   What do you mean approximately?
23     A.   Well, I mean, it's further back.  But yes,
24  it's looking in the right direction.
25     Q.   We know that there is a Love's Truck Stop
```

82

```
 1  that was immediately west across this overpass and
 2  that was the ultimate destination for Mr. Peraza for
 3  his night's sleep in the sleeper cab; is that correct?
 4     A.   That's correct.
 5     Q.   And that's shown in photo number 15, correct?
 6     A.   Yes.
 7     Q.   No other importance of these photographs in
 8  forming your opinions and conclusions; is that right?
 9     A.   Not to me.  That's correct.
10     Q.   And then there were the third item that you
11  list or that was listed by the attorney for Polk and
12  Peraza is at-scene photos from Poplarville Police
13  Department. What import were those?
14     A.   I would have to look at them again.
15     Q.   Well, do you recall anything of import?
16     A.   Not specifically. But if you show me the
17  photos I can tell you.
18     Q.   Well, I'm showing you exhibit number 34, the
19  photos from the police.
20          (EXHIBIT 34 ENTERED)
21     A.   So generally speaking these photos would
22  confirm what's in the crash report as far as the area
23  of impact, the skid before impact from Mr. Polk's
24  vehicle and the final rest position of the tractor.
25  As well as again, it documents the area of impact on
```

83

```
 1  the tractor with respect to Mr. Polk's impact.  I
 2  mean, just position confirmation really and the
 3  existence obviously of that skid mark.  Also
 4  documentation of the lights were working on the
 5  tractor and trailer. It has marker lamps. Confirmation
 6  that the reflective tape is functional.  Again, marker
 7  lamps clearly visible on the tractor.  Confirmation of
 8  the area of final rest for Mr. Polk's vehicle.  More
 9  documentation of the burn damage.  Yes.  Really it's
10  just a lot of confirmation of things that are present
11  in the police report.
12     Q.   So to summarize then, we've got that there
13  are photographs that confirm the burn damage to the
14  Polk vehicle, number 1.  It confirms the area of
15  impact on the scene and on the vehicles.  It confirms
16  the skid mark.  It confirms the final resting place of
17  the tractor-trailer and the final resting place of the
18  Polk vehicle and it confirms the existence of the
19  reflective tape and marker lamps of the Peraza
20  trailer, correct?
21          MR. HICKS: Object to the form of the
22          question.
23     A.   Yes. Generally speaking all those things.
24     Q.   Anything else?
25     A.   Well, and the marker lamps on the tractor as
```

84

```
 1  well.
 2     Q.   Well, when you say the marker lamps on the
 3  tractor, what photo shows that?
 4     A.   Well, there is a few.
 5     Q.   Let's refer to that.
 6     A.   Sure.  On Polk -- I'm going to use the last
 7  two numbers. 37.  We can see that the rear lights on
 8  the tractor are functional.
 9     Q.   The rear lights on the tractor are
10  functional.  What do you mean by that?
11     A.   That the rear lights on the tractor are
12  functional.  Right here.  Two rear lights on the
13  tractor.
14     Q.   Can you circle the rear lights on the
15  tractor?
16     A.   Sure.
17     Q.   In green.  And have you done that?
18     A.   Yes.
19     Q.   Have you circled those in green?
20     A.   I have.
21     Q.   You are not saying that those would have been
22  visible to Mr. Polk at any time prior to the crash,
23  right?
24     A.   Correct.  I'm just saying it appears all the
25  equipment on the tractor is working.  Number 42.
```

85
1    Q.    You've circled in green something. What's
2  that?
3    A.    It appears to be a marker lamp, although that
4  might be glare.
5    Q.    Well, that is, in fact, glare from one of the
6  emergency vehicles, isn't it?
7    A.    I don't know if it's an emergency vehicle.
8  It does look like glare though.  I'm sorry, we'll have
9  to omit that. 44.  You see that the headlights are
10 functional here and here.
11   Q.    You've circled them?
12   A.    Yes.  And they are also you can see that they
13 wrap around the side of the tractor which goes back to
14 your previous point about the headlights being visible
15 from the side.
16   Q.    Have you ever conducted any tests on that
17 model vehicle to see how far to the left or the right
18 they illuminate or is visible to traffic that's coming
19 directly from the east going west when this vehicle
20 would have been turned predominantly to the west?
21        MR. HICKS: Object to the form of the
22        question.
23   A.    No, I have not.
24   Q.    Are you aware of any such studies?
25   A.    No.

86
1    Q.    Do you have any facts, witnesses or documents
2  to establish that these lights would have, in fact,
3  been visible to Mr. Polk at any time prior to the
4  crash?
5    A.    Are you suggesting that the tractor couldn't
6  be seen?
7    Q.    No. Just answer my question as to the lights.
8    A.    The lights wrap around.  So if he's coming up
9  basically perpendicular to Mr. Polk's direction of
10 travel, it is my opinion that he could see those
11 headlights.
12   Q.    What facts, witnesses or documents do you
13 base that opinion on?
14   A.    Well, the existence of the headlights.
15   Q.    Anything else?
16   A.    And the way that they wrap around the
17 tractor.  Obviously they go around the side of the
18 tractor.
19   Q.    Anything else?
20   A.    Other than physics and reality, no.
21   Q.    What we know is that he wasn't pulled up
22 perpendicular to Mr. Polk's vehicle.
23   A.    How do we know that?
24   Q.    By all of the physical evidence showing that
25 he was pulling on, making a left turn going west, the

87
1  opposite direction of Mr. Polk's vehicle.
2    A.    It is still my opinion that when he was at or
3  near the stop bar before pulling out, that those
4  headlights would have been visible from the side to
5  some degree.  I don't know exactly from what degree
6  and that would have been an evolving situation because
7  he was turning to the left.  But it's my opinion they
8  would have been visible.
9    Q.    Based on what?
10   A.    Based on the presence and the physicality and
11 the size and the location of those headlights.
12   Q.    Anything else?
13   A.    No.
14   Q.    No tests ever performed?
15   A.    No.  There is no tests, no.  46. Obviously a
16 marker lamp that is illuminated on the side of the
17 tractor.
18   Q.    But that's on the opposite side of the
19 tractor from the crash that never would have been
20 visible under any circumstances to westbound traffic
21 such as Mr. Polk, correct?
22   A.    Correct.
23        MR. HICKS: Object to the form of the
24        question.
25   A.    Number 49.  You can clearly see marker lamps.

88
1  That is that side I believe.  Yes.  So that's going to
2  be the right side.  Had a marker lamp here, here, and
3  then reflective tape all the way down.  That's
4  obviously working.
5        MR. HICKS: Let's pause a minute.  We've
6        been going a solid two hours.
7    A.    I'm fine.  Do you need a break?
8        MR. HICKS: If you are fine.
9    A.    That's fine.  I have to pick up kids from
10 school.
11   Q.    Anything else?
12   A.    The point being, Sam, the lights are
13 obviously functional.  It would have been visible from
14 the side.
15   Q.    You mean the lights on the side of the
16 trailer would have been clearly visible; is that
17 correct?
18   A.    That and in my opinion again, the headlights.
19   Q.    And we've gone through all the basis of your
20 opinions on that; is that correct?
21   A.    Yes.  For the most part.
22   Q.    And with regard to exhibit number 65, that
23 shows the --
24   A.    Picture 65?
25   Q.    Picture number 65.  I apologize.

89

1    A.    Okay.

2    Q.    That shows the area of the impact between the

3 Polk vehicle and the tractor of the MNE truck; is that

4 correct?

5    A.    Yes.  Generally speaking.

6    Q.    Did you ever measure that?

7    A.    Yes.

8    Q.    Did you?

9    A.    No, I didn't measure it.

10    Q.    Who did?

11    A.    Ms. Normand.

12    Q.    And where is that reflected in your report?

13    A.    It's not.  I have my diagram which shows my

14 opinion of impact which has a diagram that shows the

15 tractor at impact.  So it's reflected there.

16    Q.    Does it show a measurement in terms of feet?

17    A.    No.

18    Q.    So nowhere in your report is that shown, is

19 it?

20    A.    An exact measurement for how far back it hit

21 on the truck?

22    Q.    Well, the area of impact on the truck.

23    A.    Well, it is here on the scale model.  So

24 theoretically yes.  But I don't have an accounting of

25 how far back it hit on the tractor, no.

90

1    Q.    Did you ever do any crush data in connection

2 with this collision?

3    A.    No. The --

4    Q.    Why not?

5    A.    I was about to tell you. If you look at the

6 overhead drone photos of the Yukon, let me find those.

7 Do you have those photos?  I saw them.  Yes.  This

8 damage profile does not fit our crush model because

9 the frame is not crushed.  So all of the damage is

10 above the frame and the bumper really.  We have a

11 little bit of damage to the bumper, but not anything

12 that can really be accounted for quantitatively.  So

13 all of the damage is above the frame, so it falls

14 outside the spectrum.

15    Q.    All of the damage is?

16    A.    All of the crush damage that you can really

17 measure, yes.

18    Q.    Well, you never even saw the Polk vehicle,

19 did you?

20    A.    Yes.

21    Q.    You mean you saw a picture of it that was

22 taken by Olivia?

23    A.    Yes.

24    Q.    That's all?

25    A.    Yes.

91

1    Q.    And that picture is what?

2    A.    It's number 57.  But there are several.

3    Q.    Of what?

4    A.    35.

5    Q.    And would you agree that the damage that

6 Yukon, Mr. Polk's vehicle, indicates that it was an

7 under ride crash?

8    A.    Partially.  You do see some deformation in

9 the bumper, so we know it hit something low. But it is

10 mostly under ride, yes. I would characterize it that

11 way, yes.

12    Q.    And what is under ride?

13    A.    It's when you under ride.  It's kind of a

14 relative term.  But when you run under something and

15 so the bottom is not as deformed as the top.

16    Q.    And looking back on exhibit number 34,

17 please.

18    A.    What is it?

19    Q.    34.

20    A.    Sorry.  It's not numbered.  I apologize.

21    Q.    If we look at photo number 38.  Are you with

22 me?

23    A.    Yes.

24    Q.    What we see there in white are the gouge

25 marks that show the point of impact of the crash,

92

1 correct?

2    A.    Correct.

3    Q.    And those are all well within the westbound

4 lane of traffic; that is, the direction of traffic

5 that Mr. Polk was traveling; is that correct?

6    A.    The gouge marks are, yes.

7    Q.    Well, do you see anything else of relevance

8 in this photo other than that somebody has been

9 driving through the diesel spill?

10    A.    Right.  No.  Just the gouge marks.

11    Q.    And on 39 we see the gouge marks even more up

12 close, but with the diesel spill covering it just

13 slightly more, correct?

14    A.    Correct.

15    Q.    Anything else in that photo of relevance?

16    A.    No.

17    Q.    Anything else about these photos that --

18    A.    Not that I can think of at the moment.

19    Q.    Now, you say that in order to formulate your

20 opinions the fourth thing was inspection of the Polk

21 Yukon.  But you didn't do that, did you?

22    A.    I reviewed my company and my representative's

23 inspection of the Polk Yukon.

24    Q.    But just answer my question.

25    MR. HICKS: He has.  It's been asked and

93

```
 1              answered.
 2       A.   No, Sam, I did not inspect the Polk Yukon.
 3       Q.   And the only thing that you reviewed with
 4  regard to the Polk Yukon were the photographs that we
 5  have here in exhibit number 35 taken by Olivia
 6  Normand; is that correct?
 7       A.   Photographs, notes and the CDR report.
 8       Q.   The photographs, notes and CDR report.
 9       A.   Correct.
10       Q.   Well, the CDR report is the document that was
11  generated as a result of and in connection with this
12  chip-swap.
13       A.   Correct.
14       Q.   By Shanon Burgess, correct?
15       A.   Correct.
16       Q.   And then you said notes.  What notes are you
17  talking about?
18       A.   The inspection notes from when Olivia
19  inspected the Yukon.
20       Q.   When she inspected the Yukon or when she
21  inspected it?
22       A.   The Yukon.
23       Q.   Where are those notes?
24       A.   I don't have them with me.
25       Q.   I'm showing you exhibit number 41.
```

94

```
 1              (EXHIBIT 41 ENTERED)
 2       Q.   These are the photos and the inspection notes
 3  of Olivia for the MNE trailer; is that correct?
 4       A.   I don't know, Sam.  I can't see it.  Yes.
 5       Q.   And any notes that she did of the Yukon would
 6  be simple notes as to measurements that she took just
 7  like that; is that correct?
 8       A.   That's correct.
 9       Q.   Well, those don't assist you in forming your
10  opinions, do they?
11       A.   Well, it's confirmation that the tire size is
12  programmed correctly on the CDR report.
13       Q.   Anything else?
14       A.   In this particular case no, not really,
15  although I may be missing something.
16       Q.   The next thing that is listed is the download
17  of the Polk's Yukon ACM or airbag control module; is
18  that correct?
19       A.   That's correct.
20       Q.   And again, in what was produced from your
21  file material, the first thing with regard to ACM
22  download is Exhibit 34. Do you know what that is?
23       A.   Yes.  It's a CDR report.
24       Q.   Of what?
25       A.   Of the module or the chip from the module
```

95

```
 1  from the Yukon.
 2       Q.   And how do you know that?
 3       A.   I don't know what this is.  This was -- oh,
 4  this is the baseline download.
 5       Q.   What do you mean it's the baseline download?
 6       A.   So the baseline download, if you read Mr.
 7  Burgess' report, many downloads were done to make sure
 8  that the module was clean basically, the surrogate
 9  modules were clean before.  So this is one of the
10  downloads to establish that that module was empty
11  basically.  There was no data on it.
12       Q.   So this isn't a download of an ACM from this
13  Yukon, correct?
14       A.   It's the ACM chip, yes.
15       Q.   No. But it's not any download that was ever
16  obtainable from the ACM in the Yukon, correct?
17       A.   Through the port --
18       Q.   Is that correct?
19       A.   I'm not going to answer that without giving
20  you an explanation.  So do you want an answer or no?
21       Q.   Were you able to -- that is, was Mr. Burgess
22  able to download any information from the Polk ECM
23  that was provided for an attempted recovery of data
24  from that ECM as it was?
25       A.   Well, from the ECM components, yes.
```

96

