IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

SUE POLK, INDIVIDUALLY, AND AS ADMINISTRATRIX
OF THE ESTATE OF JERRY R. POLK, THE HEIRS
OF THE ESTATE OF JERRY R. POLK,
AND ON BEHALF OF ALL WRONGFUL DEATH BENEFICIARIES
OF JERRY R. POLK                                                                    PLAINTIFFS

vs.                                                              CIVIL ACTION NO. 1:18-cv-59 HSO-JCG

MAURICIO PERAZA, MNE FREIGHT, LLC,
and JOHN DOES 1-5                                                                   DEFENDANTS

## DEFENDANTS' DESIGNATION OF EXPERTS

Pursuant to the Case Management Order in this cause, along with FRCP 26(a)(2) and L.U. Civ. R. 26(a)(2)(D), Defendants file this Designation of Expert Witnesses and state:

### PRELIMINARY STATEMENT REGARDING EXPERT DESIGNATIONS

A.      Defendants reserve the right to modify and supplement this designation, pursuant to Rule 26 of the Federal Rules of Civil Procedure. Defendants further reserve the right to supplement this designation as further information and opinions become available. Defendants expressly reserve the right to respond with additional designations to any designations made by Plaintiffs. Defendants will seasonably supplement their designation and disclosure of expert testimony, including a copy of any additional opinions which may hereafter be made.

B.      Defendants reserve the right to rely upon, if appropriate, the expert testimony of one or more of the experts designated by any other party in this proceeding or expressed by any other expert at a deposition, hearing, or trial and to any studies, literature or theories upon which any other experts rely.


EXHIBIT 2

C.      The experts designated herein have, over the course of their careers, reviewed numerous textbooks and articles and cannot possibly recall every piece of literature that they have reviewed. They, therefore, reserve the right to designate prior to trial any literature and other exhibits that they have relied upon in this matter.

## DESIGNATION OF EXPERTS

1. **Benjamin Smith, Accident Reconstructionist**
   **Messerschmidt Safety Consultants**
   **6068 US Highway 98, Suite 1-144**
   **Hattiesburg, MS 39402**
   **601.297.6598**

Smith is the Principal Technical Analyst and Managing Partner for Messerschmidt Safety Consultants. His CV establishing his qualifications has been previously produced and bears the Bates numbers MNE00707-00715. Smith's written and signed report, previous testimony, and compensation information are attached cumulatively as Exhibit "A."

In order to formulate his opinions, Smith reviewed the following:

1. State of Mississippi Uniform Crash Report No. 5502-PD18000024;
2. Photos from Insurance Adjuster C.J. Hester;
3. At-Scene photos from Poplarville Police Department;
4. Inspection of the Polk Yukon;
5. Download of the Polk Yukon's ACM;
6. Inspection of the MNE Freight Tractor;
7. Download of MNE Freight's ECM;
8. Download of MNE Freight's GPS Module;
9. Crash site inspection;
10. Toxicology reports of Jerry Polk; and

       11. The witness statement of Cazz Holden.

Smith is expected to state that the information regarding the crash position and orientation from the crash report appears to be accurate according to his findings. Smith will testify that the crash description indicated that Vehicle 1 was a 2010 Freightliner tractor driven by Mauricio Peraza, and Vehicle 2 was a 2004 GMC Yukon driven by Jerry Polk. Prior to impact, Peraza was exiting off of I-59 at MS 26 and was making a left turn onto MS 26 to head west, while Polk was traveling west of MS 26. As Peraza made his turn onto MS 26, Polk's front right side collided with Peraza's right side fuel tanks. Peraza came to rest in the eastbound lane of MS 26 facing west, and Polk went off the roadway to the right and came to rest on the north side of MS 26 facing west, where it then caught fire.

Smith will opine that the above described accident was caused solely by the reckless driving and impairment of Jerry Polk. Smith will state that Polk was traveling nearly twice the posted speed limit, at night, while under the influence of multiple substances, and that all driving decisions made my Peraza were completely reasonable.

Smith will state that the CDR module data recovery efforts yielded a report containing a deployment (seen in Figure 1 of Smith's report) and non-deployment event (seen in Figure 2 of Smith's report). Smith will state that these events do appear to be linked as identical readings are seen with a slight offset. The data in Figure 1 and Figure 2 clearly indicate that Polk was traveling in excess of the posted speed limit in this area (45 mph). The data in Figure 1 details Polk's behavior five seconds before impact with the trailer. Polk was traveling at 89 miles per hour 5 seconds before, 88 mph three to four seconds before, and 71 mph two seconds before.