```
 1       Q.   But not from the ECM as it was without
 2  destructive testing; that is correct?
 3       A.   That's correct.
 4       Q.   Are you aware of the difference between
 5  destructive and non-destructive testing?
 6       A.   Yes.
 7       Q.   And what is that?
 8       A.   Well, in this particular -- well, destructive
 9  testing would be something that destroys some part or
10  some component, which in this case was unavoidable
11  because the module had to be cut open to get to the
12  board.
13       Q.   And then disassembled, right?
14       A.   The chip had to be removed, yes.
15       Q.   Did you or anyone from Messerschmidt ever
16  communicate with Brett Alexander or me or anyone from
17  my office regarding your decision to pursue
18  destructive testing of this ACM?
19       A.   I know we communicated with him directly
20  about doing the chip-swap, which is inherently
21  destructive.
22       Q.   What documentation do you have of that?
23  Because it's not reflected on any of the billing.
24       A.   Are you suggesting now that you gave us your
25  module and didn't know that we were going to do a
```

97

1  chip-swap?  Because I think the date was offered for
2  them to be present during all the process.
3     Q.  Well, what facts, witnesses or documents do
4  you have to establish that?
5     A.  I think it was a phone call that was placed.
6  It's on the billing from Olivia to Mr. Alexander.
7  Give me a second.  She met with Mr. Alexander about
8  the module specifically.
9     Q.  When?
10    A.  Well, at the inspection traveled to ASI
11 Investigations in Hattiesburg on 2/27.
12    Q.  To pick up the damaged ACM in the condition
13 that we've seen in the photograph, which is exhibit
14 number 47, correct?
15    A.  Correct.  Phone call with Mr. Alexander on
16 2/27.  Field investigation.  Download assessment on
17 2/27 which was at his office.
18    Q.  Well, what was communicated then?
19    A.  I don't have a tape of the conversation, Sam.
20 I'm not sure.
21    Q.  Well, are there any facts, witnesses or
22 documents as to what was said on that date when it was
23 picked up?
24    A.  You would have to ask Ms. Normand or Mr.
25 Alexander.

98

1     Q.  Okay.  Go ahead.
2     A.  And I know dates were offered to Mr.
3  Alexander.
4     Q.  When you say dates were offered to Mr.
5  Alexander, what facts, witnesses or documents do you
6  have to support that?
7     A.  I think we have communication to Mr. Hicks
8  about our intentions and a date.
9     Q.  No.  Mr. Hicks is the attorney for the
10 Defendant.
11    A.  Yes.  Well, I don't usually correspond
12 directly with opposing counsel or his experts.
13    Q.  No.  But I'm just asking.  What if any facts,
14 witnesses or documents there was ever any
15 communication with Brett Alexander or my law firm as
16 to the date as to whether destructive testing was
17 going to be done and when and where?
18    A.  I don't know.  I would have to look that up.
19    Q.  Look up in what?
20        MR. HICKS: Let him answer.
21    A.  I would have to look through our email to see
22 if there was any correspondence with Mr. Alexander.  I
23 know that Olivia talked to him in person.
24    Q.  But you don't know the substance of that
25 conversation?

99

1     A.  I don't, Sam.
2     Q.  So what you are saying is you are unaware at
3  this time of any facts, witnesses or documents to
4  support any contention that there was disclosure that
5  destructive testing was going to be done or when,
6  where, or by whom; is that correct?
7        MR. HICKS:  Object to the form of the
8        question.  That's not what he said.  That's
9        not what he said.
10    A.  I am aware of witness in particular with Ms.
11 Normand and Mr. Alexander had that conversation and
12 that conversation was reported that she picked up the
13 module and indicated that we were planning to do a
14 chip-swap.  She talked to him on the phone.  So those
15 are witnesses.  I guess you need to talk to Brett.
16    Q.  Well, there is nothing reflected about that
17 in any of the billing that's extensively detailed as
18 you call it, is there?
19    A.  No, there is not.
20    Q.  And you don't have any emails or anything to
21 substantiate that?
22    A.  I may. I don't know.
23    Q.  Well, it's never been provided in this case,
24 has it?
25    A.  No, it hasn't.

100

1     Q.  So back to exhibit number 34.
2     A.  We have two marked as 34, Sam.
3     Q.  I apologize.  The Bosch CDR Retrieval dated
4  April 30th should be Exhibit 36 if you would be kind
5  enough to change that.
6        (EXHIBIT 36 ENTERED)
7     Q.  So looking at exhibit number 36, this
8  reflects that the user that was performing the
9  retrieval of crash data from the Polk vehicle was SRB,
10 Shanon Burgess, correct?
11    A.  That's correct.
12    Q.  Not you?
13    A.  Not me.
14    Q.  And that this indicates that those efforts
15 were taking place on April 30th of 2018, correct?
16    A.  Correct.
17    Q.  Other than the crash data retrieval
18 information that you said you substantially and
19 significantly relied upon, what facts and documents
20 related to available physical evidence from the
21 vehicles in the crash, the crash scene and the
22 witnesses did you rely upon to form your opinions in
23 this case?
24    A.  Everything that's listed.  I reviewed the
25 photos of the crash site.

101

1    Q.   You mean everything that's listed in your
2  disclosure opinion that we were just going through?
3    A.   That and on my report, which we've been over.
4    Q.   Well, we haven't been over your report.  We
5  just identified it.
6    A.   Well, it's in my report that you've reviewed.
7  The State of Mississippi Uniform Crash Report, the
8  photos from insurance adjuster C.J. Hester, the at-
9  scene photos from Poplarville PD, the inspection of
10  the Polk Yukon, the download of the Polk Yukon's ACM,
11  the inspection of MNE freight tractor.  I don't
12  know why it says that.  Download of MNE's freight ECM,
13  the download of MNE freight GPS module, the crash site
14  inspection, the toxicology reports of Jerry Polk, the
15  witness statement of Cazz Holden.  And most recently
16  the depositions of both of the Perazas and the
17  ambulance report.
18    Q.   The last three of which were just provided to
19  you yesterday in advance of this deposition, correct?
20    A.   Correct.
21    Q.   Anything else?
22    A.   Not that I'm aware of.
23    Q.   This indicates that the EDR device type that
24  was being examined here was the airbag control module,
25  correct?

102

1    A.   Correct.
2    Q.   And according to your download, it showed
3  that as we've discussed earlier, that the shoulder
4  harness was not connected in Mr. Polk's vehicle at the
5  time of the crash, correct?
6    A.   It does.  Which download are you referring
7  to?  This one doesn't have data.  There is no events.
8  Are you talking about another?
9    Q.   Yes.
10    A.   Yes, it does say unbuckled, yes.
11    Q.   And then it says events recovered on this one
12  none, right?
13    A.   Right.  That's a good thing.
14    Q.   And it specifically provides under data that
15  the SDM, recorded vehicle longitudinal velocity
16  change, reflects the change in longitudinal velocity
17  that the sensing system experienced during the
18  recorded portion of the event; is that correct?
19    A.   That's correct.
20    Q.   But that that longitudinal velocity change is
21  the change in velocity during the recording time and
22  is not the speed the vehicle was traveling before the
23  event, correct?
24    A.   Correct.
25    Q.   So what shows the speed at the time -- the

103

1  speed of the Polk vehicle before the event?
2    A.   The pre-crash data.  You are talking about
3  delta-v.
4    Q.   Yes.
5    A.   The pre-crash data is not delta-v.
6    Q.   Yes.
7    A.   Okay.
8    Q.   And what is delta-v?
9    A.   Delta-v is the experienced jerk after
10  algorithm enable.  So it's post pre-crash data.
11    Q.   Did you perform that in this case?
12    A.   Did I perform what, Sam?
13    Q.   Delta-v test.
14    A.   I read the delta-v.
15    Q.   Well, you read delta-v only from the Shanon
16  Burgess chip-swap data; is that correct?
17    A.   Yes.
18    Q.   And in this case there was a significant
19  rollover where Mr. Polk's vehicle rolled over going
20  downhill several times, correct?
21    A.   Yes.
22    Q.   And those rollover events are some of the
23  hardest that there are in terms of analyzing; isn't
24  that correct?
25          MR. HICKS: Object to the form of the

104

1          question.
2    A.   No, I wouldn't say that.
3    Q.   Why not?
4    A.   Well, because I just wouldn't say that, Sam.
5    Q.   Well, it says you would agree that SDM
6  recorded vehicle speed accuracy can be affected by
7  various factors, including significant changes in the
8  tires rolling status.
9    A.   Right.
10    Q.   And wheel slip, correct?
11    A.   Correct.
12    Q.   And that occurred in connection with this
13  case, didn't it?
14    A.   wheel slip at the very end.  But the pre-
15  impact data that we see in the minus 3, 4, 5-second
16  range was just normal driving, brakes weren't applied
17  and it wasn't rolling over.
18    Q.   It did roll over, didn't it?
19    A.   It did.  But that wouldn't affect pre-crash
20  data.
21    Q.   One of the limitations of this data is that
22  the driver's and passenger's seatbelt circuit status
23  is reported to indicate the status of the seatbelt
24  switch circuit, right?
25    A.   True.

105

1    Q.   So as part of this ACM, whether or not you
2  had your seatbelt and lap, your seatbelt with shoulder
3  harness on, is supposed to be recorded, isn't it?
4    A.   It is.
5    Q.   By the ACM?
6    A.   Yes.
7    Q.   But it goes on to warn that if the vehicle's
8  electrical system is compromised during a crash, the
9  state of the driver's belt switch circuit may be
10  reported other than the actual state, right?
11    A.   That's correct.
12    Q.   Well, in here the electrical system was
13  compromised during the crash, correct?
14    A.   I mean, it recorded an event.  I don't know
15  how compromised it was.
16    Q.   Well, you don't know because you didn't do
17  that inspection, did you?
18    A.   Sam, it was burned.
19    Q.   It was burned beyond belief with regard to
20  the electrical components.
21    A.   Yes.  I know we had power through the
22  recording process for the crash.  You are right.  Let
23  me just say that you are completely right.  The
24  seatbelt status may be wrong.  But I'm just looking at
25  the report and this is what it says.  It says it was

106

1  unbuckled.
2    Q.   But the seatbelt status may be wrong because
3  of the compromised electrical system at the time of
4  the crash?
5    A.   Right.  Because that's reading from an
6  external circuit.  Internally while it's recording
7  speed, all of that is not compromised.
8    Q.   The next of the CDRs was on 5/1.  Why was
9  there a separate one done on 5/1 after one had been
10  done on 4/30?
11    A.   This was a control download.  It says MA
12  baseline.  So Shanon was establishing that there was
13  no data on one of the test modules.
14    Q.   Well, if we look at exhibit number 37, that
15  was a second download that was performed after the
16  destructive testing performed by Shanon Burgess
17  outside your presence, correct?
18    A.   Correct.
19         (EXHIBIT 37 ENTERED)
20    Q.   And it also contains the same limitation
21  about if the vehicle's electrical system is
22  compromised during a crash, the state of the driver's
23  belt switch circuit may be reported other than the
24  actual state, correct?
25    A.   Sure.  Yes.

107

1    Q.   Meaning the information can simply be wrong
2  because of that, correct?
3    A.   With respect to the seatbelt it's possible.
4    A.   And then the third attempt at download.
5    A.   Let me clarify here.  There is not attempts
6  at downloads.  Do you understand?
7    Q.   I get it.
8    A.   They are not attempted downloads.  I just
9  want to make that clear for the record.
10    Q.   Exhibit number 38.
11         (EXHIBIT 38 ENTERED)
12    Q.   That's the download that was performed by
13  user Shanon R. Burgess in the Birmingham/Pelham,
14  Alabama area outside of your presence on May 3rd of
15  2018; is that correct?
16    A.   That's correct.
17    Q.   And that contains the same limitations that
18  we've been over in the prior exhibits with regard to
19  this; is that correct?
20    A.   That's correct.
21    Q.   And this indicates that after the destructive
22  testing Shanon was recording a deployment and a
23  non-deployment, correct?
24    A.   Correct.
25    Q.   And you would agree that with regard to all

108

1  of these automobiles like the Yukon and any of the
2  other vehicles that you've ever been involved in
3  testing, or that Messerschmidt has been involved in
4  testing, once there is a deployment event, if the car
5  is repairable, the ECM has to be sent back in and an
6  entire new one put in the vehicle, correct?
7    A.   Correct.
8    Q.   And that's because the manufacturers say that
9  putting in just a different chip isn't satisfactory,
10  correct?
11    A.   No.
12    Q.   Well why?
13    A.   Well, they send them back.  I don't know.
14  This is kind of outside of my area.
15    Q.   It's outside your area of expertise?
16    A.   No.  Vehicle repair is outside of my area of
17  expertise.  But once that event is locked, it doesn't
18  replace.  They are not replacing chips.  They
19  reprogram them in some cases, but they are not
20  replacing chips.
21    Q.   Yes.  They don't replace chips.  They don't
22  use that ECM.  They totally replace it with a brand
23  new one with all new chips, right?
24    A.   Right.  But you said replace chips.
25    Q.   They don't replace chips, do they?

1    A.   You said they do replace chips.  I was just[109]
2  clarifying.
3    Q.   Just so we're totally clear, after there is a
4  deployment event because these are erasable events,
5  that's part of what an EEPROM is?
6    A.   Well, it's part of the nature of the chip,
7  yes.
8    Q.   The entire -- what do they call it?  Black
9  box?
10   A.   The module, yes.
11   Q.   The module SDM has to be sent back to the
12 manufacturer or totally replaced before the vehicle
13 can be safely driven, correct?
14   A.   It is my understanding it has to be replaced
15 after a deployment event.
16   Q.   And you can't just go in, open up the SDM and
17 put a new chip in make the vehicle roadworthy or
18 accurate in its programming, correct?
19        MR. HICKS: Object to the form of the
20        question.
21   A.   I'm not in the vehicle repair industry, so I
22 don't know exactly what you can do and what you can't
23 do.  But it's my understanding that after a deployment
24 event the module has to be replaced.
25   Q.   In its entirety?

1    A.   That's my understanding.                      110
2    Q.   And you would agree that one of the other
3  limitations with regard to this Bosch CDR or crash
4  data retrieval program, is that the manufacturer of
5  that program that was used by Shanon Burgess
6  specifically mandates that all of the data has to be
7  examined in conjunction with the other available
8  physical evidence from the vehicle on the scene,
9  correct?
10   A.   Correct.
11   Q.   And you have to be able to synthesize that
12 and explain how it fits with what you are seeing on
13 the report, correct?
14   A.   Correct.
15   Q.   And this exhibit number 38, that was a
16 printout that was then sent to you by Shanon Burgess
17 on 5/3 as indicated by your time records; is that
18 right?
19   A.   I believe so.
20   Q.   And one of the other specific documents that
21 was provided by the Defendant as having come from your
22 firm is exhibit number 39.
23        (EXHIBIT 39 ENTERED)
24   Q   And are you aware of what this is?
25   A.   I am -- saved on June 14, 2011.  No, Sam.

1  You're going to have to be specific about this.  I[111]
2  don't know which wreck this belongs to.  It's
3  obviously not this one.
4    Q.   Well, it was specifically provided in the
5  information as to documents that were produced by you
6  to the Defendants' attorneys and relied upon in your
7  report.
8    A.   In what case, Sam?
9    Q.   It was in this case.  This was provided as
10 information relied on.  Did you rely on it?
11   A.   Well, I did not.  I don't remember this being
12 produced unless Mr. Burgess produced it in his file
13 for -- oh, this is a sample Toyota report.  Okay.
14 This may have been issued as some kind of example.
15 But I'm not completely aware of why or what this is.
16 But it's a sample report from a CDR program.
17   Q.   And other data limitations that's described,
18 it specifically says --
19   A.   Whoa, Sam.  So this is from a Toyota Rav4.
20 We don't need to get into data limitations.  They
21 would be completely different.  This is a different
22 make, a different model, a different manufacturer.
23   Q.   And those are not the same; is that right?
24   A.   Well, the data limitations wouldn't be
25 exactly the same.  They are different units.  So

1  again, if we could just cut to the chase and tell me[112]
2  where you are going with this.  This is a sample
3  download generated from the CDR program.
4    Q.   Where I'm going is that the only data with
5  regard to fire damage to these SDMs and ECUs is also
6  from Toyota vehicles of a specific make and model that
7  are totally different from the one in question,
8  correct?  Is that correct?
9    A.   Well, no, it's not correct.  Those tests were
10 done directly with the chips and not inside the
11 housing.  So not with the housing intact, which it was
12 in our case.  And the chips are all going to be
13 generally consistent as far as their makeup.  It is
14 the same type of chip.
15   Q.   Well, have you analyzed those?
16   A.   No, I haven't.
17   Q.   So that's just speculation, isn't it?
18   A.   No. All of the modules are basically
19 consisting of the same thing.  There are some
20 different types of plastic modules that have come out
21 lately.  But with respect to the actual chips, it's
22 the same material that is used to make them.  It's a
23 common thing I guess. But those tests were done
24 directly to the chip and not inside the housing.
25   Q.   Those are the only tests that were ever done

113

1 to determine heat resistance, correct? Is that
2 correct?
3     A.   That I know of, yes.
4          MR. HICKS: Remember you can explain your
5          answer. He keeps saying is that correct and
6          you stop your answer.
7     A.   It's immaterial.
8          MR. HICKS: No. You need to give an
9          answer.
10    Q.   With regard to the download of MNE's freight
11 GPS module, what did you rely on that for?
12    A.   Nothing actually. We downloaded that, but I
13 don't think any useful data emerged as a result of
14 that.
15    Q.   So you didn't rely on that?
16    A.   Well, no, I don't think so. It says -- I
17 mean, to be honest with you, Sam, it doesn't say I
18 relied upon it. It says I performed and reviewed the
19 following sources of information. It doesn't say I
20 used them to formulate my opinion. It says they have
21 been reviewed.
22    Q.   And I'm showing you exhibit number 42.
23          (EXHIBIT 42 ENTERED)
24    Q.   Is this the download of the MNE freight's GPS
25 module?

114

1     A.   It appears to be.
2     Q.   And you said that there was no useful
3 information on that.
4     A.   Well, if you look at the frequency here, we
5 have one ping on March 2nd. Hold on. Can I see the
6 crash report again? I'm sorry. I'm looking at the
7 wrong one. I don't have any -- oh, this is '17. I'm
8 in the wrong year. Excuse me. So we have three
9 reportings from the day of the crash.
10    Q.   Well, if we look at page 263, that deals with
11 miles that he drove and the location of the vehicle on
12 January 2nd and 3rd up to the time of the crash,
13 right?
14          MR. HICKS: Object to the form of the
15          question.
16    A.   I'm sorry. I wasn't -- I apologize. I wasn't
17 paying attention as well as I should. What did you
18 say?
19    Q.   If we look at page 263, please.
20    A.   Yes.
21    Q.   If we look at the dates January 2nd through
22 3rd, this would be the GPS information that would show
23 the date, the state in which travel occurred, and the
24 total number of miles that Mr. Peraza drove, correct?
25          MR. HICKS: Object to the form of the

115

1          question.
2     A.   It would appear to.
3     Q.   And according to this download data, who did
4 this download?
5     A.   This was also Mr. Burgess.
6     Q.   And what did he download this from?
7     A.   The GPS unit that was inside the tractor.
8 Like the Garmin. Like that.
9     Q.   Not the Polk vehicle?
10    A.   Right.
11    Q.   And how was that download obtained?
12    A.   We have a system in Birmingham or Pelham. We
13 have software there where you plug into one of the
14 ports on the GPS module and you just extract the
15 historical data.
16    Q.   Was the GPS module taken off of the Peraza
17 truck to be inspected?
18    A.   Yes.
19    Q.   So it shows that on January 3rd of 2018 Mr.
20 Peraza drove 229-plus miles in Texas, 256, almost 257
21 miles in Louisiana. And then crossed over into
22 Mississippi and drove almost 30 miles to the point of
23 the crash, correct?
24    A.   Correct.
25    Q.   And that's all that this information then

116

1 shows; is that right?
2     A.   Yes.
3          MR. HICKS: Object to the form of the
4          question.
5          MR. MCHARD: Let's take about a
6          20-minute break.
7          (OFF THE RECORD)
8     Q.   Do you agree that crash reconstruction is the
9 science of analyzing vehicle collisions using applied
10 physics?
11    A.   In part, yes.
12    Q.   Well, what's the other part?
13    A.   Currently or modern crash reconstruction is
14 also the analyzing of digital data. It's the
15 application of human factors, studies and outcomes.
16 It's a little bit more than just doing calculations.
17    Q.   Well, do you agree that proper reconstruction
18 analysis commonly relies on the study and
19 interpretation of roadway and vehicle evidence?
20    A.   Yes.
21    Q.   Do you agree that when available, it can rely
22 on properly collected data from event data recorders?
23    A.   Yes.
24    Q.   Do you agree that the data from event data
25 recorders is not a substitute for crash

117