In Figure 3 of Smith's report, Smith is able to establish an approximate impact orientation with respect to the roadway. He establishes this based on the documentation of the

3

crash site, the measurement log and at-scene photos provided with the crash report, and the damage to each vehicle. This impact orientation indicates that Peraza would have traveled a minimum of 32 feet from his pre-impact position to the area of impact. Based on an acceleration factor ($f$) of 0.06, this maneuver would have taken approximately 5.7 seconds.

The CDR data referred to in Figure 1, indicates that the Yukon would have been approximately 464 feet away five seconds prior to impact (see Figure 4). If we assume that Polk was traveling at approximately the same speed (88-89 mph or 129 feet per second) one to two seconds prior to the outer limit of the data, we see that 6.7 seconds prior to impact (when Peraza was making the decision to pull out one second prior to his physical movement), Polk would have been approximately 684 feet from impact. At this distance, had Polk not been traveling at what was effectively twice the speed limit (45 mph), the time gap relative to Peraza would have been approximately 10.3 seconds. Put simply, a driver entering the roadway would assume that they had about a 10 to 10.5 second gap to Polk (assuming Polk was traveling at or near the posted speed limit). Smith will state that research application in this case indicates that, with this gap, 98% of drivers would have behaved exactly as Peraza did when he initiated his left turn. Namely, Peraza did not suddenly pull out in front of Polk. Peraza initiated a safe left turn under the presumption that Polk was traveling the posted speed limit. See Figure 5 for a graphical export that illustrates the statistical breakdown for studied drivers in similar situations to Peraza.

Smith will state that Polk would have had approximately 5.7 seconds to perceive and respond. Prior to impact, Polk would have been 554 feet from impact. Traveling at or near the speed limit, Polk would have easily been able to stop or slow before striking Peraza's tractor. Basic total stopping distance calculations reveal that he could have braked with a frictional coefficient of $f = 0.35$ (half of peak emergency braking) with a perception response time up to

4

5.5 seconds (normal being 1.5 to 2.5 seconds) and still avoided the collision with Peraza's tractor.

Smith will further testify that the toxicology reports indicate that Polk was under the influence of alcohol, cannabis, and Tramadol. Smith will state that it is an obvious and well-documented fact that these substances can have deleterious effects on an individual's general decision making and ability to operate a motor vehicle.

Smith will state that Polk's reckless driving and impairment were the cause of this incident. Polk's excessive speed while driving at night under the influence of multiple substances greatly diminished his ability to make responsible and reasonable decisions on the roadway. Smith will rely on the toxicology reports and opinions of toxicologist Thomas Pittman.

Smith will further state that Peraza's decision to pull out was completely reasonable based on everything known about Polk's speed and positioning. Smith will opine that based on Polk's likely distance to impact when this sequence began, Peraza would have reasonably perceived that he had about 10 seconds to pull out and complete his turn. As discussed previously, the published research on gap acceptance indicates 98% of drivers would have acted exactly as Peraza did. If Polk had been operating his vehicle in a responsible manner, this collision would not have happened. Polk had more than enough time and space to modulate his speed in a safe and reasonable manner at or near the speed limit.

Further, Smith will rebut the opinions of Plaintiffs' expert, Brett Alexander. He will specifically rebut Alexander's opinion that the Freightliner had an obligation to yield to traffic on MS 26 and that the GMC Yukon driven by Polk had the right of way at the intersection. Smith will further rebut Alexander's report that the ACM download from the Yukon is inconsistent with eyewitness accounts. He will also rebut Alexander's statement that the ACM download

does not show the number of ignition cycles, which Alexander claims can be used to help verify that the information is from the event in question. Smith will further rebut Alexander's claim that industry standard practices and/or protocols for the conduction of chip transplants or swapping EPROMS do not exist.

Smith is expected to testify based on a reasonable degree of scientific and mathematical probability. He will testify according to his knowledge, skills, training, and experience in the field of accident reconstruction.