```
 1   reconstruction?
 2        A.   Yes.
 3        Q.   Do you agree that such event data recording
 4   information, although is not a substitute for crash
 5   reconstruction, but is only some evidence?
 6        A.   It's a part of it, yes.
 7        Q.   And that proper crash reconstruction has to
 8   include and assimilate the analysis of vehicle
 9   movements, the analysis of vehicle speeds, the
10   analysis of vehicle angles, the analysis of time/
11   distance relationships of vehicles based on facts, not
12   speculation?
13        A.   Yes.
14        Q.   That the EDR never stands alone and is only a
15   tool to analyze the objective crash facts?
16        A.   It's a very important part, yes.
17        Q.   But you agree with that statement, correct?
18        A.   Yes.  The two should be done in concert.
19        Q.   Do you agree that data from EDRs or airbag
20   control modules must be analyzed in conjunction with
21   other evidence to ensure reliability?
22        A.   Yes.
23        Q.   And that in order to properly perform
24   reconstruction there must be correct analysis and
25   understanding of the vehicle dynamics prior to the
```

119

```
 1   crush.  We only have a partial skid mark that is 34
 2   feet long.  So we don't have the whole picture from
 3   there.  And we don't really know what energy he lost
 4   rolling downhill because we don't know exactly which
 5   angle he came off of.  All we really have are gouge
 6   marks and a skid mark, right?  And so I think Mr.
 7   Peraza by virtue of the fact that he stopped very
 8   shortly after this, knew he had been hit by something.
 9   I don't know why anyone would -- if he didn't know
10   that he had been hit by something, why would he pull
11   into the opposing lane and stop?  That doesn't make
12   sense.
13        Q.   That's just speculation on your part, isn't
14   it?
15        A.   It's reality, Sam.  Why would he pull into
16   the opposing lane and stop and get out of his truck?
17   He knew he was hit by something.
18        Q.   The only testimony is in his deposition that
19   he didn't know what happened and when he saw the fire,
20   that's when he first realized that another vehicle was
21   involved.
22        A.   Right.
23             MR. HICKS: Object to the form of the
24             question.
25        Q.   At what speed do you think that the impact
```

118

```
 1   crash?
 2        A.   Yes.
 3        Q.   And in this case are you aware that in
 4   connection with this crash Mr. Peraza didn't even know
 5   what happened?
 6        A.   Yes.
 7        Q.   And that only when he first saw a fire at the
 8   bottom of the hill did he realize another vehicle was
 9   involved?
10             MR. HICKS: Object to the form of the
11             question.
12        A.   Yes.
13        Q.   Now, do you agree that if Mr. Polk was
14   traveling 70, 80 miles an hour at the time of the
15   impact as you conclude, Mr. Peraza would know that he
16   had been struck by something, right?
17        A.   I didn't conclude that he hit at 70 or 80
18   miles an hour.
19        Q.   Well, what did you conclude that he hit at?
20        A.   It looks like from the download --
21        Q.   Based on the download information --
22        A.   That's all we have.
23        Q.   You believe what?
24        A.   We can't do crush.  We've already been over
25   that.  This is an under ride situation, so we can't do
```

120

```
 1   occurred at?
 2        A.   I'm going to say somewhere less than 50.
 3        Q.   And that's based solely on the download
 4   information?
 5        A.   Yes.  It is based solely on the download
 6   information.  Let me find the right one.  So his
 7   delta-v as you were referring to earlier, on the
 8   deployment event was 31.9.  So it's going to be a
 9   little bit higher than that.
10        Q.   What do you mean?
11        A.   Well, that's the speed lost in the -- it only
12   recorded 100 milliseconds and it was still dropping.
13   So it's going be somewhere north of that 31.93.  The
14   last recorded speed we have is 50.  Although if we
15   look at the second record --
16        Q.   So you are saying that according to the
17   download information that was performed by Shanon
18   Burgess after the chip-swap, you think that the speed
19   of the Polk vehicle at the time of the impact was
20   around 30 miles an hour?
21        A.   No.  That's not what I'm saying, Sam.  I'm
22   saying it's at least 30 miles an hour.  Actually 31.93
23   is the last cumulative recorded delta-v value we have.
24   So this is 100 milliseconds after AE, which is
25   algorithm enabled.  So this means that in the 100th
```

121

1  millisecond, so in 1/10th of a second after his airbag
2  deployed, after the algorithm enabled, he lost 31.93
3  miles an hour.  Now, I don't think we have --
4      Q.  And stopped?
5      A.  No. I don't think we have the whole picture
6  because this chart, this graph, and this is Exhibit 38
7  for the record, is continuing to go down.  So this is
8  his speed loss graph post-impact.  So after the
9  algorithm enables, after the module wakes up and says
10  I need to decide to deploy the airbags or not, he lost
11  31.93 miles an hour.  So we know it is at least that
12  much, which makes sense, because we have a final speed
13  reading of 50 and then zero.  So we know it's less
14  than 50 and we know it's higher than 31.93.  So
15  somewhere in that range.
16     Q.  Somewhere in that range; you don't know?
17     A.  No.  We can't do crush, so I can't tell you
18  that.  When you look at the frontal damage to the
19  Yukon, that looks appropriate.  It's substantial
20  damage to the engine compartment.  The hood, it's all
21  pushed backwards.  It's under ride.  That looks
22  appropriate. It adds up with the physical evidence.
23     Q.  Well, if a Yukon hit the side of this semi
24  going between 31 miles an hour and 50 miles an hour,
25  certainly someone would know that he had been struck

122

1  by another vehicle, wouldn't he?
2          MR. HICKS: Object to the form of the
3          question.
4      Q.  Is that correct?
5      A.  He knew something had happened because he
6  pulled over, Sam.
7      Q.  But you don't know what and that would just
8  be speculation, right?
9      A.  Yes. I guess he could have just pulled over
10  in the opposing lane for no reason.
11     Q.  Yet are you aware that Mr. Peraza said that
12  he actually felt the impact?
13     A.  You'll have to show me that line in his
14  deposition. I don't know which line that is
15  specifically.  But I don't doubt he felt it.
16     Q.  As an impact from a crash from another
17  vehicle?
18     A.  Yes. He felt something.  I don't know if he
19  knew at the moment that it was another vehicle.
20     Q.  And you would agree that when two vehicles
21  are entering an intersection from different highways,
22  the driver of the vehicle on the left has to yield to
23  the vehicle on the right?
24          MR. HICKS: Object to the form of the
25          question.  That's not a correct statement of

123

1          law.
2      Q.  Is that correct?
3      A.  Sam, it doesn't make any sense.  In this
4  particular case --
5      Q.  No.  Do you know that that's one of the rules
6  of the road in Mississippi?
7          MR. HICKS: Object to the form of the
8          question.  It's not a rule of the road.
9      A.  A driver on the left has to yield to the
10  driver on the right at every intersection?
11     Q.  Yes.
12     A.  At a 4-way stop.
13     Q.  Yes.
14     A.  Yes.  This isn't a 4-way stop.
15     Q.  At any intersection.
16     A.  No.
17     Q.  You disagree with that?
18     A.  Yes. It's not always to the left or the
19  right.  In this case it happens to be that way.
20     Q.  There was a stop sign facing Mr. Peraza,
21  correct?
22     A.  Yes.  Right.
23     Q.  And the through lane was on 26 for Mr. Polk
24  proceeding westbound, correct?
25     A.  I agree with that completely, Sam.  But the

124

1  way you put that is not correct.
2      Q.  Well, that when you have a vehicle like
3  Peraza's 18 wheeler entering a through highway, he has
4  to stop as required by the rules of the road in
5  obedience to the stop sign, and he is not allowed to
6  proceed until he proceeds cautiously, yielding to
7  vehicles not obliged to stop which are approaching,
8  correct?
9      A.  Agree.
10         MR. HICKS: Object to the form of the
11         question.  That is not a correct statement
12         of law.
13     Q.  You agreed?
14         MR. HICKS: That is not a correct
15         statement of law.
16         MR. MCHARD: I'm sorry.  It's not your
17         deposition.
18         MR. HICKS: We don't need to get into
19         discussions about the law.  That's a
20         legal question.  He can't agree to something
21         that's not legal, that's not correct
22         legally.
23         MR. MCHARD: I'm sorry. It's not --
24         MR. HICKS: Why don't you show him the
25         rule?  Show him the statute, Sam.  You know

125