2. **Thomas S. Pittman, Ph. D.**
   **ToxConsulting, LLC**
   **P.O. Box 15114**
   **Hattiesburg, MS 39404**
   **601.297.1771**

Pittman is a board certified toxicologist with the American Board of Forensic Toxicology and the State of Mississippi at a Forensic Toxicologist. His CV stating his qualifications has been previously produced and bears the Bates numbers MNE00723-00733. Pittman's written and signed report, previous testimony, and compensation information are attached as Exhibit "B."

In order to formulate his opinions, Pittman reviewed the following documents:

1. State of Mississippi Uniform Crash Report by the Poplarville Police Department;

2. Mississippi State Medical Examiner Report of Death Investigation;

3. Mississippi Forensics Laboratory Ethanol Report of Jerry Randall Polk; and

4. Mississippi Forensics Laboratory Drug Screen and Drug Confirmation/Quantification Report of Jerry Randall Polk.

Pittman will testify that on January 5, 2018, Pearl River County Coroner Dempsey Seals delivered blood and urine samples taken from Mr. Polk to the Mississippi Forensics Laboratory

for ethanol and drug testing. The samples consisted of 2 grey top tubes of blood and 1 green top specimen container of urine. Submissions 001-A, a grey top tube of blood labeled "Jerry R. Polk" and submission number 001-B a green top tube specimen, were analyzed for ethanol. Submission 001-A containing the blood, was found to contain .205% ethanol, and the urine, Submission 001-B, contained 0.261% ethanol.

Pittman will further testify that Submissions 001-A and 001-B were also screen for several drugs by immunoassay. Submission 0001-A showed presumptive positive results for Cannabinoids and Tramadol. Submission 0001-B showed a presumptive positive for Cannabinoids. Tramadol was not tested for in the urine by immunoassay, but was confirmed present by GC/MS along with caffeine, Bupropion and its metabolite. Bupropion and/or its metabolite was not found in Submission 0001-A. Pittman will further testify that caffeine and Tramadol were confirmed present in Submission 001-A, but that neither drug was quantified, and therefore, their role in Polk's impairment cannot be stated with any scientific certainty. The unquantified finding of Bupropion and its metabolite in the urine also cannot be used to interpret any impairment.

Pittman will state that the Mississippi Forensics Laboratory did quantify Delta-9-THC and 11-nor-carboxy-delta-9-THC with resulting concentrations of 7.8 ng/ml and 39 ng/ml in Submission 001-A by Liquid Chromatography/Mass Spectroscopy/Mass Spectroscopy (LC/MS/MS).

Pittman will further state that drinking is the most common means of ethanol ingestion and allows for 100% bioavailability. The vast majority of ethanol is absorbed in the small intestine (90-95%) while the other percentage is absorbed through the stomach wall. Once ethanol is absorbed, it enters the portal vasculature (liver) and is carried to the heart where it is

pumped throughout the body. Ethanol is 100% miscible with water and will enter those tissues that are highly perfused and contain the most water. Ethanol will cross the blood-brain barrier where it exhibits its main effects on the Central Nervous System as a depressant drug.

Pittman will state that the depressive effects of ethanol on the nervous system are continuous as long as the ethanol concentration is rising or falling. Even at low concentrations of ethanol, the effects on the more complex functions become effected with cause physiological effects on breathing and vision. Dr. Kurt Dubowski formulated stages of ethanol influence that an individual would exhibit at certain ranges of BAC. The excitement range (0.009 – 0.25g/dl) shows emotional instability, loss of critical judgment, decreased reaction time, visual acuity reduction, impaired balance, and drowsiness. The Confusion range (0.18-0.30 g/dL) shows exaggerated emotional states, disorientation, muscle uncoordination, mental confusion, dizziness and lethargy, and apathy. Polk would have exhibited some or all of the ethanol depressive central nervous system effects listed above and would have been incapable of safely operating a motor vehicle.

Pittman will further testify that the main active component of Marijuana is THC. THC has a large volume of distribution and is transported to highly perfused organs, such as the brain, very rapidly after ingestion by smoking. Experimental studies have shown that THC impairs perception, psychomotor function, and driving performance. These impairments appear to be dose related.

Driving studies on individuals given only THC looked at Standard Deviation of Lateral Position, Time Driven Out of Lane, Reaction Time, and Standard Deviation Headway. Low doses of THC had a moderate impairment on driving performance. Other experimental studies and reviews have shown the same detrimental effects on driving.