```
 1        that's not the law.
 2             MR. MCHARD:  It is not ethical for you
 3        to have --
 4             MR. HICKS: It's not ethical for you to
 5        ask him legal questions when he's not asked
 6        to be the lawyer in the case.  Be very
 7        careful.  Don't give answers to legal
 8        questions unless he shows you the law.
 9   Q.   Did you say agreed in your last answer?
10   A.   I was about to qualify my agreement before
11 you got started.
12   Q.   Did you say agreed first?
13   A.   I'm not going to answer that until I'm
14 allowed to explain my answer.
15   Q.   Well, first did you say agreed and then you
16 can explain your answer.
17   A.   Yes, I did say agreed.  In this case, Sam,
18 Mr. Polk is 654 feet at a minimum from this
19 intersection.
20   Q.   Based on what?
21   A.   Based on my reconstruction and the data that
22 came out of his vehicle.
23   Q.   When you say that, your reconstruction relies
24 upon the download performed by Shanon Burgess for
25 that.
```

127

```
 1        trying to answer and you keep interrupting.
 2        That's inappropriate.  Let him finish his
 3        answer.
 4   A.   Mr. Polk is so far away it doesn't matter or
 5 it shouldn't matter.
 6   Q.   Well, two football fields --
 7   A.   It's more than that by the way.
 8   Q.   No.  Your reference was two football fields.
 9   A.   I said more than two football fields.
10   Q.   which is 600 feet, isn't it?
11   A.   I said more than two football fields.  I said
12 at a minimum.  I think my number is 650-ish.
13   Q.   So 650 isn't even half of the 1500 feet that
14 he's supposed to be looking and seeing if there is any
15 approaching traffic, correct?
16             MR. HICKS: Object to the form of the
17        question.
18   A.   Right.  But if you were a driver as I've
19 demonstrated the gap acceptance studies and you saw
20 that gap and Mr. Polk was actually doing the speed
21 limit, it should not have been an issue.  This is a
22 move that 90 percent of the population would have
23 made.
24   Q.   Well sir, with all due respect, you
25 understand that only if Mr. Peraza was a qualified
```

126

```
 1   A.   Yes.
 2   Q.   Are you familiar with --
 3   A.   I'm not finished.
 4   Q.   Okay.
 5   A.   So at 654 feet in a 45 zone where your driver
 6 is doing 90 miles an hour or double the speed limit,
 7 he's not an imminent threat.  It is not like he pulled
 8 out when he was 50 feet from the intersection. He's
 9 over two football fields away.  So your question is
10 not that simple.  It's not a -- I mean, it has to do
11 with how far that gap is or how big that gap is.  It's
12 not a yes or no question.
13   Q.   Well, you understand that Mr. Peraza
14 specifically agreed that for drivers of semi tractors
15 like himself, that he has to be looking at least 1500
16 feet down the road to see if it's safe.
17             MR. HICKS: Object to the form of the
18        question.
19   Q.   Didn't he?
20   A.   Yes.  And I'm sure he was, but that Mr. Polk
21 was --
22   Q.   You are sure based on what?
23   A.   Because he says that he was. But --
24   Q.   But he didn't see him.
25             MR. HICKS: You keep interrupting.  He's
```

128

```
 1 driver was he to be on the road, correct?
 2   A.   Correct.
 3   Q.   And you understand that based on the
 4 deposition of MNE, that Mr. Peraza was not a qualified
 5 driver entitled to be on the road that evening,
 6 correct?
 7             MR. HICKS:  Object to the form of the
 8        question.  Calls for a legal conclusion.
 9   Q.   Do you understand that?
10   A.   No.
11   Q.   You didn't understand that?
12   A.   No.
13             MR. HICKS: It's not part of his report.
14        He said he was a qualified driver.
15             MR. MCHARD:  I'm sorry.  It's not your
16        deposition.
17             MR. HICKS: You can't tell him he wasn't
18        qualified when he was.  You can't do that.
19             MR. MCHARD: They admitted in the
20        deposition.
21             MR. HICKS: He admitted he was qualified.
22        You know he was qualified.  So don't tell
23        him he wasn't.
24             MR. MCHARD: Well, we're going to take
25        this up with the court too.
```

129

1    Q.   But are you aware according to the rules
2  applicable for qualified drivers in this case, that as
3  admitted by MNE in their 30(b)(6) that Mr. Peraza was
4  not a qualified driver?
5    A.   No.
6         MR. HICKS: Object to the form of the
7         question.  That is not a correct question.
8         It is not a correct statement of testimony.
9         MR. MCHARD:  Please.  It's just
10        unethical.
11        MR. HICKS: No.  It's unethical for you
12        to give him testimony that's not accurate.
13        You know that's not the case.
14   Q.   Are you aware, sir, and would you agree, that
15 if Mr. Peraza was not a qualified driver for purposes
16 of driving an over-the-road interstate 18-wheeler,
17 that he shouldn't have been on the road and at the
18 scene of this crash?
19   A.   I don't know that that's true.
20   Q.   No. But if that is true, you agree he's not?
21   A.   If he's not a qualified driver, then I guess
22 not.  I'm not opining on the regs at this point.
23   Q.   Now, and in terms of opining, you are not a
24 toxicologist either, are you?
25   A.   I'm not.

130

1    Q.   And you are not qualified to give opinions
2  with regard to toxicology, correct?
3    A.   Correct.
4    Q.   And with regard to this case, you don't know
5  anything about the draw of any blood samples by Mr.
6  Polk in this case?
7    A.   No.
8    Q.   You know that they weren't directed by the
9  police in this case, were they?
10   A.   I have no idea.
11   Q.   You don't know who drew them or how they were
12 drawn or when they were drawn or how they were
13 preserved, do you?
14   A.   I don't have -- no.  I've seen the report,
15 but I don't have any memory of that.
16   Q.   So with regard to any of the toxicology
17 involved in this case, that's not your field of
18 expertise and it would just be speculation on your
19 part, wouldn't it?
20   A.   It would.  It does say in the police report
21 that the police did direct the test.  Test given.
22 Blood test given.
23   Q.   No.  It doesn't say that the police directed
24 it.
25   A.   It's on the police report.

131

1    Q.   No.  It just says that they know that it
2  happened.
3    A.   Well, how would it happen if they didn't
4  direct it?
5    Q.   Well, you don't know, do you?
6    A.   No.  I'm just reading what's on the record.
7    Q.   Are you familiar with the Scientific Working
8  Group on Digital Evidence Standards that might apply
9  in this case?
10   A.   No.
11   Q.   Do you know what the Scientific Working Group
12 on Digital Evidence is?
13   A.   No.
14        (EXHIBIT 56 ENTERED)
15   Q.   Have you ever seen Exhibit 56, the Scientific
16 Working Group on Digital Evidence Best Practices for
17 Computer Forensic Acquisitions?
18   A.   No.
19   Q.   Do you agree that that's one of the standards
20 in the industry?
21   A.   I don't.
22   Q.   Why don't you agree with that?
23   A.   Because I have never seen it and so I
24 wouldn't know if it was.
25        MR. HICKS:  Was this produced in

132

1  discovery?
2    A.   No. I doubt it.
3         MR. HICKS: I'm asking has this been
4         produced to us in discovery.
5         MR. MCHARD: It doesn't have to be.
6         MR. HICKS: Yes, it does.  If you are
7         going to ask him a question about a document
8         it has to be produced in discovery.
9         MR. MCHARD: This is a deposition of
10        an expert.  You don't do that.
11        MR. HICKS: Yes, you do when it's asked
12        for.  You don't do it, but professional
13        lawyers do when it's asked for.  So if you
14        can answer questions with regard to a
15        document that hasn't been produced, then go
16        right ahead, I guess.
17   A.   (Reviews document.)  Do you have questions
18 about this?
19   Q.   Well, you've answered them.  I'm moving on.
20 Do you know what the NIST is?
21   A.   I don't.
22   Q.   Have you ever heard of the National Institute
23 of Standards and Technology?
24   A.   No.
25   Q.   Part of the U.S. Department of Commerce, the

133

```
 1  United States Government?
 2      A.  Not specifically.
 3      Q.  Are you familiar with the Scientific Working
 4  Group on Digital Evidence Best Practices for
 5  Collection of Damaged Mobile Devices?
 6      A.  I don't even know what organization that is,
 7  so no.
 8      Q.  I'm showing you exhibit number 57.
 9              (EXHIBIT 57 ENTERED)
10          MR. HICKS: Was this document produced in
11          discovery?
12          MR. MCHARD: No.
13          MR. HICKS: Interpose an objection to it.
14      A.  Where is the disclaimer?  Okay.
15      Q.  Have you ever seen this document?
16      A.  I'm sorry.  Give me one second.
17          MR. HICKS: I don't have time to study a
18          document I have never seen. I can't comment.
19      A.  I have no idea what this is, Sam.  I guess
20  you printed this off from the Internet.  I don't know
21  who the Working Group on Digital Evidence is.  It
22  doesn't appear to be -- is it a government agency or
23  part of?  Can you tell me where it came from?
24      Q.  I'm asking you if you are familiar with this
25  and it's a standard.
```

134

```
 1      A.  No.  I don't know if it's a standard.  This
 2  looks like something printed from the Internet.
 3      Q.  Are you familiar with the National Institute
 4  of Standards and Technology Computer Forensics Tool
 5  Testing Handbook?
 6      A.  I'm not, no.
 7      Q.  I'm showing you Exhibit 58.
 8              (EXHIBIT 58 ENTERED)
 9      Q.  Have you ever reviewed this document?
10      A.  No.
11          MR. HICKS: Has this been produced?
12          MR. MCHARD: No.
13          MR. HICKS: I object to it.
14      A.  No.  I don't know what this is.
15      Q.  Do you know what chip research Messerschmidt
16  ever performed in connection with this standard for
17  attempting to do chip-swaps and downloading from
18  damaged mobile devices?
19      A.  Mobile devices?
20      Q.  Well, this is a mobile device.
21      A.  No, it's not.
22      Q.  It's an ACM.  Well, from damaged ACMs then.
23      A.  Yes. Mr. Burgess has worked extensively with
24  University of Tulsa's engineering department as well
25  as the manufacturers of the equipment that he uses in
```

135

```
 1  California.
 2      Q.  But he's not an expert in this case, is he?
 3      A.  That's up to you guys.
 4      Q.  Well, he's never been disclosed as an expert
 5  witness.  You are aware of that?
 6          MR. HICKS: He's not offering opinions in
 7          the case.  Opinions are being offered by
 8          this gentleman here.
 9      A.  What was the question?  You would have to
10  repeat it.  I'm sorry.
11      Q.  He's been never been disclosed.  We've been
12  through the disclosure of experts in this case.
13      A.  No, not to my knowledge.  We've already been
14  through it and not to my knowledge.
15      Q.  I'm showing you exhibit number 59.
16              (EXHIBIT 59 ENTERED)
17      Q.  Are you familiar with this document?
18          MR. HICKS:  Has this been produced in
19          discovery?
20          MR. MCHARD: Yes.
21      Q.  Do you know what this is?
22          MR. HICKS: I interpose an objection to
23          it because I'm not familiar with it.
24      A.  I don't. I've never seen this, Sam.
25      Q.  And you've never seen it because again, this
```

136