8

Pittman will testify that studies going back to 1986, along with the studies mentioned above, all conclude that the combination of THC and Ethanol severely affect a person's ability to safely operate a motor vehicle. All the studies conclude even at low doses of either drug when combined with the other markedly impair a person's central nervous sytem resulting in a driver to be more culpable in an accident than a drug free driver when THC blood concentrations were greater than or equal to 5.0 ng/ml and the BAC were greater than or equal to 5.0 g/dL when found together in blood analyses.

Pittman will also testify on the phenomenon of Postmortem Redistribution (PMR) of drugs. The fact that drugs will be redistributed within the bodies vasculature following death has been well established in postmortem forensic toxicology. The longer the time frame from death to collection of biological samples increases the likelihood of redistribution. In this case, the blood drawn for analyses was performed at the hospital within a couple of hours of the accident. Therefore, Pittman opines that PMR is not a factor as it relates to the analytical findings of the Mississippi Forensics Laboratory.

Pittman will testify that based on the findings of the Mississippi Forensics Laboratory, Polk's BAC of .205% and his THC concentration of 7.8 ng/ml rendered him incapable of safely operating a motor vehicle. Pittman will state that the combination of these two findings dramatically increased Polk's impairment and thus his probability of causing a vehicular accident. It is Pittman's opinion that Polk's impairment caused the accident of January 3, 2018.

Pittman will testify within a reasonable degree of mathematical and scientific probability. He will state his opinions according to his knowledge, skills, training, education, and experience in the field of forensic toxicology.

9

3. **Officer Kristy Boyd**
   **Poplarville Police Department**
   **305 MS-26**
   **Poplarville, MS 39470**

Boyd will testify consistent with her own personal experience and review of the accident scene, as well as her interviews with Mr. Peraza, Cazz Holden, Jessica Wade, and Kimberly Saul. She will testify consistent with her findings documented in the accident report, attached as Exhibit "C."

Boyd will testify according to her knowledge, skills, training, and experience as a police officer.

4. **Charles May, CNP**
   **Pearl River County Hospital**
   **305 West Moody Street**
   **Poplarville, MS 39470**
   **601.795.4543**

May will testify consistent with his own examination of the body and condition of Jerry Polk when he was transported to Pearl River County Hospital. He will testify consistent with the medical records, attached as Exhibit "D." He will state his opinions according to his knowledge, skills, training, education, and experience as a Nurse Practitioner. His opinions will be stated within a reasonable degree of medical certainty.

May will testify that Polk remained in asystole from his arrival at Pearl River County Hospital until he was pronounced dead. Polk will testify that asystole is a reading that indicated no sign of life. May will further testify Polk was not breathing and did not have a pulse the entire time he was monitored. Additionally, May will testify that it was unclear whether or not Polk was restrained or not, as there were no seatbelt bruises or abrasions.

10

5. **William French, Paramedic**
   **100 Rawls Springs Loop Road**
   **Hattiesburg, MS 39402**
   **601.264.0175**

French will testify consistent with his own examination of the body and condition of Jerry Polk when French arrived to the accident scene. He will testify consistent with the medical records, attached as Exhibit "E." He will state his opinions according to his knowledge, skills, training, education, and experience as a paramedic. His opinions will be stated within a reasonable degree of medical certainty.

French will state that in his assessment, he discovered that Polk was pulseless, unconscious, and with no respirations. He will further state that Polk was in asystole throughout transport to Pearl River County Hospital.

6. **Dempsey Seals, Pearl River County Medical Examiner**
   **917 Goodyear Boulevard**
   **Picayune, MS 39466**

Seals will testify consistent with his own examination of the body and condition of Jerry Polk. He will testify consistent with the coroner's report, attached as Exhibit "F," and the statements of Pearl River County Hospital staff. He will state his opinions according to his knowledge, skills, training, education, and experience as a medical examiner. His opinions will be stated within a reasonable degree of medical certainty.

Seals will state that the immediate cause of death of Jerry Polk was cardiorespiratory failure. He will state that Polk was unconscious and without respirations when paramedics arrived at the scene. Seals will further state that blood and urine samples were extracted from Polk and turned over to the Mississippi Forensics Laboratory.