```
 1  whole area that was performed by Shanon Burgess with
 2  his special area of expertise is outside your area of
 3  expertise; is that correct?
 4      A.  I don't know if this random document you
 5  printed off is even irrelevant.  But in either case I
 6  haven't seen it.
 7      Q.  But again, Shanon Burgess has a particular
 8  area of expertise, isn't it?
 9      A.  Yes.
10      Q.  And that area of expertise is outside of your
11  area of expertise, isn't it?
12          MR. HICKS: Object to the form of the
13          question.  It's been asked and answered.
14      A.  Some of it, yes.
15      Q.  Well, in terms of attempting to gather
16  information from damaged ACMs and chip-swaps, all of
17  that is in his area of expertise and not in your area
18  of expertise; is that correct?
19      A.  I'm going to answer the question my way or
20  I'm not going to answer it.  Shanon is a technician
21  that works for me.  Shanon performed the physical
22  process of moving the chip over.  That is his area.
23  So yes, I do not have that expertise. But that's his
24  only role here is to move the chip from one module to
25  the other, to assess the module and to remove the
```

137

1  chip, put it in a healthy host so that we can download
2  the data.  He's a technician that performs that task.
3     Q.   And his area of expertise is not within your
4  area of expertise; is that correct?
5           MR. HICKS: Object to the form of the
6        question.
7     A.   Well, in addition to doing this, Shanon also
8  downloads modules, which I do.  He also analyzes data,
9  which I do.  He also does some of the general
10  reconstruction stuff that I do.  So when you ask that
11  question, the answer is not yes or no.  It's both. We
12  have fields that overlap.  But with respect to
13  physically moving one chip from one module to another,
14  no, we do not have the same expertise.
15     Q.   That's his area of expertise and not yours?
16     A.   Correct.
17     Q.   And to the extent that this document was
18  produced by MNE and Messerschmidt and was explained as
19  chip research, you still don't know what it means, do
20  you?
21     A.   Chip research?
22     Q.   Yes.
23     A.   What does that mean?
24     Q.   I don't know.  You're the one who produced
25  it.

138

1     A.   What are you talking about?
2           MR. HICKS: What document?
3     Q.   The document that you have in front of you.
4     A.   Which one?
5     Q.   This one.  Which I think --
6     A.   That was produced by us?
7     Q.   Yes.
8     A.   Yes.  So that's something that Mr. Burgess
9  relied upon when --
10     Q.   But you've never seen it and you don't
11  understand it and you can't explain it?
12     A.   No.
13     Q.   And it's not within your area of expertise?
14     A.   Correct.
15     Q.   And with all of these Scientific Working
16  Group's Best Practices, you don't even know if Mr.
17  Burgess knows of these standards, do you?
18     A.   What is that?  You tell me what the
19  Scientific Working Group on Digital Evidence is
20  because that looks like -- honestly it looks like a
21  club of people that have put out white papers.  So
22  unless that's a government agency, it doesn't change
23  the fact.  I don't know what that is.  I don't know if
24  Mr. Burgess knows what that is or not.  But Sam, I
25  don't know what that is.

139

1           MR. HICKS:  Was that produced in
2        discovery?
3           MR. MCHARD: No.
4           MR. HICKS: Interpose an objection.
5     Q.   I'm showing you exhibit number 60.
6           (EXHIBIT 60 ENTERED)
7     Q.   Are you familiar with this Exhibit 60, the
8  Scientific Working Group on Digital Evidence Best
9  Practices for Chip-Offs or Chip-Swaps?
10     A.   This is a dot org.  It also says you are
11  supposed to alert them if you are going to use this in
12  a legal capacity.  I don't know if you've done that or
13  not.
14     Q.   In testimony.
15     A.   I don't know what this is, Sam.
16     Q.   And you don't know if Mr. --
17     A.   I don't.
18     Q.   -- Shanon Burgess --
19     A.   No, I don't.
20     Q.   -- is familiar with this either?
21     A.   I don't.
22     Q.   And you are not aware that the digital
23  evidence subcommittees that we were talking about form
24  the standards and guidelines for any NIST, the
25  National Institute of Standards and Technology for the

140

1  United States Department of Commerce?
2     A.   Sam, that question went off the rails.  What
3  are you saying?  Could you put that more concisely?
4     Q.   That all of these standards from the Digital
5  Evidence Subcommittee --
6     A.   Which subcommittee?
7     Q.   All of these subcommittee standards that
8  we've been through are part of the NIST, the National
9  Institute of Standards for Technology that's part of
10  the U.S. Department of Commerce.
11     A.   I don't know that.
12     Q.   But you have no facts, witnesses or documents
13  to disagree with it, do you?
14     A.   No, Sam, I don't.
15           (EXHIBIT 61 ENTERED)
16     Q.   Now earlier you talked about the JTAG
17  standards.
18           MR. HICKS: Object to any questions on
19        this document not produced in discovery.
20     Q.   Is that correct?
21     A.   Yes, I did.
22     Q.   This is the JTAG standard that's referenced,
23  isn't it?
24     A.   I believe so.
25     Q.   But you didn't produce it, did you?

141

1    A.    No.

2    Q.    And you are not familiar with it, are you?

3    A.    No.

4    Q.    This again is within the special area of

5 expertise of Shanon Burgess, not you, correct?

6          MR. HICKS: Object to the form of the

7          question.

8    A.    That is correct.

9    Q.    And you don't know whether Shanon Burgess

10 complied with this or not, do you?

11    A.    He indicates in the report that he did.

12    Q.    But you are simply relying upon his hearsay

13 statement that he did, right?

14          MR. HICKS:  The rules allow him to rely

15          on expert and evidence in and outside the

16          hearing.  You're getting into legal

17          questions that you know the answer to.

18    A.    He didn't actually use JTAG, so I don't know

19 why this would matter.

20    Q.    It's the standard that he cites, correct?

21    A.    Right.  He said he has two options.  One of

22 them being JTAG.

23    Q.    And this is the JTAG that's referred to,

24 isn't it?

25    A.    Right.  But he did not use JTAG, so why you

142

1 would need the standard for that I don't know.

2    Q.    And we talked earlier about the only other

3 report about downloading from damaged EEPROMs or ACMs

4 that you are aware of was from the E³ponent testing

5 done, correct?

6    A.    That I'm aware of, yes.

7    Q.    I'm showing you exhibit number 62.

8          (EXHIBIT 62 ENTERED)

9    Q.    That is the E³ponent report performed by

10 Failure Analysis Associates sponsored by E³ponent,

11 correct?

12    A.    Correct.

13          MR. HICKS: Same objection.  Not produced

14          in discovery.

15    Q.    And that was testing and analysis.

16          MR. HICKS: I wish you would let me

17          finish my objection before you continue.

18          MR. MCHARD: I wish you wouldn't --

19          MR. HICKS:  You don't want me to object.

20          I'm sorry.  That's my responsibility.

21          MR. MCHARD: Well, it's object to form

22          and then you have to be quiet.

23          MR. HICKS: No.  I don't have to object

24          to form if you produce a document that

25          hasn't been produced.  That's not the form

143

1          of the question.

2    Q.    Now, with regard to this E³ponent report that

3 you say was the only other data that you knew of that

4 dealt with such testing of ACMs, what it specifically

5 states in the report is that airbag control modules

6 installed in late model Toyota Corporation vehicles

7 incorporate the event data recorder function, correct?

8    A.    I don't know.  I haven't read this.

9    Q.    Well, that's what it says in the first line

10 of the summary, isn't it?

11    A.    If that's what it says, then that's what it

12 says.

13    Q.    And they only tested according to it, 24

14 Toyota and 24 Lexus vehicles under controlled

15 conditions, right?

16    A.    Okay.

17    Q.    They didn't do any testing of any of the

18 EEPROMs or ACMs in the 2004 Yukon, correct?

19    A.    It doesn't appear so.

20    Q.    And in fact, the late model vehicles were in

21 the 2011 range when this report was prepared, wasn't

22 it?

23          MR. HICKS: Interpose an objection.  He's

24          asking you questions.  If you know the

25          answer, you know it.  If you haven't read it

144

1          --

2    A.    I don't know, Sam.  I haven't read this.  I

3 know of the study and I know it's specifically with

4 respect to the propane flame, the fire, because that

5 was an example that Mr. Burgess was giving as to why

6 this chip was fine because it didn't experience direct

7 flame because it was still housed within the module.

8 So it has nothing to do with what comes out of a

9 Toyota.  It has everything to do with they tested

10 chips in similar devices and those chips had --

11    Q.    Similar devices.  We don't know what the

12 similarity is, do we?

13          MR. HICKS: Please let him finish his

14          answer.

15    A.    Sam, I'm not talking about this anymore.  I

16 haven't read this.  If you are going to ask me about

17 specific studies within this report, that's fine.  I

18 see 2002s, 2003s.  All around the time -- or excuse

19 me.  The manufacturer date of our 2004 Yukon.  I don't

20 know exactly what chips they used and what those are

21 compared to our chip.  I simply know Mr. Burgess was

22 making a comparison to the fact that these types of

23 chips in these types of devices were fine as long as

24 they didn't experience direct flame contact, which

25 this one didn't, because it was still housed within

145

1  its ACM shell.
2      Q.  Well, or extreme heat up to certain
3  temperatures because we don't know of any testing
4  about that, do we?
5      A.  We don't.  But we do know that it was fine
6  because we got a download from it.
7      Q.  Well, when you say you got a download, we
8  don't have any documents or analyses or written peer-
9  reviewed studies that show that the information
10 obtained off of it was reliable and accurate.
11     A.  Yes, we do.
12     Q.  Under such circumstances.  What?
13     A.  We have 1000 studies that talk about the
14 reliability of data in the ACMs.
15     Q.  No.  In downloads of information from damaged
16 ACMs.
17     A.  I get it.  These things don't make up data.
18 I'm sorry that you don't like the data that's in it,
19 but they don't make up data.  Yes, it was in a fire.
20 Yes, it was under extreme heat.  We don't know how
21 much.  We know the chip is fine, that it was pulled,
22 that all of our processes worked, that we went through
23 a standard of tests to get to this point.  The chip
24 was removed and placed in and we recovered an event
25 that matches the physical evidence in our crash.

146

1      Q.  You haven't ever shown me the standard of
2  tests.  I've shown you all of the standards.
3              MR. HICKS: Object to the form of the
4          question.
5      Q.  There is no standard.  Is that what you are
6  saying?
7      A.  This is something that's so rarely done, I
8  doubt that there is a standard.
9      Q.  Thank you.
10     A.  Remember Sam, all these are very different.
11 So this is a step-wise protocol.  We've outlined our
12 protocol.
13     Q.  You've outlined what you did to attempt to
14 extract data in this case by Shanon Burgess; is that
15 correct?
16     A.  Which is documented in a specific article
17 that was written in a peer-reviewed source years ago.
18 I'm sorry if Brett doesn't understand this stuff.  But
19 this is not complex. This is taking a flashdrive out
20 of one computer and putting it in another.
21     Q.  Just read back the question because I need an
22 answer to my question.
23              (WHEREUPON THE LAST QUESTION WAS READ
24          BACK BY THE COURT REPORTER AS FOLLOWS:
25          "You've outlined what you did to attempt to

147

1              extract data in this case by Shanon Burgess;
2          is that correct?")
3      A.  Yes is the answer.
4      Q.  I'm showing you exhibit number 48.
5              (EXHIBIT 48 ENTERED)
6      Q.  Have you ever seen Brett Alexander's report?
7      A.  Yes.
8      Q.  And when did you see that?
9      A.  I don't know when I was sent this report.
10 I'm assuming sometime after June 20th.
11     Q.  After you had prepared your report and your
12 Disclosure of Opinions?
13     A.  Let's see.  His is dated June 20th.  Mine is
14 dated June 14th.  So yes.
15     Q.  So you saw this for the first time after you
16 had written your report, correct?
17     A.  Correct.
18     Q.  And you didn't know what Mr. Alexander's
19 opinions and conclusions were at the time you wrote
20 your report and made your disclosure, correct?
21     A.  That's correct.
22     Q.  And I would like to walk through this.  You
23 agree that image 278 shows the skid mark in the center
24 of the lane?
25     A.  I'm sorry, Sam.  Which photo?

148

1      Q.  278.
2      A.  Is that in this pile of pictures?
3      Q.  Yes.  Right here.  278.
4      A.  I think that's it.  My numbers are washed
5  out, so I can't see it.
6      Q.  I apologize.
7      A.  Yes.  Okay.
8      Q.  And is that the skid mark that you've
9  referenced?
10     A.  No.  It looks to be too far back.  I can't
11 really tell where that -- I don't know, Sam.  That
12 picture is too grainy.
13     Q.  Well, show me the skid mark that you are
14 referencing in the photos that have been provided that
15 you relied upon in forming your opinions and
16 conclusions. Well, you are pointing to something.
17     A.  I'm pointing to the skid mark that's obvious
18 in the photos.
19     Q.  You've put a green arrow on Polk photo number
20 35 from Exhibit 34; is that correct?
21     A.  That's correct.
22     Q.  Any other skidmarks that you are referencing?
23     A.  No.  And that was the skid mark that was
24 measured in the police report in the official
25 measurement log.

149

```
 1    Q.   That's attached to the police report,
 2 correct?
 3    A.   Yes.  This one doesn't have an exhibit
 4 number.  It's the police report.  And it's the last
 5 page.
 6    Q.   It's Exhibit 13, yes.
 7    A.   It's the last page of the police report.
 8    Q.   And do you agree that at the top of the
 9 picture near the double line there is another skid
10 mark that can be seen?
11    A.   No.
12    Q.   That there are two skidmarks?
13    A.   No.
14    Q.   You disagree with that?
15    A.   I see two.  There is a light one here and
16 there is one here.  What you are talking about?
17    Q.   Well, are there two skidmarks or one skid
18 mark?
19    A.   Well, there is two.  There is a lighter one
20 here and there is a darker one here.  This is the only
21 one that was measured.  So that is the one I'm
22 referring to.
23    Q.   Well, point and mark number 1, the one you
24 are referring to and to the second one.  So you've
25 done that on the photo; is that correct?
```

150

```
 1    A.   Yes.
 2    Q.   Do you agree that the damage to the passenger
 3 side of the Freightliner is shown in image 258?
 4    A.   I don't have color photos over here, so I'm
 5 not sure which -- I can't see some of the numbers.
 6    Q.   Well, let me get a color copy for you.
 7    A.   I'm sorry.  Which photo?
 8    Q.   I apologize.  I don't see it here. Do you
 9 agree with Mr. Alexander's conclusion that the front
10 of the GMC shows most damage after the impact, with
11 the bumper being pushed back to the front tires and
12 dented and bent in different directions?
13    A.   Yes, I agree with that.
14    Q.   And do you agree that the front corners of
15 the Polk vehicle were bent out of place with the
16 passenger side being disfigured more than the driver's
17 side?
18    A.   It's a quality of term, but yes, seemingly.
19    Q.   And that the damage shown to the Yukon is
20 consistent with under ride?
21    A.   Yes.
22    Q.   And do you agree that you cannot make
23 consistent with your interpretation of the download
24 information performed by the chip-swap by Shanon
25 Burgess, the testimony that Polk's vehicle was
```

151

```
 1 traveling under reasonable control and at a reasonable
 2 speed with no erratic driving or weaving prior to the
 3 crash.  Is that a true statement?
 4    A.   How could anyone say he was not dramatically
 5 weaving before the crash?  What evidence would there
 6 be of that?
 7    Q.   If they had been following for several miles.
 8    A.   What they were truthful in following, yes.
 9    Q.   But you don't believe that Cazz Holden is
10 truthful?
11    A.   I don't, no.
12    Q.   And do you agree that the Freightliner had an
13 obligation to yield to traffic on Mississippi 26?
14         MR. HICKS: Object to the form of the
15 question.
16    A.   Traffic that would have been in imminent
17 danger under the speed guidelines for that road.
18    Q.   Oh, you are saying that if a vehicle was
19 traveling over the speed guidelines that Mr. Peraza
20 had a right not to yield the right of way?
21    A.   No.  What I'm saying is if Mr. Peraza comes
22 up to the stop sign as he did and looks to the right
23 and sees Mr. Polk or didn't see him, I know this is a
24 for instance, sees him to the right at 654 feet away,
25 reasonably he could conclude on that roadway that he
```

152