7.  **Kimberly Foster**
    **Mississippi Forensics Laboratory Case Analyst**
    **215 Allen Stuart Drive**
    **Pearl, MS 39208**

Foster will testify consistent with her own examination and analysis of Polk's blood and urine at the Mississippi Forensics Laboratory. She will testify consistent with the lab results, attached as Exhibit "G." She will state her opinions according to her knowledge, skills, training, education, and experience as a forensic scientist. Her opinions will be stated within a reasonable degree of scientific certainty.

Foster will testify that the blood and urine of Jerry Polk were analyzed for ethanol concentration. She will state that the results for the blood alcohol concentration of Polk's blood was .205% and the concentration for his urine was .261%.

8.  **Felicia Wilson**
    **Mississippi Forensics Laboratory Technical Reviewer**
    **215 Allen Stuart Drive**
    **Pearl, MS 39208**

Wilson will testify consistent with her own examination and analysis of Polk's blood and urine at the Mississippi Forensics Laboratory. She will testify consistent with the lab results, attached as Exhibit "G." She will state her opinions according to her knowledge, skills, training, education, and experience as a forensic scientist. Her opinions will be stated within a reasonable degree of scientific certainty.

Wilson will testify that the blood and urine of Jerry Polk were analyzed for ethanol concentration. She will state that the results for the blood alcohol concentration of Polk's blood was .205% and the concentration for his urine was .261%.

12

9. **Alyssa Bailey**
   **Mississippi Forensics Laboratory, Toxicology Section Chief**
   **215 Allen Stuart Drive**
   **Pearl, MS 39208**

Bailey will testify consistent with her own examination and analysis of Polk's blood and urine at the Mississippi Forensics Laboratory. She will testify consistent with the lab results, attached as Exhibit "H." She will state her opinions according to her knowledge, skills, training, education, and experience as a forensic scientist. Her opinions will be stated within a reasonable degree of scientific certainty.

Bailey will testify that the blood and urine of Jerry Polk were analyzed for drugs. She will state that the results for the drug screen of the blood specimen indicated 7.8 ng/ml of THC, as well as caffeine and Tramadol. She will further testify that THC, caffeine, Tramadol, and Bupropion and its metabolite were found in his urine.

10. **Contessa Gardner**
    **Mississippi Forensics Laboratory**
    **215 Allen Stuart Drive**
    **Pearl, MS 39208**

Gardner will testify consistent with her own examination and analysis of Polk's blood and urine at the Mississippi Forensics Laboratory. She will testify consistent with the lab results, attached as Exhibit "H." She will state her opinions according to her knowledge, skills, training, education, and experience as a forensic scientist. Her opinions will be stated within a reasonable degree of scientific certainty.

Gardner will testify that the blood and urine of Jerry Polk were analyzed for drugs. She will state that the results for the drug screen of the blood specimen indicated 7.8 ng/ml of THC, as well as caffeine and Tramadol. She will further testify that THC, caffeine, Tramadol, and Bupropion and its metabolite were found in his urine.

RESPECTFULLY SUBMITTED, this the 23rd day of July, 2018.

*Clark Hicks*
L. CLARK HICKS, MSB No. 8963
*Attorney for Defendants*

HICKS LAW FIRM, PLLC
211 South 29th Avenue, Suite 201 (39401)
Post Office Box 18350
3Hattiesburg, MS  39404-8350
Telephone:  601.544.6770
Facsimile:  601.544.6775
Email: clark@hicksattorneys.com

## CERTIFICATE OF SERVICE

I, undersigned counsel, do hereby certify that I have this date forwarded a true and correct copy of the above foregoing **DEFENDANTS' DESIGNATION OF EXPERTS** via United States Mail, first class, postage prepaid, facsimile and/or electronic mail under F.R.C.P. 5(b) to:

Samuel S. McHard, Esq.
P. Manion Anderson, Esq.
McHard, McHard, Anderson & Associates, PLLC
140 Mayfair Road, Suite 1500
Hattiesburg, MS  39402
Telephone:    601.450.1715
Facsimile:     601.450.1719
Email: smchard@mchardlaw.com
           manderson@mchardlaw.com

This the 23rd day of July, 2018.

*Clark Hicks*
L. Clark Hicks, Jr. (MSB No. 8963)
*Attorney for Defendants, Mauricio Peraza and MNE Freight, LLC*

14