```
 1 had time to pull out.  So then he's not required to
 2 yield because he has enough headway to pull out
 3 safely.
 4    Q.   Well, at night you can't tell what those
 5 distances were, can you?
 6         MR. HICKS: Object to the form of the
 7 question.
 8    A.   I don't know if that's true or not.
 9    Q.   It's just speculation, isn't it?
10    A.   It's a long way away.
11    Q.   But it's just speculation, isn't it?
12    A.   Yes, sure.
13    Q.   And you would agree that the GMC Yukon had
14 the right of way at this intersection?
15    A.   No.
16    Q.   It was the through traffic?
17    A.   It's on the through road.  But that doesn't
18 mean he has a right -- with your logic, Sam, that
19 means that no one can ever turn on 26 if Mr. Polk is
20 on it because he's on it and has the right of way.  So
21 where does that stop?  Where does Mr. Polk's right of
22 way stop?  Should people at Love's not pull out
23 because Mr. Polk is coming?  There is a limit to that.
24 And what I'm saying is that he was beyond that limit.
25    Q.   Beyond that limit based on what?
```

153

1    A.   Based on reasonable speeds.  If Mr. Polk is
2 doing the speed limit or even close to it, this never
3 happens.  It never happens because Mr. Peraza would
4 have had time to pull out.
5    Q.   But he never saw him.
6    A.   That's his recollection.  That has nothing to
7 do with him pulling out.
8    Q.   He pulled out because he didn't see him.
9    A.   He pulled out because he thought it was safe
10 to do so.
11    Q.   No.  He pulled out because he never saw the
12 Polk vehicle, right?  Is that correct?
13    A.   Maybe he doesn't remember seeing him.
14    Q.   He pulled out because he never saw the Polk
15 vehicle.
16    A.   That's correct if that's what he says in his
17 deposition.
18    Q.   As well you don't have any facts, witnesses
19 or documents to contradict that, do you?
20    A.   No, I don't.
21    Q.   And you would agree that the Freightliner
22 line of sight was more than 1500 feet, correct?
23         MR. HICKS:  Object to the form of the
24         question.
25    Q.   Going to the east.

154

1    A.   I don't know that it's that far.  It is a
2 long way, but I don't know if it's that far.
3    Q.   And you would agree that as we've seen in the
4 map performed by Brett Alexander, the house that's in
5 the photo is approximately 1500 feet from the
6 intersection where Mr. Peraza was pulling out,
7 correct?
8    A.   No.  I haven't seen that.  I've seen the
9 diagram, but I don't know exactly what you are
10 referring to.  Is his diagram in this?
11    Q.   We've gone through it this morning.
12    A.   You are bringing up a point we didn't talk
13 about earlier.
14    Q.   No.
15    A.   What house?
16    Q.   The house that's shown down here.
17    A.   Yes.  That's fine, Sam.
18    Q.   You agree?
19    A.   I agree that that house is there, yes.
20    Q.   Well, and that the house in the photo is
21 about 1500 feet from the intersection.
22         MR. HICKS: Object to the form of the
23         question.
24    A.   Again, I don't know that.
25    Q.   Well, it is according to the map.

155

1    A.   Well, that's fine.  If Brett's map says it,
2 then I'm sure it's true.  But I've never measured it.
3    Q.   And you agree that the gouge marks that we
4 see were in the westbound lane of traffic and the
5 crash occurred in the westbound lane of traffic, Mr.
6 Polk's, correct?
7    A.   Well --
8    Q.   Is that correct?
9    A.   Give me a second.  Based on the gouge marks
10 and the skid mark, I mean, it appears to happen
11 basically if you looked to the centroid of the
12 collision, I would say it's near the center line.
13    Q.   But it's on the north side of the center
14 line, isn't it, where we identified the gouge mark?
15    A.   Most of Mr. Polk's vehicle would have been
16 north of the center line.  And the gouge marks are
17 there.  That doesn't mean his whole car was over
18 there.  His car remember is 7-ish feet wide, 6 feet
19 wide.  Just because there are gouge marks on the north
20 side doesn't mean his car didn't extend into the south
21 side.
22    Q.   Well, do you know what portions of his
23 vehicle made the gouge marks?
24    A.   No.  With the burning it kind of erases the
25 fresh damage.

156

1    Q.   And you would agree that the ACM download
2 from the Yukon is inconsistent with the eyewitness
3 accounts of Cazz Holden, correct?
4    A.   Mr. Holden's account is inconsistent with the
5 data, yes.
6    Q.   And the ACM download that was performed by
7 Shanon Burgess shows the number of ignition cycles to
8 be four, doesn't it?
9    A.   Yes.
10    Q.   And why is that?
11    A.   Because the control chip is not the original
12 control chip.  There is two things housed on that
13 control chip.  That happens to be one of them.  It's a
14 new module, so there is no ignition cycles or very
15 few.
16    Q.   Well, it says four.  How did he get four?
17    A.   Because he did testing on it.  You just
18 showed me four or five downloads that he submitted.
19    Q.   No.  I only saw --
20    A.   If it's powered on it shows.  We know it's
21 not the right number of ignition cycles.  But that's
22 expected.
23    Q.   In your report you say without ever having
24 seen Brett Alexander's report and opinions that you
25 are going to rebut the opinions of Brett Alexander.

157

1  What are you going to --
2      A.  I never said that in my report.
3      Q.  Well, your disclosure that we've previously
4  marked as exhibit number 32 says exactly what I just
5  read.
6      A.  When was that submitted?
7      Q.  23th day of July 2018, sir.
8      A.  So after Brett's report came out.  A month
9  and three days after Brett's report came out.  Yes.
10  What's the problem with that?  A month after his
11  report came out my designation says I'm going to rebut
12  his opinions.
13     Q.  Well, what are you going to rebut?
14     A.  You are right.  Because he doesn't really
15  have any opinions, does he?  Well, the Freightliner
16  had a stop sign on the right and the left of the exit
17  ramp.  The GMC did not have a traffic control device.
18  That's true.
19     Q.  No.  Just tell me what you are going to
20  rebut.
21     A.  I'm reading the opinions so I can tell you
22  what I'm going to rebut.  The Freightliner had an
23  obligation to yield to traffic on Mississippi 26.  The
24  GMC Yukon had a right of way at this intersection.
25  I'm rebutting that, because I think at the distances

159

1  So he didn't look very hard.  So I would rebut that as
2  well.
3      Q.  But you've never cited any of those, any
4  section.
5      A.  I didn't do the chip-swap transplant.
6      Q.  And you are not relying on that article, are
7  you?
8      A.  No, I am, because that's why we had the idea
9  to do it is because we have research and we have
10  protocols that have been established for 10 years.
11     Q.  For some other expert Shanon Burgess to do;
12  is that correct?
13         MR. HICKS:  Object to the form of the
14         question.
15     A.  He is the technician, so yes, he did it.
16     Q.  And he is the expert?
17         MR. HICKS:  Object to the form of the
18         question.
19     A.  He's the technician.
20     Q.  And you relied upon his expert opinion.  Is
21  that what you are saying?
22     A.  I relied on the result of his technical
23  process.
24         MR. MCHARD:  Let's take about a 5-minute
25         break.

158

1  that we've put forward based on our analysis of the
2  CDR data, he did not have a duty to yield to Mr. Polk.
3      Q.  That's based on the download by Shanon
4  Burgess?
5      A.  Based on the download by Mr. Shanon Burgess.
6  The Freightliner's line of sight is more than 1500
7  feet.  That's fine.  I'm sure that's true.  Skidmarks
8  showed deviation on double yellow.  Here we go.
9  That's perfect.  The skid mark showed deviation on the
10  double yellow center line, which means Mr. Polk was
11  over the center line.  Gouge marks were in the
12  westbound lane.  That's true.  Indicating the crash
13  occurred in that lane.  His skid mark goes over the
14  center line, which means some of his car was not in
15  his lane.  The ACM download from the Yukon is
16  inconsistent with the eyewitness accounts.  That's
17  true.  The ACM download does not show the number of
18  ignition cycles.  That's true.  But that's an overly
19  simplistic argument that he's making because we know
20  that they are not going to show the same ignition
21  cycles.  That's irrelevant.  After research I have not
22  been able to find any industry standard practices or
23  protocols conducting chip transplants or swapping
24  EEPROMs.  That's not true.  I first read the study
25  about chip transplant in his office in his library.

160

1              (OFF THE RECORD)
2      Q.  Back on the record.  Please look at Exhibit
3  44.  As we stated earlier, the first five pages of
4  that, excuse me, six pages of that document are your
5  signed report, correct?
6      A.  Correct.
7      Q.  And as we see on page 2 of that document, it
8  is directed to Mr. Hicks per his request, correct?
9      A.  Yes.
10     Q.  And he requested, according to this, that you
11  review the sources of information that you list, which
12  we've gone over those 11 that are stated, correct?
13     A.  Correct.
14     Q.  And that was written by -- that section was
15  written by Olivia, wasn't it?
16     A.  She put in -- she does the letterhead part
17  and the first page, and then she puts together the
18  bullet points for -- yes, she lists the things that
19  were reviewed and the --
20     Q.  Crash description?
21     A.  Right.  It's a formula.
22     Q.  From Dear Mr. Hicks down to analysis and
23  findings, Olivia did that for you, correct?
24     A.  Yes.
25     Q.  And did you ever speak with Don Trooskin, the

161

```
1  investigator?
2     A.  Not that I'm aware of.
3     Q.  Are you aware that Don Trooskin took a
4  statement of Mauricio Peraza?
5     A.  No.
6     Q.  Well, that would be important information for
7  you to see, wouldn't it?
8     A.  Yes. I mean, I have his deposition.
9     Q.  But if an investigator --
10    A.  Sure.
11    Q.  -- for MNE or their insurance company, had
12 taken a statement shortly after the crash from Mr.
13 Peraza, you should look at that?
14    A.  Yes, I agree, Sam.  Yes.
15    Q.  But that was never provided to you by Mr.
16 Hicks, was it?
17    A.  No.
18    Q.  Or anybody from MNE or their side, correct?
19    A.  Not unless it got lost in the shuffle, no.
20    Q.  Well, you would certainly remember that,
21 wouldn't you?
22    A.  I have not seen the statement for whatever
23 reason.
24    Q.  With regard to the Analysis and Findings
25 portion of your report, you say that there were CDR
```

162

```
1  module data recovery efforts, right?
2     A.  Yes.
3     Q.  And all of those were performed by and under
4  the expertise of Shanon Burgess, correct?
5           MR. HICKS: Object to the form of the
6           question.
7     A.  He is the technician, yes.  He performed the
8  operation.
9     Q.  And they were performed by him with his
10 special expertise, correct?
11          MR. HICKS: Object to the form of the
12          question.
13    A.  As a technician he performed the task, yes.
14    Q.  Which is his special area of expertise; is
15 that right?
16          MR. HICKS: Object to the form of the
17          question.
18    A.  One of them.
19    Q.  And it's not your area of expertise, is it?
20    A.  It's not.
21    Q.  And according to the report that he obtained
22 from his efforts, there was a deployment and a
23 non-deployment event, correct?
24    A.  Correct.
25    Q.  And you conclude that they appear to be
```

163

```
1  linked, but there is an offset, correct?
2     A.  Well, they are definitely linked, but there
3  is an offset, yes.
4     Q.  Offset meaning what?
5     A.  That means that the data is offset.
6     Q.  It's not identical for the deployment and
7  non-deployment.
8     A.  Right.  It's two different events.  It
9  happened at two different times.  But they overlap, so
10 that's what I mean.
11    Q.  They are not identical?
12    A.  Well, no, they wouldn't record two events
13 that were identical.
14    Q.  With regard to -- I'm going to page 4.  You
15 say based on the documentation of the crash site, the
16 measurement log and the at-scene photographs provided
17 with the crash report.  All of that is what some
18 Poplarville police officer did, correct, those three
19 things?
20    A.  Well, that, and then our visit to the crash
21 site where we created the scale for the diagram.  So
22 the documentation at the crash site that we performed
23 as well as the measurement log from the crash report
24 and the at-scene photos, yes.
25    Q.  Those are what you are referring to, correct?
```

164

```
1     A.  Yes.
2     Q.  And then it says we have established an
3  approximate impact orientation.  Who is we?
4     A.  It's my company.
5     Q.  Yes. But who did that?
6     A.  I made this diagram.
7     Q.  Who established that approximate impact
8  orientation?
9     A.  I did. Sam, it's the royal we.  Brett says it
10 in his report.  It's together Olivia I with her
11 work with the drone and then her work with some of
12 scene and my work with the crash site and then coupled
13 with the measurement log and the at-scene photos we
14 did it I guess.
15    Q.  You and Olivia, correct?
16    A.  Yes.
17    Q.  And then in paragraph 5 you say that you
18 calculated how far you believe Peraza would have
19 traveled from his pre-impact position to the area of
20 impact.  Now, tell me what the pre-impact position is.
21    A.  Well, just to give Mr. Polk the benefit of
22 the doubt, I put the pre-impact position, which is
23 labeled on the diagram, at the very edge of the
24 roadway.  So a likely start point for a vehicle in the
25 middle of that lane turning left.
```

165

1    Q.  And then you say based on an acceleration
2  factor.  Where do you get the acceleration factor?
3    A.  Those are -- it's just an average factor for
4  a loaded 18-wheeler from a stop.  So it's just a
5  published value that we've learned in our crash
6  reconstruction courses.  It's a commonly used number.
7    Q.  But that assumes that Mr. Peraza had stopped,
8  doesn't it?
9    A.  Yes.
10   Q.  And you don't have any facts, witnesses or
11 documents to support that, do you?
12          MR. HICKS:  Object to the form of the
13          question.  Mr. Peraza testified.
14   A.  There are no facts, witnesses or documents,
15 if not Mr. Holden, that illustrates he didn't stop
16 either.
17   Q.  Other than Mr. Holden who indicates that he
18 didn't stop.
19   A.  Or Mr. Peraza says he did stop.  Which one?
20 It's whoever you want to believe there, Sam.
21   Q.  And you've chosen to believe Mr. Peraza and
22 not believe Mr. Holden, correct?
23   A.  Mr. Peraza is the driver.  He said he
24 stopped.  There is no evidence that he didn't stop.
25 And Mr. Holden has been wrong about a number of other

166

1  things.  And he was a very long way away. So yes, in
2  this particular case since there is no evidence he
3  didn't stop, that's the scenario I'm running.
4    Q.  Yeah.  You elect to believe Mr. Peraza and
5  not Mr. Holden; is that correct?
6    A.  There is no evidence he didn't --
7    Q.  Is that correct?  That's a yes or no.
8    A.  No, it's not.  Because there is no evidence
9  he didn't stop.  We don't have skids over the stop bar
10 into the intersection from Mr. Peraza.  There is no
11 evidence he didn't stop.  And he says he did stop.
12 But yes, in effect, that's fine.
13   Q.  You then state that -- and this is
14 parenthetical number 6.
15   A.  Okay.
16   Q.  When Peraza was making the decision to pull
17 out one second prior to his physical movement.  What's
18 the basis for that assumption?
19   A.  That's a minimum time for most drivers.  It
20 takes a second to go from the brake to the gas.  In
21 his case he would have had to use the clutch and shift
22 if he hadn't already shifted.  So it's just an
23 approximation of what most drivers take.  There is a
24 time between him looking and deciding and then his
25 feet moving and his hands steering.  So there is a

167

1  little bit of a buffer there.
2    Q.  Well, that's an assumption that he did look,
3  when in fact, he didn't see what was clearly visible,
4  the oncoming headlights of Mr. Polk and Mr. Holden,
5  correct?
6          MR. HICKS:  Object to the form of the
7          question.
8    A.  That's not what that is.  That was his
9  decision to pull out.  So from his mental decision,
10 whether or not he's looking at Mr. Polk or not, his
11 decision to -- his movement, his physical movement
12 onto the accelerator or the shifter, whatever he did,
13 that time is usually about a second.  It's more than
14 that.
15   Q.  Based on what?
16   A.  Based on years of research and I.DRR again.
17 That program boils down these figures.  But that's a
18 commonly accepted value.  And that's a minimum, Sam.
19   Q.  Again, that assumes that he stopped prior to
20 entering?
21   A.  Yes.
22   Q.  And then you say that a driver entering the
23 roadway, meaning the right of way of Route 26, would
24 assume that they had a 10 to 10 1/2 second gap to
25 Polk, correct?

168

1    A.  Well, that's what it would look like based on
2  the speed limit and the distance.
3    Q.  Well, that would be what it would look like
4  if, in fact, Mr. Peraza ever saw Mr. Polk's
5  headlights, correct?
6    A.  Well --
7    Q.  Is that correct?
8    A.  He was so far away I doubt he registered on
9  Mr. Peraza's radar.
10   Q.  No.  But that assumption is based upon a
11 decision --
12   A.  Yes.
13   Q.  -- made that he saw Mr. Polk's oncoming --
14   A.  Sure.
15   Q.  -- vehicle and headlights.
16   A.  Sure.  If you want to cling to that you can.
17 But yes, you are right.
18   Q.  Well, when you say cling to that, I mean,
19 this is an assumption and I'm trying to find out the
20 bases, the facts, witnesses and documents.
21   A.  It's not an assumption.  If he had seen him,
22 he would have -- the average driver would have pulled
23 out.  That's not an assumption.
24   Q.  This isn't a question about the average
25 driver.

169

1    A.   It is when you are applying research to a
2  situation to see if something was appropriate or not.
3  It's exactly what it is.  You apply research and you
4  apply other people, normal drivers, and you apply that
5  body of research to this situation and say would
6  someone have turned out.  And the answer is yes.  If
7  he had seen him, he still would have turned out.  He
8  still would have pulled out.  Excuse me.  Not turned
9  out. 98 percent of the population, Sam, would have
10 seen him over two football fields away and would have
11 thought they had enough time to pull out.
12    Q.   Based on what?
13    A.   Based on research, Sam.
14    Q.   What research?
15    A.   The research that's compiled within I.DRR,
16 which is a program we've already discussed, Mr.
17 Muttart's program or his company's program.
18    Q.   For what an average driver would do if they
19 saw a vehicle that far away at a certain speed?
20    A.   Yes.
21    Q.   At night?
22    A.   Yes.  All those things. It's an analytical
23 program which boils down these situations and says
24 what would --
25    Q.   For an average driver.

170

1    A.   For an average driver.
2    Q.   And is there anything to show that Mr. Peraza
3  was an average driver at the time of this crash?
4    A.   That's a ridiculous question.
5    Q.   Is there?
6    A.   Is there anything that doesn't?
7    Q.   Is there anything that does?
8    A.   There is nothing that I have seen that says
9  he wasn't an average driver.  Do you have something?
10   Q.   This whole business about the gap and the
11 research about the gap and what 90 percent of average
12 drivers would do.
13   A.   98 percent.
14   Q.   98 percent of average drivers would do, is
15 irrelevant if, in fact, Mr. Peraza never saw the
16 headlights of the oncoming Polk vehicle; is that
17 correct?
18   A.   No, it's not.
19   Q.   Why not?
20   A.   Because what I'm saying is even if he had
21 seen him, still 98 percent of the population would
22 have pulled out.
23   Q.   Based on what?
24   A.   Sam, we just talked about this.  Based on
25 research, the years and years of research into gap

121

1  acceptance.  Based on a field of human factor studies
2  that's decades old.
3    Q.   Well, in paragraph 7, your conclusion that
4  Mr. Polk would have approximately 5.7 seconds to
5  perceive and respond to Mr. Peraza.  That assumes
6  again, that Mr. Peraza stopped at the stop sign,
7  correct?
8    A.   Yes.
9    Q.   And that also assumes that headlights that
10 were pointed predominantly to the west would have been
11 visible to Mr. Polk, correct?
12   A.   Are you suggesting that Mr. Polk would not
13 have seen Mr. Peraza?  I don't know what you are
14 asking.
15   Q.   It's a dark and unlit intersection, correct?
16   A.   Right.
17   Q.   The only lights that are there are whatever
18 vehicle lights there are at that time and place,
19 correct?
20   A.   Sure.
21        MR. HICKS: Object to the form of the
22     question.
23   Q.   And we know that Peraza's vehicle was pointed
24 with its headlights predominantly going to the west
25 toward the Love's Truck Stop.

172

1    A.   At the time of impact, not when he was
2  pulling out.
3    Q.   Well, do we know where --
4    A.   We know where the road is.  And it comes up
5  and angles toward the roadway.  His whole trailer is
6  visible.  What are you suggesting?
7    Q.   His whole trailer is pointed to the west,
8  isn't it?
9    A.   No.  His side of his trailer, which is the
10 one with all the reflective tape, is facing Mr. Polk
11 in the opposite direction.
12   Q.   Show me a picture that shows that.
13   A.   When he pulls out, his trailer would have
14 been down the road sideways.  It would have still been
15 sideways when he was hit.
16   Q.   What facts are there for that?
17   A.   Physics.  Sam, it's a truck.  It didn't
18 disappear.  It pulls out.  His trailer is sideways as
19 he's going that way.
20   Q.   It's sideways meaning --
21   A.   Perpendicular to Mr. Polk's path.
22   Q.   It's your assumption that Polk's tractor and
23 trailer were perpendicular to westbound traffic for
24 Mr. Polk at the time that Mr. Peraza pulled out?
25   A.   No.  Mr. Peraza pulls out.  It's an

173

1  articulated vehicle.  It's a tractor and a trailer,
2  right?  It has a king pin.  So that rotates.  So as he
3  turns his tractor, yes, his headlights start to go
4  north and then west.  That's fine.  But his trailer is
5  still going to be generally sideways.
6      Q.  At what point?
7      A.  Basically at any point until he pulls
8  forward.  His trailer is going to not -- it's called
9  off tracking.  His trailer is going to be virtually
10  sideways or perpendicular to Mr. Polk's path as he
11  approaches.  Look at the intersection, Sam.  It is not
12  a difficult point.
13      Q.  Let's look at the intersection.  The
14  intersection shows that it's a hard left.
15      A.  No, it doesn't.
16      Q.  Curbing to the west.
17      A.  His trailer --
18      Q.  Let's look at the aerial photo of it that's
19  attached in Mr. Alexander's map.
20      A.  I don't want to look at Mr. Alexander's map,
21  but we can if you want to.  Where is it?  Where is Mr.
22  Alexander's map?  It looks just like mine.
23      Q.  Well, yours is a recreation.  His is the
24  aerial photo that shows it exactly, isn't it?
25      A.  Not a recreation.

174

1      Q.  Exhibit number 46 that we have looked at
2  earlier.
3      A.  Okay.  Can I draw on this?
4      Q.  You may in the green.
5      A.  Okay.  So if he's sitting here waiting to
6  turn out, right, he's right here.
7      Q.  Well, you've got the path marked, the path
8  that you assumed marked already on here.
9      A.  I don't have that marked.  That's not my
10  diagram, Sam.
11      Q.  Well, do you disagree with that marking?
12      A.  Yes.  I don't think it goes that far.
13      Q.  That it was that far?
14      A.  No.  That far into the roadway.  Mine is a
15  little shallower, the path.  But the trailer is here,
16  right?  We can agree reasonably that that's where the
17  trailer would have been behind him?
18      Q.  Well, the trailer would have been behind him
19  as he came up the --
20      A.  Right.  Assuming it's in the roadway
21  following the tractor.
22      Q.  Yes.
23      A.  Okay.  So as Mr. Polk approaches from this
24  direction, it's basically sideways.  It's not
25  perfectly perpendicular, but it's close and it is

175

1  going to follow this path out.  So it is virtually
2  always going to be a wide shot of his trailer for him.
3  I don't know whether that's a problem or why that's
4  disputed.  I mean, is there another way that it works
5  that I'm not seeing?  Was the trailer in line with the
6  roadway?
7      A.  Well, what we have by way of the photos show
8  that the damage on the Polk vehicle and the damage to
9  Peraza's truck were on the very front of the cab of
10  the truck on the side for a very limited area.
11      A.  Show me the front of the truck that's
12  damaged.
13      Q.  Show me the photos that you have with you.
14      A.  Which ones do you want?
15      Q.  Well first, let's look at Polk exhibit number
16  50.  This shows that Mr. Peraza's truck, the trailer
17  is going predominantly westbound, correct?
18      A.  Yes.  At final rest.  It's already completed
19  a turn almost.  But that wouldn't have been at impact.
20      Q.  Because he didn't stop prior to that, right?
21      A.  What now?
22      Q.  Because he's almost completed a turn because
23  he didn't stop prior to that, right?
24      A.  He kept going after impact.  He went to final
25  rest.

176

1      Q.  I'm showing you exhibit number 64.  The
2  damage to MNE cab or truck portion.
3      A.  Yes.
4      Q.  Is just at the side up at the front on the
5  driver's side, correct?
6      A.  No.  That's the passenger side.
7      Q.  I'm sorry.  Passenger side.
8      A.  And that's the middle of the truck.  I mean,
9  the front is not touched at all.
10      Q.  Yes.  That's what I'm saying.
11      A.  Yes.
12      Q.  It's hitting the side.
13      A.  Hitting the side of the tractor.
14      Q.  And going at a glancing blow which then
15  allows Mr. Polk's vehicle to glance off and roll over
16  and go down the hill; is that correct?
17      A.  That's correct, Sam.  Nobody is disputing
18  that.
19      Q.  When you say in your summary of findings that
20  Peraza's decision to pull out was reasonable based on
21  everything we know.  Well, what we know is that Peraza
22  never saw the Polk vehicle coming and we know that
23  that argument is totally contrary to what Cazz Holden
24  says, correct?
25      A.  We don't know either one of those things.  We

177

1  know what they say.  But we don't know that those
2  things are facts.
3      Q.  So you assume that they are not facts?
4      A.  It is not physical evidence or digital
5  evidence.
6      Q.  That you would rely on, right?  The digital
7  evidence that you rely on?
8      A.  Yes.
9      Q.  And with regard to the toxicology information
10 in paragraph 8, your specific recommendation since you
11 are not a toxicologist and can't opine about that, is
12 you recommend that you consult with a toxicologist so
13 that the effects can be analyzed in a quantitative
14 manner, correct?
15     A.  Yes.
16     Q.  You are not going to be opining about that,
17 are you?
18     A.  No.
19     Q.  Then there is a separate document that is
20 signed by Shanon Burgess as his expert report; is that
21 correct?
22     A.  That's correct.
23         MR. HICKS:  Object to the form of the
24         question.
25     Q.  And that specifically says that when he got

178

1  the subject SDM or ACM as we've called it, it was
2  evaluated to determine the extent of the damage,
3  right?
4      A.  That's what it says, yes.
5      Q.  And you can simply go on whatever he says,
6  right?
7      A.  He is a person who is a technician that works
8  in my company.  So yes, just like anyone else in the
9  world with a company that has employees.
10     Q.  Well, but you weren't there and you didn't
11 make these observations, correct?
12         MR. HICKS:  Objection.  Asked and
13         answered.
14     A.  He is a technician that is employed by me to
15 do this job.  So yes, Sam, I trust what he says.
16     Q.  And you rely on it?
17     A.  I do rely on it, yes.
18     Q.  And you agree that according to him, the case
19 showed signs of extreme heat exposure?
20     A.  Well, extreme is a relative --
21     Q.  That's what he says.
22     A.  I get it, Sam.  Extreme is a relative term.
23 But yes, I would agree that's what it looks like.
24     Q.  And what he says is that the input and the
25 output connectors and corresponding wiring harness was

179

1  visibly melted, making attempts to back probe the
2  connector impossible, correct?
3      A.  Correct.
4      Q.  And we've got his photos.  Photo 2 shows
5  that, that there is fusion of the input/output
6  connector with the wiring harness, meaning that this
7  was totally inoperable and you couldn't download
8  anything.
9      A.  No.  That means he couldn't download it
10 through that connection.  It doesn't mean it is
11 totally inoperable.  Obviously it wasn't.
12     Q.  Well, it was totally inoperable in the
13 condition that it was in.
14     A.  Right.  As an ACM it is not operable, yes.  I
15 see what you are saying.
16     Q.  And that the printed circuit board, as we
17 talked about earlier, was charred and had undergone
18 chemical decomposition due to the extreme heat
19 exposure.
20     A.  Correct.
21     Q.  And what he describes as merely a visible
22 inspection of the PCB determined the board had
23 delaminated due to extreme temperatures, correct?
24     A.  Correct.
25     Q.  And that the board, the actual ACM or SDM

180

1  couldn't be repaired, right?
2      A.  Correct.
3      Q.  And at that point he made the determination
4  to completely disassemble this module, correct?
5      A.  Correct.
6      Q.  And as he started to disassemble it, he notes
7  that there were a number of the surface mount devices,
8  resistors, capacitors that had become unsoldered due
9  to this extreme heat, correct?
10     A.  Sure.  Yes.
11     Q.  And that many of the integrated circuits had
12 become unsoldered.
13     A.  Okay.  Yes.
14     Q.  Correct?
15     A.  Correct.
16     Q.  And so what he did was to order different
17 modules and have those shipped to him, correct?
18     A.  Correct.
19     Q.  And do you know what the model numbers were
20 of the ACM involved?
21     A.  He got the identical module.
22     Q.  How do you know that?
23     A.  Because he told me that's what he did.
24     Q.  Well, is that anywhere in the report?
25     A.  Two identical surrogate SDMS were purchased

181

```
 1   to complete a proof of concept before any work began
 2   on the subject SDM.
 3        Q.   What is the proof that they are identical?
 4        A.   He probably has photos of them in a video of
 5   the modules.
 6        Q.   There has never been a video that's been
 7   provided to us.
 8        A.   There is one.
 9        Q.   Well, it wasn't provided to us.
10        A.   I'm sorry about that, Sam.  But there is one.
11   In his report they are two identical surrogate SDMs.
12        Q.   What's the original one?  What's the make and
13   model of the original one?
14        A.   I don't know that.
15        Q.   And what's the make and model of the
16   surrogate ones that he bought to try and run this test
17   on?
18        A.   Well, he says identical, so I'm assuming the
19   manufacturer is the same.
20        Q.   But that's just an assumption without any
21   facts in this report; is that right?
22        A.   Well, we will --
23        Q.   Is that correct?
24             MR. HICKS:  You can answer.
25        A.   That's correct.  We can supplement this with
```

182

```
 1   the documentation and the order forms for the modules
 2   if that will satisfy you.
 3        Q.   All I've got is this.  And this was what I
 4   had to depose you.  Then it says according to this
 5   expert, that there were two possible techniques that
 6   could be used to extract the data from the SDM.  One
 7   being more destructive than the other, right?
 8        A.   Yes.
 9        Q.   And the two techniques were JTAG, which I
10   showed you what that process involves, right?
11        A.   Yes.
12        Q.   And what the standard is for that, right?
13             MR. HICKS:  Object to the form of the
14             question.  It's not a standard.
15        A.   You showed me a document, yes.
16        Q.   Is that the standard?
17        A.   I don't know.  I'm not the technician.
18        Q.   Well, you are not the expert in this field,
19   so you don't know whether that's the standard or not;
20   is that right?
21             MR. HICKS:  Object to the form of the
22             question.  Asked and answered over and over
23             and over.
24        Q.   Is that correct?
25        A.   It says it's the Joint Test Action Group is
```

183

```
 1   an industry standard used for -- so he said that he
 2   used the Joint Test Action Group Standard.  So I'm
 3   assuming he did.
 4        Q.   But you don't know what it is or what it
 5   requires?
 6        A.   No.  I'm not the technician for that.
 7        Q.   And then the other technique is chip-swap,
 8   correct?
 9        A.   Correct.
10        Q.   And in the expert opinion of Mr. Burgess, the
11   JTAG technique was not possible due to the extensive
12   damage to the SDM.
13             MR. HICKS:  Object to the form of the
14             question.  It is not an opinion.
15        Q.   Is that correct?
16        A.   That was the assessment that he made.
17        Q.   Well, that's his opinion, isn't it?
18             MR. HICKS:  Object to the form of the
19             question.  It's not an opinion.  Factual
20             statements.
21        A.   Well, if there is a standard that he used and
22   he refers to it for doing a JTAG and it was damaged
23   beyond the point where that could be done, no, it's
24   not an opinion.
25        Q.   What is it?
```

184

```
 1        A.   It's an assessment based on a standard.
 2        Q.   Well, an assessment based on a standard is an
 3   expert opinion, isn't it?
 4             MR. HICKS:  Object to the form of the
 5             question.
 6        A.   No.  It's a process for a technician to go
 7   through.
 8        Q.   Well, he says that the input/output connector
 9   in this case was melted and beyond repair, correct?
10        A.   Correct.
11        Q.   And then in his opinion the chip-swap
12   technique was the only option that he had, right?
13             MR. HICKS:  Object to the form of the
14             question.  It is not an opinion, it's a
15             factual statement.
16             MR. MCHARD:  I'm sorry.  It's not your
17             deposition.  It's unethical for you to do
18             anything other than say object as to form.
19             MR. HICKS:  Look in the mirror, Sam.
20             Look in the mirror.
21             MR. MCHARD:  I know you love saying
22             that, Clark, but it's just not so.
23        A.   Can you repeat the question?  I'm sorry.
24        Q.   Sure.  You agree that in the opinion of
25   Shanon Burgess, the chip-swap technique became the
```

185

```
 1  only option.
 2              MR. HICKS: Object to the form of the
 3       question.  Not an opinion.
 4       A.   That's the assessment that he made based on
 5  the condition of the module.
 6       Q.   And you didn't have an opinion about that,
 7  did you?
 8       A.   No.
 9       Q.   And again, we don't have any information that
10  at this point in his work and analysis that he or
11  anybody from Messerschmidt stopped and contacted me or
12  anybody from ASI or Brett Alexander individually and
13  said hey, we're not going to be able to do a download
14  from this SDM.  We're going to have to do destructive
15  testing and try chip-swap.
16              MR. HICKS: Object to the form of the
17       question.
18       A.   I don't know if that's true or not.
19       Q.   And he describes the chip-swap technique
20  under a paragraph called Chip-swap Technique, correct?
21       A.   Correct.
22       Q.   And that's his particular area of expertise,
23  isn't it?
24              MR. HICKS:  Object to the form of the
25       question.  It's been asked and answered.
```

187

```
 1  testing, it simply says that some EEPROMs were capable
 2  of withstanding direct flame impingement for 13 to 28
 3  seconds, right?
 4       A.   Correct.
 5       Q.   But in this case we know that the fire
 6  continued for many minutes in this vehicle and
 7  consumed as we saw in the photos, virtually all of the
 8  interior of Mr. Polk's car, correct?
 9              MR. HICKS: Object to the form of the
10       question.
11       Q.   Is that correct?
12       A.   We don't know that.  With that knowledge,
13  it's unlikely the EEPROM ever received any type of
14  direct flame impingement and was likely subjected to
15  indirect thermal stresses.  So he's simply pointing
16  out that some EEPROMs even when exposed to direct
17  flames were still functioning.
18       Q.   But not these EEPROMs.
19       A.   Right.  But he goes on to say this one was
20  never exposed to any direct flame impingement, which
21  is obvious, because it was still in the module.
22       Q.   No.  But whether or not it had sufficient
23  indirect thermal stresses to cause problems, we don't
24  know.
25       A.   We don't know if it did or didn't.  We know
```

186

```
 1       A.   That's the process he uses during this
 2  process.
 3       Q.   And you are not an expert in that, are you?
 4              MR. HICKS: Object to the form of the
 5       question.  Asked and answered.
 6       A.   No.
 7       Q.   And in this he says unlike JTAG, chip-off or
 8  chip-swap is a destructive process, correct?
 9       A.   Correct.
10       Q.   And then it talks about testing done by
11  E²ponent Failure Analysis.  And that's the document
12  that I provided earlier to you as being the only
13  report that there is with regard to testing, correct?
14       A.   No.  That's incorrect.
15       Q.   Well, it's the only one you cited to me.  And
16  then after you had cited it to me I showed you the
17  actual document, didn't I?
18       A.   I get that, Sam.  You said that was the only
19  one that existed and I don't know if that's true.
20       Q.   You are unable to cite any others?
21       A.   Right.
22       Q.   And none others are cited in any of the
23  documents produced by Messerschmidt or you, right?
24       A.   That's correct.
25       Q.   And in any event, based on that E²ponent
```

188

```
 1  it clearly didn't because we have a download.
 2       Q.   Well --
 3       A.   No.  We do.
 4       Q.   With regard to visible inspection, he doesn't
 5  ever indicate that he did anything other than look at
 6  it; that is, he doesn't indicate that he ever looked
 7  at it through any sort of electron scanning microscope
 8  or any other type of microscope?
 9       A.   How would you use an electron scanning
10  microscope with this?
11       Q.   Or any type of microscope.
12       A.   Well, it doesn't say whether or not he was
13  wearing glasses or whether he had a lamp on or whether
14  or not it was daytime or what shirt he was wearing.
15       Q.   It just says whatever was visible.
16       A.   He has a microscope and he examined it.
17       Q.   Well, it doesn't say that here, does it?
18       A.   No.  I know what he has.  He said he examined
19  it to the point where he felt comfortable moving
20  forward with the chip-swap.
21       Q.   Is that something that's shown on this
22  videotape that wasn't produced?
23              MR. HICKS: Object to the form of the
24       question.
25       A.   I'm sure it is.
```

189

1  Q.  Have you seen it?
2  A.  I've seen some of it.  It's very boring
3  though.  No, you should have the video, Sam.
4  Q.  Did you see any microscope used in connection
5  with this?
6  A.  No.  He said he followed this process and
7  part of that --
8  Q.  Followed what process?
9  A.  His process.  This chip-swap technique.
10  Q.  His process?
11  A.  And the assessment of --
12  Q.  Is that correct?
13  A.  If you interrupt me one more time, I'm
14  walking out, okay?  So decide.  He followed the JTAG
15  process which includes a visual assessment.  He
16  doesn't say it wasn't with a microscope.  I don't know
17  if he used one or not.  We can supplement, send you
18  the video, you can watch all of it.  I don't care.
19  That's why we took the video, so we wouldn't have to
20  fight this battle.  You should have the video.  You
21  have everything else in our file.  So I don't know
22  exactly which microscope he used, how long he used it.
23  This is why he's the technician. He used these
24  processes to come to the assessment that this
25  chip-swap needed to be done and he examined the chip,

190

1  okay?  I'm done.
2  Q.  Well, he then makes an assumption that crash
3  data was stored on an I$^2$C serial EEPROM; is that
4  correct?
5  A.  That's correct.
6  Q.  Is that a manufacturer?
7  A.  Yes.  The I$^2$C, yes.
8  Q.  Well, is that the manufacturer of the entire
9  SDM or just the chip?
10  A.  The chip.
11  Q.  So we still don't know the manufacturer of
12  the SDM, do we?
13  A.  No, we don't.  But I can find out for you.
14  Q.  Well, what he goes on to state in paragraph 2
15  is that the SDMs were disassembled by him to see and
16  confirm "similar construction," right?
17  A.  Yes.
18  Q.  Not that they were the same or that they were
19  identical, right? It just says similar.
20  A.  If you want to get down to this level of
21  wording, yes, Sam, he does.
22  Q.  Well, in terms of level of wording, he talks
23  about an Atmel EEPROM in paragraph 4.  But that's not
24  the same as the I$^2$C EEPROM, is it?
25  A.  I don't know --

191

1  Q.  Do you see where it identifies?
2  A.  I see where he says Atmel.  I'm looking at
3  his work.  Do we have a color version of this?
4  Because I can't read the -- Sam, the punch line on
5  this is I don't exactly what the manufacturer is going
6  to be on that.  I get it.  I don't know what it's
7  going to be. And I don't know that I$^2$C serial EEPROM is
8  the manufacturer or just the type.  So I'll have to --
9  we'll have to get back to you on that because honestly
10  I don't think we're going to find the answer here.
11  Q.  You don't know if an I$^2$C serial EEPROM is the
12  same as an Atmel EEPROM?
13  A.  I don't.  That may be the model or a model
14  name. I don't know.  It's probably -- I honestly don't
15  know.
16  Q.  That would just be speculation, right, by
17  you?
18  A.  At this point it would be speculation.
19  Q.  Then it says that the surrogate model was
20  essentially new.
21  A.  Where does it say that?
22  Q.  In paragraph 5.  It doesn't say that it was
23  new.  It says it was essentially new.
24  A.  The data represented crucial data from the
25  respective surrogate module that visibly showed the

192

1  surrogate module -- I don't know what he means by
2  that.  He's saying that there is no data on it that
3  would contaminate our process.
4  Q.  Well, you don't know what he means by
5  essentially new, do you?
6  A.  I don't know what essentially -- no, you're
7  right.  I don't know what essentially new means.  But
8  he clearly didn't have a problem with any of it.
9  Q.  You've never testified on an issue involving
10  chip-swap and surrogate SDMs, correct?
11  A.  Correct.
12  Q.  You've never been recognized as an expert in
13  that, correct?
14  A.  Many times in --
15  Q.  As an expert on that.
16  A.  No.
17  Q.  Do you know of anybody that has been?
18  A.  Not particularly.
19  Q.  Well, has Shanon ever been designated as an
20  expert to testify in connection with those issues?
21  A.  I don't know.  He's a technician.
22  Q.  But you don't know whether or not he has ever
23  testified with regard to that?
24  A.  I don't have his testimony history in front
25  of me.  I don't.  But he's a technician.  The answer

```
193
1    is I don't know.
2              MR. MCHARD: No further questions.
3              MR. HICKS:  All right.  Thank you.
4         (DEPOSITION CONCLUDED AT 2:48 P.M.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
194
1         ELENA C. JAMES, COURT REPORTER, CCR#1682
                   560 LAVELLE LADNER ROAD
2                    LUMBERTON, MS 39455
                  PHONE:  (225)663-0482
3
4    * * * * * * * * * * * * * * * * * * * * * * * *

5    September 12, 2018
6
     Mr. L. Clark Hicks, Jr., Esq.
7    Hicks Law Firm, PLLC
     211 South 29th Avenue
8    Hattiesburg, MS 39401

9    RE:  SUE POLK, ET AL VS. MAURICIO PERAZA, ET AL

10   Dear Mr. Hicks,

11   Attached is the deposition of BENJAMIN N. SMITH taken
     in the above-styled cause.  Would you please have him
12   read him deposition within 30 days, noting any
     corrections on the enclosed affidavit sheet.  The
13   affidavit should then be signed by him and notarized.

14   When reading and signing has been accomplished and the
     affidavit properly executed, please forward the
15   original affidavit to Mr. Samuel S. McHard, Esq. to be
     attached to the original deposition.
16
     Your prompt attention to this would be greatly
17   appreciated.

18   Very truly yours,

19
     ELENA C. JAMES, COURT REPORTER
20
21   Attachment
     cc:  Mr. Samuel S. McHard, Esq.
22
23
24
25
```

```
195
1              E R R A T A   S H E E T
2         I, BENJAMIN N. SMITH, deponent in this deposition,
3    hereby certify that I have examined the foregoing
4    pages and find them to contain a full, true and
5    accurate transcription of the testimony as given on
6    September 11, 2018, in Hattiesburg, Mississippi, with
7    the exception of the changes noted below, if any:
8    Page    Line    Correction
9    ____   ____   _____
10   ____   ____   _____
11   ____   ____   _____
12   ____   ____   _____
13   ____   ____   _____
14   ____   ____   _____
15       This the _____ day of _____, 2018.
16                    _____
                        BENJAMIN N. SMITH
17   State of _____
18   County of _____
19       Sworn to and subscribed before me, this the
20   _____ day of _____, 2018.
21
22                    _____
                          NOTARY PUBLIC
23   MY COMMISSION EXPIRES_____
24
25
```

```
196
1    STATE OF MISSISSIPPI
2    COUNTY OF PEARL RIVER
3              CERTIFICATE
4         I, Elena C. James, Certified Shorthand
5    Reporter, do hereby certify there came before me the
6    deponent, who was by me duly sworn to testify to the
7    truth and nothing but the truth concerning the matters
8    in this cause.
9         I further certify that the foregoing
10   transcript is a true and correct transcript of my
11   original stenographic notes.
12        I further certify that I am neither attorney
13   or counsel for, nor related to or employed by any of
14   the parties to the action in which this deposition is
15   taken; and furthermore, that I am not a relative or
16   employee of any attorney or counsel employed by the
17   parties hereto or financially interested in the
18   action.
19        I do further certify that my certificate
20   annexed hereto applies only to the original and the
21   certified transcript.
22        WITNESS MY SIGNATURE on this the _____ day
23   of _____, 2018.
24
25                    _____
                        ELENA C. JAMES, CSR #1682
```